No. 22-35097

## IN THE U.S. COURT OF APPEALS FOR THE NINTH CIRCUIT

STATE OF ALASKA DEPARTMENT OF FISH AND GAME,
*Plaintiff - Appellant*,

v.

FEDERAL SUBSISTENCE BOARD; et al.,
*Defendants - Appellees*,

and

ORGANIZED VILLAGE OF KAKE,
*Intervenor-Defendant - Appellee.*

_____

On appeal from the U.S. District Court
for the District of Alaska, Anchorage
No. 3:20-cv-00195-SLG
Hon. Sharon L. Gleason

## APPELLANT STATE OF ALASKA'S OPENING BRIEF

Laura Wolff
Assistant Attorney General
Department of Law
1031 West Fourth Ave, Suite 200
Anchorage, AK  99501
(907) 269-6612
laura.wolff@alaska.gov

*Attorney for Appellant*
STATE OF ALASKA

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION .............................................................................................................. 1

JURISDICTIONAL STATEMENT ................................................................................... 3

AUTHORITIES .................................................................................................................. 3

ISSUES PRESENTED ....................................................................................................... 3

STATEMENT OF THE CASE ........................................................................................... 5

 I. The State manages wildlife throughout Alaska ............................................ 5

 II. The Board opened a 60-day hunt for the Village of Kake. ........................... 9

 III. The Board closed moose and caribou hunting on federal public lands in Subunits 13A and 13B to non-federally-qualified users. ........................... 10

 IV. The State sued and the district court dismissed as moot the State's argument related to the Kake hunt and upheld the legality of the Board's closure in Subunits 13A and 13B. ............................................................................... 18

SUMMARY OF THE ARGUMENT ............................................................................... 20

STANDARDS OF REVIEW ........................................................................................... 22

ARGUMENT .................................................................................................................... 24

 I. The Federal Subsistence Board exceeded its authority when it opened the Kake hunt. ................................................................................................... 24

  A. The Board's decision to open the Kake hunt was not moot because the 60-day opening is capable of repetition and would otherwise evade review. ................................................................................... 25

  B. The Board lacks authority to open seasons. ..................................... 27

  C. ANILCA did not preempt State management of its wildlife under the sustained yield principle. ................................................................... 32

  D. *Chevron* deference is inappropriate here because ANILCA did not authorize the Board to *open* a hunting season and because Congress

did not clearly mean to preempt the State's management of game under the sustained yield principle...................................................35

II.    The Federal Subsistence Board's closure of Subunits 13A and 13B was arbitrary and capricious and not in accordance with law. ...........................37

    A.    Closing Subunits 13A and 13B was unlawful because it was not necessary for the continuation of subsistence hunting....................39

    B.    Closing Subunits 13A and 13B was unlawful because it was not necessary for public safety. ...............................................46

    C.    Closing Subunits 13A and 13B was arbitrary and capricious because the Board did not provide a reasoned explanation to support its changed position after denying an identical proposal the previous year. ...................................................................................48

    D.    The Board violated its own regulation by closing Subunits 13A and 13B for two regulatory seasons. .......................................52

CONCLUSION ..............................................................................53

STATEMENT OF RELATED CASES.............................................................55

CERTIFICATE OF SERVICE.........................................................................56

CERTIFICATE OF COMPLIANCE (Form 8) ..................................................57

ADDENDUM CONTENTS ...........................................................................A-1

# TABLE OF AUTHORITIES

**Cases**

*Alaska v. Fed'l Subsistence Bd.*,
  544 F.3d 1089 (9th Cir. 2008) ........................................................7

*Century Sw. Cable Television, Inc. v. CIIF Assocs.*,
  33 F.3d 1068 (9th Cir. 1994) .........................................................31

*Ctr. for Biological Diversity v. Bernhardt*,
  946 F.3d 553 (9th Cir. 2019) .........................................................32

*FCC v. Fox Television Stations, Inc.*,
  566 U.S. 502 (2009) ......................................................................48

*Gregory v. Ashcroft*,
  501 U.S. 452 (1991)................................................................36, 37

*Info. Providers' Coal. for Defense of the First Amendment v. FCC*,
  928 F.2d 866 (9th Cir. 1991) .........................................................23

*I.N.S. v. Cardoza-Fonseca*,
  480 U.S. 421 (1987)......................................................................30

*Kleppe v. New Mexico*,
  426 U.S. 529 (1976)............................................1, 5, 20, 32, 36

*Metlakatla Indian Commty. v. Egan*,
  369 U.S. 45 (1962)..........................................................................5

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)........................................................................24

*Ninilchik Traditional Council v. United States*,
  227 F.3d 1186 (9th Cir. 2000) .........................................................8

*Nw. Envtl. Advocates v. U.S. E.P.A.*,
  537 F.3d 1006 (9th Cir. 2008) .......................................................23

*Organized Village of Kake v. U.S. Dep't of Agriculture*,
  795 F.3d 956 (9th Cir. 2015) ...........................................24, 48, 51

*Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*,
  426 F.3d 1082 (9th Cir. 2005) .......................................................23

*Solid Waste Agency of N. Cook County v. U.S. Army Corp of Eng'rs*,
  531 U.S. 159 (2001).................................................................36, 37

*Sturgeon v. Frost,*
    139 S. Ct. 1066 (2019)......................................................................23, 27, 35

*Sturgeon v. Frost,*
    577 U.S. 424 (2016)..............................................................................1, 20

*Turner v. Rogers,*
    564 U.S. 431 (2011)..................................................................................25

*United States v. $814,254.76, in U.S. Currency, Contents of Valley Nat. Bank*
    *Acct. No. 1500-8339*, 51 F.3d 207 (9th Cir. 1995)........................................30

*United States v. Bass,*
    404 U.S. 336 (1971)..................................................................................36

*Wolfson v. Brammer,*
    616 F.3d 1045 (9th Cir. 2010) ....................................................................24

## United States Constitution

U.S. Const. art. IV, § 3, cl. 2......................................................................32

## Federal Statutes

5 U.S.C. § 706......................................................................................22

16 U.S.C. § 3101...............................................................................1, 37

16 U.S.C. § 3102......................................................................................8

16 U.S.C. § 3111.......................................................................7, 39, 40, 43

16 U.S.C. § 3112 ........................................... 1, 7, 20, 27, 28, 34, 43

16 U.S.C. § 3113.................................................................................7, 38

16 U.S.C. § 3114 ................................................ 1, 2, 7, 20, 28, 34, 37

16 U.S.C. § 3115(d) ...........................................................................8, 38

16 U.S.C. § 3124......................................................................................27

16 U.S.C. § 3125 ................................... 1, 2, 7, 34, 38, 39, 40, 43, 46

16 U.S.C. § 3126.............................................................................38, 39, 46

16 U.S.C. § 3202...................................................................1, 2, 7, 20, 33. 37

28 U.S.C. § 1291........................................................................................3

28 U.S.C. § 1331........................................................................................3

Alaska Statehood Act, Pub. L. 85-508, 72 Stat. 339 (1958)............................1, 5, 32

Pub. L. 115-20, 131 Stat. 86 (2017)..........................................................33

**Federal Regulations**

36 C.F.R. § 242.10 ................................................................................8, 12

36 C.F.R. § 242.19 ......................................... 10, 26, 31, 39, 52, 53

36 C.F.R. § 242.26(n)(3)..........................................................................9

50 C.F.R. § 100.3 ...................................................................................45

50 C.F.R. § 100.4 .............................................................................10, 45

50 C.F.R. § 100.6 ...................................................................................45

50 C.F.R. § 100.10 .............................................................................8, 12

50 C.F.R. § 100.19 .......................................... 10, 19, 26, 27, 31, 39, 52, 53

50 C.F.R. § 100.26(n)(3)..........................................................................9

**Alaska Constitution**

Alaska Const., art. 8, § 4 .........................................................1, 5, 20, 32

**Alaska Statutes**

Alaska Stat. § 16.05.050(a)(19) ...............................................................6

Alaska Stat. § 16.05.221(b)......................................................................6

Alaska Stat. § 16.05.255(a)......................................................................6

Alaska Stat. § 16.05.255(k)(5)............................................................5, 32

Alaska Stat. § 16.05.255(j) ......................................................................6

Alaska Stat. § 16.05.258 .........................................................................7

**Alaska Regulations**

Alaska Admin. Code tit. 5 § 92.121................................................5, 6, 42

Alaska Admin. Code tit. 5 § 92.127................................................................6

**Court Rules**

Federal Rule of Appellate Procedure 4(a)(1)(B) .....................................3

**Legislative History (excerpts reproduced in addendum)**

H.R. 39, 96th Cong., 2d Sess. (1978) ...............................................29, 30

H. Rep. 95-1045 (1978) ...............................................................................29

House. Comm. On Interior and Insular Affairs, Calendar, H.R. 39 (1980) ...........29

S. Rep. 95-1300 (1978) ................................................ 27, 28, 29, 30, 34, 40, 43, 44

S. Rep. 96-413 (1979) ....................................... 27, 28, 29, 34, 38, 40, 43

95 Cong. Rec. S9383 (June 19, 1978) .....................................................30

163 Cong. Rec. H1260 (Feb. 16, 2017) ..................................................33

163 Cong. Rec. S1864 (Mar. 21, 2017) ..................................................33

**Other Authorities**

Executive Order 10857, 25 Fed. Reg. 33 (Dec. 29, 1959) ............................5, 20, 32

Alaska Dep't Fish & Game, 2021–2022 Alaska Hunting Regulations – Unit 3 .......9

*Necessary*, Merriam-Webster Dictionary ................................................40

Temporary Subsistence Management Regulations for Public Lands in Alaska, 55 Fed. Reg. 27,114 (June 20, 1990)....................................................8

U.S. Dep't of Interior's Federal Subsistence Management Program, Emergency Special Action WSA18-02, ..........................................................26

## INTRODUCTION

The regulation of hunting is a core part of a state's police powers. *See Kleppe v. New Mexico*, 426 U.S. 529, 545 (1976). And when Congress passed the Alaska Statehood Act, it made clear that the State of Alaska would—like other states—control management of wildlife throughout its borders, including on federal lands. Pub. L. 85-508, § 6(e), 72 Stat. 339 (1958). Unlike other states, however, this core state power is of such importance to Alaska that sustainably managing wildlife is enshrined in the state Constitution. Alaska Const., art. 8, § 4.

When Congress passed the Alaska National Interest Lands Conservation Act (ANILCA), it recognized that "Alaska is different." *Sturgeon v. Frost*, 577 U.S. 424, 438 (2016). And it intended to protect that difference and the economic and social needs of the State of Alaska and its people by expressly maintaining the State's plenary management of hunting throughout its territory, including on federal public lands. *See* 16 U.S.C. §§ 3101(d); 3202(a).

Congress made a narrow exception to the State's plenary control, as provided in Title VIII of ANILCA. 16 U.S.C. § 3202(a). That title affords a preference to rural subsistence users "when it is necessary to restrict taking to assure . . . the continuation of subsistence uses of [certain] population[s of fish or wildlife]." 16 U.S.C. § 3112(2); *see also* 16 U.S.C. §§ 3114, 3125. The preference does not allow the Federal Subsistence Board to take over management of hunting

and open hunting seasons that the State has closed. *See* 16 U.S.C. §§ 3112(2), 3114, 3125, 3202(a). And the preference does not allow the Federal Subsistence Board to close federal public lands to non-rural hunters unless doing so is necessary for an enumerated reason (e.g., necessary to continue subsistence uses or necessary for public safety). 16 U.S.C. § 3125.

Yet that is exactly what the Federal Subsistence Board did. The Board exceeded its statutory authority when it usurped the State's management of wildlife and opened a hunting season for the Village of Kake. 2-ER-335. The Board acted unlawfully again when it closed moose and caribou hunting in Subunits 13A and 13B to non-rural users when such closure was not necessary. 2-ER-114. It was not necessary to continue subsistence uses for rural users. And it was not necessary for public safety. In fact, the Board had, just the year before, concluded that the closure was not necessary to continue subsistence uses for rural users or for public safety. 2-ER-163. The Board therefore not only exceeded its statutory authority but acted capriciously when it reversed course without any new information or reasoned explanation.

The Court should reverse the district court's order and conclude that the Board acted beyond its authority when it opened the Kake hunt and acted unlawfully and arbitrarily and capriciously when it closed Subunits 13A and 13B to non-rural hunters.

# JURISDICTIONAL STATEMENT

The district court had jurisdiction over this case pursuant to 28 U.S.C. § 1331. The State of Alaska appeals from the district court's final judgment dated December 3, 2021, 2-ER-53. Alaska timely filed its notice of appeal on February 1, 2022, 3-ER-345. Fed. R. App. P. 4(a)(1)(B). This Court's jurisdiction over the appeal arises under 28 U.S.C. § 1291.

# AUTHORITIES

All relevant statutory and regulatory authorities, along with some excerpts of legislative history, appear in the Addendum to this brief.

# ISSUES PRESENTED

1.      When it is necessary to *restrict* the taking of wildlife on federal public land in Alaska, ANILCA gives local subsistence users a preference over other users. Congress expressly rejected a version of the statute that granted federal agencies broader authority to effectuate the subsistence preference. More specifically, before Congress passed ANILCA, it deleted a provision that would have allowed the federal agencies to open federal public lands to rural subsistence hunting in times of emergencies. Nevertheless, the Federal Subsistence Board gave itself the very authority, through regulation, that Congress declined to authorize. Did the Board exceed its statutory authority when it opened the Kake hunt? And did the district court err in concluding that the issue was moot?

2.      ANILCA allows restricting non-rural subsistence users from taking wildlife on federal public lands when *necessary* for the continuation of subsistence uses or when *necessary* for public safety. The Federal Subsistence Board previously considered requests to close the federal public lands within Unit 13 and the subunits therein. And previously, including the year before the request at issue here, the Board concluded that closing federal public lands in Unit 13 was not necessary for the continuation of subsistence uses because the subsistence harvest numbers remained consistent and the closure would not ameliorate the public safety concerns. Just one year after concluding the closure was not necessary, the Board reversed course and cursorily concluded the opposite. Was the Board's closure of federal public lands within Subunits 13A and 13B not necessary and thus not in accordance with ANILCA? And was the Board's change in position—without a reasoned explanation—arbitrary and capricious?

## STATEMENT OF THE CASE

### I.    The State manages wildlife throughout Alaska.

Regulation of hunting is part of a state's historic police power. *See Kleppe v. New Mexico*, 426 U.S. 529, 545 (1976). Pursuant to that power, states manage hunting and wildlife within their borders, including on federal land, unless expressly limited by Congress. *See id.* at 543.

When Congress passed the Alaska Statehood Act, it intended to transfer to Alaska the same broad measure of administration and jurisdiction over wildlife as possessed by other states. *Metlakatla Indian Commty. v. Egan*, 369 U.S. 45, 57 (1962); Pub. L. 85-508, § 6(e), 72 Stat. 339 (1958). And the following year, after the Secretary of the Interior recognized that Alaska managed its resources in "the broad national interest," the State assumed full management of its wildlife resources. Executive Order 10857, 25 Fed. Reg. 33 (Dec. 29, 1959).

The State manages its wildlife under the constitutionally-mandated "sustained yield" principle. Alaska Const., art. 8, § 4. "Sustained yield" is defined by statute for wildlife management as "the achievement and maintenance in perpetuity of the ability to support a high level of human harvest of game, subject to preferences among beneficial uses, on an annual or periodic basis." Alaska Stat. § 16.05.255(k)(5). Unlike the federal government, the State actively manages wildlife so that there is a surplus of game to be harvested. *Compare, e.g.*, Alaska

Admin. Code tit. 5 § 92.121 (establishing an intensive management plan in Unit 13 to increase moose harvest), and Alaska Admin. Code tit. 5 § 92.127 (establishing an intensive management plan in Unit 3 to increase deer population), *with* U.S. Fish and Wildlife Service's Notice of Decision for the Unimak Island Caribou Herd (2011) (denying State's request to actively manage herd and instead allowing for "possible extinction events"), http://www.adfg.alaska.gov/static/research/wildlife/speciesmanagementreports/pdfs/caribou_2015_chapter_6_unit_10_unimak.pdf.

In Alaska, the Department of Fish & Game administers regulations adopted by the Board of Game in accordance with its statutory duty to "promote . . . hunting" and "preserve the heritage of . . . hunting . . . in the state." Alaska Stat. § 16.05.050(a)(19). The Board of Game provides "for the conservation and development" of Alaska's game resources. Alaska Stat. § 16.05.221(b). Critical to the Board of Game's management of game is its ability to establish seasons for hunting. Alaska Stat. § 16.05.255(a). It regulates "the conservation, development, or utilization of game in a manner that addresses whether, how, when, and where the public asset of game is allocated or appropriated." Alaska Stat. § 16.05.255(j).

In 1980, Congress passed the Alaska National Interest Lands Conservation Act (ANILCA) and in doing so expressly preserved Alaska's control over wildlife management throughout its territory, including on federal public lands. 16 U.S.C.

§ 3202(a). Congress provided that "[n]othing in this Act is intended to enlarge or diminish the responsibility and authority of the State of Alaska for management of fish and wildlife on public lands except as may be provided in [Title VIII] or to amend the Alaska constitution." 16 U.S.C. § 3202(a).

Title VIII, the subsistence title, creates a subsistence management and use program that protects the subsistence way of life in Alaska. *Alaska v. Fed'l Subsistence Bd.*, 544 F.3d 1089, 1091 (9th Cir. 2008). Congress made statutory findings and policy determinations at the beginning of Title VIII, 16 U.S.C. §§ 3111, 3112, which help inform implementation of the substantive provisions of the Act, 16 U.S.C. §§ 3113–3126. One of the main purposes of the subsistence program is to grant certain subsistence uses priority over other uses. 16 U.S.C. §§ 3112(2); 3114; 3125(3). ANILCA defines subsistence users (i.e., "federally-qualified users" or "rural subsistence users") as both Native and non-Native rural Alaskans who engage in customary and traditional uses of wildlife. *See* 16 U.S.C. § 3113. Many non-rural Alaskans (i.e., "non-federally-qualified users" or "non-rural subsistence users"), including many former rural residents who have cultural and traditional ties to subsistence hunting but who have been displaced to urban areas for health, education, and other social reasons, also practice subsistence hunting under the State's statutory subsistence priority, Alaska Stat. § 16.05.258, but they are not prioritized under ANILCA.

Congress envisioned that the State of Alaska would implement the subsistence priority, 16 U.S.C. § 3115(d), and the State did so for many years. *See Ninilchik Traditional Council v. United States*, 227 F.3d 1186, 1189 (9th Cir. 2000). When the Alaska Supreme Court ruled that the Alaska Constitution prohibited a *rural* resident preference, the Secretary of the Interior and the Secretary of Agriculture took over implementing Title VIII. Temporary Subsistence Management Regulations for Public Lands in Alaska, 55 Fed. Reg. 27,114, 27,114 (June 29, 1990) (discussing how the Secretaries "implement a joint program to grant a preference in favor of subsistence uses of fish and wildlife resources on public lands unless the State of Alaska implements a subsistence program consistent with ANILCA's requirements").

Once the State was no longer constitutionally able to implement a rural subsistence priority, as directed in ANILCA, the Secretary of the Interior and the Secretary of Agriculture created the Federal Subsistence Board ("Board"), and delegated to the Board their authority "for administering the subsistence taking and uses of fish and wildlife on public lands.[1]" 50 C.F.R. § 100.10; 36 C.F.R. § 242.10.[2]

---

[1]     "Public lands" are federal, as opposed to State or private, lands. 16 U.S.C. §§ 3102(1)–(3).

[2]     The same regulations are published both under Title 50 (Interior's regulation) and also Title 36 (Agriculture's regulations).

## II.     The Board opened a 60-day hunt for the Village of Kake.

In the spring of 2020, the Organized Village of Kake, a federally recognized tribe, requested the opening of an emergency hunt of two bull moose and five male deer for its tribal citizens. 2-ER-338. It did not request a hunt for non-tribal members of the community who, under ANILCA, would be qualified to participate. 2-ER-338, 341. The tribe alleged that the COVID-19 pandemic made the meat delivered to its community stores more expensive and of poorer quality than wild game. 2-ER-338, 340–41. It requested an emergency hunt because the normal hunting seasons that the State's Board of Game established for moose and deer would not open until the fall and late summer, respectively. *See, e.g.*, 50 C.F.R. § 100.26(n)(3); 36 C.F.R. § 242.26(n)(3) (incorporating State seasons) and Alaska Dep't Fish & Game, 2021–2022 Alaska Hunting Regulations – Unit 3, https://www.adfg.alaska.gov/static/applications/web/nocache/regulations/wildliferegulations/pdfs/gmu3.pdfB1E6C97350748A7EC9A6516E4E8AF1F8/gmu3.pdf. Without timely notifying the State to determine how this emergency hunt would affect its wildlife management, the Board approved the tribe's request and authorized an emergency hunt, opening the moose and deer season in late June and permitting the tribe to harvest two bull moose and five male deer.[3] 2-ER-332–36.

---

[3]     This special action is labeled throughout the record as WSA19-14.

The Board relied on the Secretaries' "[e]mergency special action" regulation, which provides "[i]n an emergency situation, if necessary . . . for public safety reasons, the Board may immediately open or close public lands for the taking of fish and wildlife for subsistence uses" for a period that "may not exceed 60 days." 50 C.F.R. § 100.19(a); 36 C.F.R. § 242.19(a); 2-ER-337. The Board reasoned that "public safety related to food security concerns" merited opening the hunt. 2-ER-335. The Board further found that the harvest "presents no known conservation concern for the growing population of moose and stable population of Sitka black-tailed deer in the harvest area," and that restricting the harvest to male animals would "reduce the impact to the population." 2-ER-336. In reaching these conclusions, there was no consultation with the State who is the primary manager of the moose and deer populations. 2-ER-332–33.

## III. The Board closed moose and caribou hunting on federal public lands in Subunits 13A and 13B to non-federally-qualified users.

The State of Alaska is divided into twenty-six game management units. 50 C.F.R. § 100.4. The Board's closure of moose and caribou hunting to non-federally-qualified users involves Unit 13, which borders Denali National Park on the west and Wrangell-St. Elias National Park on the east. Unit 13 comprises twelve percent federal lands, of which six percent is Bureau of Land Management and Forest Service lands. 2-ER-127. The lands managed by the Bureau of Land Management in Subunits 13A and 13B are some of the most accessible lands in

Unit 13 because they border one of the scarce roads traversing Unit 13 as well as navigable rivers. 2-ER-128.

A longstanding conflict exists between local and non-local hunters[4] that use Unit 13. 2-ER-185. Local subsistence hunters have repeatedly requested shutting down hunting on these federal public lands to non-federally-qualified hunters to avoid competition. *See, e.g.*, 2-ER-130, 132, 136–37.

In 2002, for instance, Copper River Native Association requested closing federal public lands in Subunits 13A and 13B to the taking of caribou and moose except by federally-qualified users. 2-ER-174 The Board rejected that request. 2-ER-174.

In 2019, a resident of Glenallen requested that the Board close moose and caribou hunting on federal public lands in Unit 13 to non-federally-qualified users.[5] 2-ER-165–67. Some local residents testified in support of the request, asserting that the increased competition made it more difficult for them to take caribou and moose close to their communities, and that the large number of hunters deflected caribou and moose away from the roads, where local residents preferred to hunt.

---

[4]    The dispute is mainly between local and non-local hunters, rather than federally-qualified and non-federally-qualified users. This local versus non-local divide somewhat parallels the federally-qualified versus non-federally-qualified divide. It is not a perfect parallel, however, because federally-qualified hunters from other rural communities come to hunt in Unit 13. 2-ER-195.

[5]    This special action request is labeled throughout the record as WSA19-03.

2-ER-179. Local residents also discussed safety concerns, alleging that people would shoot from the road and over other people's heads. 2-ER-267, 282–83. And because of these concerns, some local hunters said that they either no longer hunted or hunted at less convenient times. 2-ER-179.

The Board rejected the request concluding the closure was "not shown to be necessary to continue subsistence uses of [caribou and moose] populations. Federally qualified subsistence users annual harvest rates have remained fairly consistent in comparison to the annual harvest rates by non-Federally qualified users." 2-ER-163. The Board recognized that "local harvesters do experience an influx of non-local hunters and many feel displaced by this activity and alter their subsistence activities as a result," but it concluded that this does not mean that the closure was necessary to continue subsistence uses. 2-ER-163. The Board was well aware of the public safety concerns—including testimony about increased traffic along the road that bisects Unit 13. *See, e.g.*, 2-ER-188, 279–80. Nevertheless, the Board reasoned that "the closure would not alleviate [p]ublic safety concerns as non-Federally qualified users would still be able to cross Federal public lands to access State and private lands." 2-ER-163. And an Interagency Staff Committee[6]

---

[6]     The interagency staff committee is set by regulation and comprises members across the U.S. Fish and Wildlife Service, National Park Service, Bureau of Land Management, Bureau of Indian Affairs, and Forest Services. 50 C.F.R. § 100.10(d)(7); 36 C.F.R. § 242.10(d)(7).

memorandum considered by the Board discussed how lack of sufficient enforcement during the hunting season was an ongoing issue and determined that closing Unit 13 to non-federally-qualified users "would not . . . resolve[] unethical hunting activities, such as trespass or shooting from the road, [which] are already illegal." 2-ER-195.

In 2020, another resident of Glenallen requested closing moose and caribou hunting on federal public lands in Unit 13 to non-federally-qualified users.[7] 2-ER-116–23. He recognized that the State of Alaska analyzes how many caribou need to be harvested to maintain a sustainable population, and that during half of the past decade, harvest fell below the State's management objective (i.e., there was insufficient harvesting of and too great a surplus of caribou throughout Unit 13). 2-ER-122. The requester also recognized that the State determines annually how many caribou and moose are necessary for subsistence use statewide (including both federally-qualified and non-federally-qualified uses) and that, according to the State, that number has been consistently satisfied. 2-ER-122. But he complained that the Federal Subsistence Board has never itself determined what amount of moose and caribou in Unit 13 would ensure "the continuation of federal subsistence uses" under ANILCA, and he argued that despite the harvestable

---

[7]     This special action is labeled throughout the record as WSA20-03.

surplus available each year, there needed to be even more restrictions on non-federally-qualified users to meet local needs. 2-ER-118–19. He believed that closing Unit 13 for one season could serve as an "experiment" to see if rural subsistence users' success rates improve when the area is closed to non-federally-qualified hunters. 2-ER-118.

The State of Alaska, among other interested parties, commented on the request. 2-ER-157–62. The State discussed how the harvests were more than meeting the standard it set for the amount necessary for subsistence for statewide users, including both federally- and non-federally-qualified users. 2-ER-159–61. The State also explained that the data does not support the interpretation that more state hunters meant less success for federally-qualified hunters. 2-ER-160. The data showed the contrary: as the number of state hunters increased, federal permit success also increased. 2-ER-160. The State recognized the realistic safety concerns—namely traffic jams caused by hunters walking on or parking on the sides of the road—but explained how this situation occurs every year even during times when state hunts are closed and when only federally-qualified hunters have the opportunity to harvest. 2-ER-161. The State reasoned—just as the Board had the prior year when it rejected a different Glenallen resident's request to close federal public lands in Unit 13 to non-federally-qualified hunters—that this public

safety concern would simply not be addressed by eliminating non-federally-qualified hunters. 2-ER-161.

When the Federal Subsistence Board met to discuss the request, Lisa Maas, the acting policy coordinator in the Office of Subsistence Management provided an analysis to the Board, summarizing the request, biological data, and testimony and comments from those supporting and opposing the request.[8] 2-ER-79–84. She explained that the effectiveness of closing federal public lands in Unit 13 was "uncertain"—she conceded that harvest success of caribou on federal lands by federally-qualified hunters is really just related to whether caribou cross federal lands during hunting season—but she theorized that reducing competition for caribou "may increase hunting opportunity and harvest success" for rural subsistence users. 2-ER-83. She discussed how long-standing safety concerns have resulted in federally-qualified hunters "who do not feel safe" choosing not to hunt. 2-ER-84. She recognized that closing the most accessible federal public lands to non-federally-qualified users would not actually curb the presence of non-federally-qualified hunters, who would park on the road, camp on the land, and transition through the land in order to reach State and private lands on which they are permitted to hunt. 2-ER-91–93. But, she posited that if coupled with law

---

[8] Interestingly, fewer people testified in support of the request in 2020 than did in 2019, even though the requests were identical. 2-ER-81.

enforcement efforts, unsafe shooting practices (that are already illegal) might be alleviated.[9] 2-ER-93. She recommended closing Subunits 13A and 13B to caribou and moose hunting by non-federally qualified hunters. 2-ER-84.

One Board member was concerned that he was "not hearing anything being recommended different than what we had dealt with in '19," other than reducing the restrictions to federal public lands in Subunits 13A and 13B. 2-ER-85. Another Board member echoed that concern, noting that "[l]ast year this Board opposed a similar special action request," and "no new data have been brought forth . . . to indicate that anything has changed since that time." 2-ER-99.

Another Board member asserted that there was a little bit of new information regarding success rates, and, misunderstanding the data presented to her, stated "the Federally-qualified user subsistence success rate is significantly lower than non-Federally qualified users." 2-ER-101. As to federal permit holders successfully hunting caribou on federal public lands, Ms. Maas had previously clarified that the caribou harvest is "primarily related to availability and caribou[, which] have not been available of Federal public lands in recent years." 2-ER-83, 149. As for the success rates of moose, the data did not compare the success of federally-qualified *users* versus non-federally qualified *users*. 2-ER-151. The data

---

[9]     This is substantially similar to her recommendation the year prior. 2-ER-194.

showed the success rates of state permittees throughout all of Unit 13 (on both state and federal lands) versus federal permittees on only the federal public lands within Unit 13. 2-ER-151. Both the State of Alaska and the Board's own staff explained to the Board that federally-qualified users can and do hunt on state and federal lands pursuant to the state permitting system so that they are not limited to hunting only on the federal lands portion of Unit 13, and those hunters record their successful hunts via the state permit system. 2-ER-150, 161. The federal permit success rate shows only those federally-qualified users who choose to hunt solely on federal public lands pursuant to a federal permit. 2-ER-150, 161.

As for the total number of moose harvested by federal permit holders, Ms. Maas explained to the Board that it already considered the prior year data that showed "annual harvest rates" for federally-qualified users "remained fairly consistent in comparison to the annual harvest rates by non-Federally-qualified users." 2-ER-80. And she noted that the Board had, just the prior year, denied a request to close Unit 13 because the consistency of the harvest rates supported the conclusion that closure was not warranted for the continuation of subsistence hunting. 2-ER-80.

In responding to a question about how to measure the effectiveness of this closure, Ms. Maas responded that the closure could be deemed effective if the Board received "positive feedback" from local hunters that they were more

successful or had a subjectively better "hunting experience." 2-ER-89. Without

explaining why it changed its position, the Board voted to close moose and caribou

hunting on federal public lands in Subunits 13A and 13B for two seasons, rather

than the requested single season, for non-federally qualified subsistence users. 2-

ER-99–102, 114. The Board stated that it "limited the closure to Units 13A and

13B because this is the area where most overcrowding, disruption of hunts, and

serious safety concerns have occurred." 2-ER-114.

## IV. The State sued and the district court dismissed as moot the State's argument related to the Kake hunt and upheld the legality of the Board's closure in Subunits 13A and 13B.

The State sued the Federal Subsistence Board and several federal officials

alleging, among other things, that the Board violated the Administrative Procedure

Act and ANILCA by opening an emergency hunt in Kake and by closing moose

and caribou hunting in Subunits 13A and 13B to non-federally qualified hunters. 2-

ER-71–74. The district court denied the State's motions for immediate and

preliminary injunctive relief. Dkt. 10 and 28 in 3:20-cv-00195.

In its final decision, issued December 3, 2021, the district court recognized

that the State was not simply challenging the Board's opening hunting seasons for

pandemic reasons, but was challenging the Board's application of 50 C.F.R.

§ 100.19 to the extent it authorized opening a hunting season. 1-ER-24–25.

Without getting to the merits of the State's argument that the Board lacked the

statutory authority to open a hunting season, the district court concluded that a challenge to the Kake hunt did not fit within the "capable of repetition, yet evading review" exception to mootness. 1-ER-29. The court recognized that the sixty-day length of the hunt "certainly satisfied the limited durational requirement of the exception." 1-ER-25. But the court concluded that opening a hunt like the Board did in Kake did not present a "reasonable likelihood" of reoccurrence because that particular hunt was premised on a lapsed delegation of authority to local land managers during a pandemic. 1-ER-30.

As for the State's challenge to the Board's closure in Subunits 13A and 13B, the court concluded that the Board permissibly closed the federal public land due to competition because "competition between users" was "linked to both subsistence and public safety concerns." 1-ER-32. The district court concluded that "the Board articulated a rational connection between [the] evidence and its decision." 1-ER-40. And even though the Board had just the prior year rejected a proposal to close federal public land in Unit 13 to non-federally-qualified hunters, the district court concluded that the Board did not act arbitrarily and capriciously when it flip-flopped the following year. 1-ER-48.

The State appeals.

## SUMMARY OF THE ARGUMENT

States' historical police powers include management of fish and wildlife throughout their territories, including on federal lands. *Kleppe v. New Mexico*, 426 U.S. 529, 545 (1976). The execution of these police powers in Alaska is even more critical because there is so much federal land in Alaska that in order for the State's management of its wildlife to be effective, it must be comprehensive.

Congress recognized how "Alaska is different" when it passed ANILCA. *Sturgeon v. Frost*, 577 U.S. 424, 438 (2016). And through ANILCA, Congress expressly preserved the State of Alaska's ability to manage its fish and wildlife resources, which it does, in the national interest and under the sustained yield principle. 16 U.S.C. § 3202(a); Executive Order 10857, 25 Fed. Reg. 33 (December 29, 1959); Alaska Const., art. 8, § 4. Congress made a narrow exception as provided in Title VIII, which affords a preference to rural subsistence users only "when it is necessary to restrict taking to assure . . . the continuation of subsistence uses." 16 U.S.C. §§ 3112(2), 3114, 3202(a). It did not grant federal agencies broad authority to manage wildlife.

1. When the Board opened an emergency 60-day hunt in Kake, the Board exceeded its statutory authority and acted unlawfully. ANILCA does not authorize *opening* public lands for hunting that the State has closed. In fact, Congress expressly rejected a version of the bill doing just that and instead passed the

version of ANILCA that effectuates the rural subsistence priority by authorizing *restrictions* for non-federally-qualified users. Nevertheless, the Board gave itself, through regulation, the precise power Congress decided not to authorize.

Although the Kake hunt has concluded, the underlying issue—whether the Board has the statutory authority to open hunts—is capable of repetition and will evade review. The district court erred in concluding otherwise. The district court should have reviewed the merits of the State's claim, concluded the Board lacks authority to open seasons, and enjoined the Board from doing so in the future.

2. ANILCA allows restricting non-federal subsistence hunting on federal public lands, but only when *necessary* for certain enumerated reasons. As the Board had concluded just one year prior, it was not necessary for the continuation of subsistence hunting or for public safety to close federal public lands within Subunits 13A and 13B to moose and caribou hunting by non-federally-qualified users. The Board's decision to close those subunits was unlawful, not supported by substantial evidence, and arbitrary and capricious.

Certainly, there is competition in Unit 13, but competition would authorize closing federal public lands to non-federally-qualified hunters *only if* such competition threatened the continuation of subsistence hunting. Here, there continued to be a harvestable surplus of moose and caribou for the taking. Necessary for the continuation of subsistence hunting does not entail closing land

to non-federally-qualified hunters simply because federally-qualified hunters *prefer* to hunt with less competition. Nor does it entail closing federal public lands *if* data shows that non-federally-qualified hunters are more successful at harvesting game than federally-qualified hunters. In any event, that is not what the data showed and the Board erred in relying on such a misinterpretation to close Subunits 13A and 13B.

As for public safety issues in Unit 13, only a year earlier the Board had concluded that closing federal public lands to non-federally-qualified users would not alleviate safety concerns. It further concluded that such concerns would continue regardless of whether federal public lands in Unit 13 were closed to non-federally-qualified hunters.

The Board's reversing its decision, and deciding to close the federal public lands to non-federally-qualified moose and caribou hunters was arbitrary and capricious. No new information was presented that could have meaningfully changed the Board's analysis.

## STANDARDS OF REVIEW

The Court reviews agency decisions under § 706 of the Administrative Procedure Act. The Court will hold unlawful an agency's decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "unsupported by substantial evidence." 5 U.S.C. § 706(2).

Whether an agency action is not "in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations" is a question of statutory interpretation. *Nw. Envtl. Advocates v. U.S. E.P.A.*, 537 F.3d 1006, 1014 (9th Cir. 2008). Agency action is not in accordance with law when "it is in conflict with the language of the statute." *Id.* Likewise, whether an agency's interpretation of the scope of its authority is "ultimately inconsistent" with the statute depends on the "text and context of the statute," as well as "[t]he legislative history." *Sturgeon v. Frost*, 139 S. Ct. 1066, 1084–85 (2019).

When an agency action is based on factual conclusions drawn from the administrative record, it must be supported by substantial evidence. *Info. Providers' Coal. for Defense of the First Amendment v. FCC*, 928 F.2d 866, 869–70 (9th Cir. 1991). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 870. An agency action cannot be sustained if it lacks "a rational connection between the facts found and the conclusions made." *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1090 (9th Cir. 2005).

An agency may, of course, reverse its position, but it is arbitrary and capricious to do so unless the agency provides "a reasoned explanation" for why

prior factual findings support its new position when those facts previously supported a different position. *Organized Village of Kake v. U.S. Dep't of Agriculture*, 795 F.3d 956, 968 (9th Cir. 2015). It is likewise arbitrary and capricious to offer an explanation that runs counter to the evidence before an agency. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The Court reviews the district court's dismissal of an action for mootness de novo. *Wolfson v. Brammer*, 616 F.3d 1045, 1053 (9th Cir. 2010).

## ARGUMENT

### I. The Federal Subsistence Board exceeded its authority when it opened the Kake hunt.

The Federal Subsistence Board lacks authority to open hunting seasons. The district court failed to address this issue because it erroneously concluded that it did not fall under the "capable of repetition, yet evading review" exception to the mootness doctrine. The district court should have addressed the merits, and it should have concluded the Board acted beyond its statutory authority. The text of the statute, legislative history, and federalism concerns all make clear that the Board does not have the authority to open hunting seasons.

**A.    The Board's decision to open the Kake hunt was not moot because the 60-day opening is capable of repetition and would otherwise evade review.**

The Board's decision to open the Kake hunt is excepted from the mootness doctrine because it is capable of repetition and would otherwise evade review. This exception applies when "the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration" and "there is a reasonable expectation that the same complaining party will be subjected to the same action again." *Turner v. Rogers*, 564 U.S. 431, 439–40 (2011) (brackets omitted).

The district court correctly recognized that the "sixty-day length of the Kake hunt certainly satisfies the limited duration requirements of the exception." 1-ER-29. But it erred in analyzing the reasonable expectation of reoccurrence. Instead of considering the likelihood the Board would open another short-term emergency season, it asked whether the Board would issue another 60-day open season premised on the Board's then-lapsed delegation to local land managers during the COVID-19 pandemic. 1-ER-29–30. This framing of the issue was simply too narrow. The State's challenge of the Board's authority was not just a challenge to the Board's authority to open seasons via a delegation to land managers during the COVID-19 pandemic. The State challenged the Board's authority to open the Kake hunt because the Board does not have authority to open seasons that the State has closed. 1-ER-6 (n.18); *see also* 2-ER-61, 71–72 (Compl.) and Dkt. 49 at 20

(State's Opening Brief). This challenge does not depend on whether the Board

funneled its authority to a local land manager or whether the Board issued its order

during the COVID-19 pandemic. The State brought an as applied challenge to

50 C.F.R. § 100.19 and 36 C.F.R. § 242.19.

Given the Board's regulation purporting to authorize it to take such action,

there is a reasonable likelihood the Board will open another season that the State

has closed. *See* 50 C.F.R. § 100.19; 36 C.F.R. § 242.19. The Board regularly

receives requests for it to authorize emergency hunts—these requests existed

before the COVID-19 pandemic, continued during the pandemic, and there is no

reason these requests will abate in the future. 2-ER-329. And this is not the first

time the Board has opened a 60-day season. In 2018, the Board opened a moose

hunt to residents of Tuluksak to respond to a localized food shortage caused by

power outages. *See* U.S. Dep't of Interior's Federal Subsistence Management

Program's discussion of Emergency Special Action WSA18-02, opening an

emergency federal moose season for Tuluksak residents,

https://www.doi.gov/subsistence/news/general/emergency-unit-18-moose-hunt-

tuluksak-residents-end-1159-am-august-26 (last visited June 12, 2022).[10] The

---

[10]     The Board also opens subsistence fisheries even when the State decides not
to open that type of fishery because the sustainability of certain salmon populations
are threatened when highly-effective gillnets (used in subsistence fishing) are
deployed. *See, e.g.*, Office of Subsistence Management Analysis for
Reconsideration of FP15-10 (supporting reconsideration of Board's opening a

State's challenge to the Board's application of § 100.19 clearly fits within the "capable of repetition, yet evading review" exception to the mootness doctrine and it was error for the court to avoid applying the exception by narrowly framing the State's challenge.

### B.    The Board lacks authority to open seasons.

The Secretaries of the Interior and Agriculture have the authority to implement regulations to carry out Title VIII. 16 U.S.C. § 3124. But that authority is limited to what Congress intended and authorized. The purpose of Title VIII is threefold: (1) to use federal public lands in a way that causes the least adverse impact on rural subsistence users, (2) to prioritize rural subsistence users "when it is necessary to restrict taking," (3) and to cooperate with landowners adjacent to federal public lands in order to protect the viability of Alaska's wild renewable resources. 16 U.S.C. § 3112.[11] The second purpose is relevant here: to prioritize subsistence users when *restrictions* are necessary. 16 U.S.C. § 3112(2). These broad purposes are not self-executing but rather help inform the substantive provisions in ANILCA. *See, e.g.*, *Sturgeon v. Frost*, 139 S. Ct. 1066, 1084–85

---

subsistence gillnet fishery on the Kenai River because, among other reasons, the Board did not fully consider how sustainability of chinook salmon is threatened by gillnets), https://www.doi.gov/sites/doi.gov/files/uploads/supplemental_1_-_rfr15-01_final_threshold_analysis.pdf (last visited June 12, 2022).

[11]    *See also* S. Rep. 96-413 at 268 (1979) (A-21) (describing the "three basic policies" of the subsistence title); S. Rep. 95-1300 at 220 (1978) (same) (A-47).

(2019) (using ANILCA's statement of purpose to inform interpretation of § 103(e) and the limited scope of federal regulatory authority).

The main substantive provision granting a "preference" or "priority" to federally-qualified users is found in § 3114, which accords a "priority" to "the taking on public lands of fish and wildlife for nonwasteful subsistence uses." The legislative policy Congress announced applies this priority "when it is necessary to *restrict* taking." 16 U.S.C. § 3112(2) (emphasis added).[12] The language of the substantive provision itself further speaks in terms of *restrictions*, outlining subpriorities within the priority "[w]henever it is necessary to restrict the taking of populations of fish and wildlife." 16 U.S.C. § 3114.

The legislative history supports the plain meaning of the text, which makes the priority applicable when necessary to *restrict* taking wildlife. For instance, the sectional analyses of the bill that became ANILCA clarify that the priority is effectuated by "restrictions on taking" wildlife. S. Rep. 96-413, at 269–70 (1979) (A-22–23); S. Rep. 95-1300, at 221 (1978) (A-48). "If a particular fish or wildlife

_____

[12]    Section 3112(2) reads: "It is hereby declared to be the policy of Congress that – (2) nonwasteful subsistence uses of fish and wildlife and other renewable resources shall be the priority consumptive uses of all such resources on the public lands of Alaska *when it is necessary to restrict taking* in order to assure the continued viability of a fish or wildlife population or the continuation of subsistence uses of such population, the taking of such population for nonwasteful subsistence uses shall be given preference on the public lands over other consumptive uses;" (emphasis added).

population (e.g. salmon, moose or caribou) in a particular area is sufficient to sustain a harvest by all persons engaged in subsistence and other uses, the implementation of restrictions on taking set forth in this section need not be imposed . . . ."  S. Rep. 96-413, at 269 (A-22); S. Rep. 95-1300, at 221 (A-48). Conversely, "if the continued viability of a particular population or the ability of rural subsistence-dependent residents to satisfy their subsistence needs would be threatened by a harvest by all such person," ANILCA directs the establishment of "regulations which restrict the taking of such population to Alaska residents engaged in subsistence uses." S. Rep. 96-413, at 269–70 (A-22–23); S. Rep. 95-1300, at 221 (A-48). Congress never authorized the opposite of *restricting* hunting (i.e., opening hunting seasons for federally-qualified users).

In fact, Congress rejected a version of the bill that gave the Secretaries authority to *open* seasons. In May 1978, the House of Representatives passed its version of ANILCA, H.R. 39, and forwarded the bill to the Senate. House. Comm. On Interior and Insular Affairs, Calendar, H.R. 39 (1980) (A-10). The House bill gave the Secretaries emergency authority to "open public lands, or any portion thereof, to subsistence uses by local residents." *See* Section 705(d)(2) of H.R. 39, 96th Cong. (1978), also in H. Rep. 95-1045, Part II at 27, 93 (1978) (A-60, 65, 85). Upon receiving H.R. 39, the Senate sent the bill to the Committee on Energy and Natural Resources, which held seven days of hearings in Washington D.C. in

addition to two weeks of workshops in Alaska villages. S. Rep. 95-1300, at 112

(1978) (A-41). Among the many comments received about H.R. 39, the Alaska

Board of Fisheries and Game objected to the wildlife management provisions on

subsistence that "essentially supplant an integrated statewide management system

with a fragmented system under federal government direction." 95 Cong. Rec.

S9383 (June 19, 1978) (remarks of Mr. Stevens) (A-68). The Committee made

significant changes to the House's bill, explaining that it "adopted a subsistence

management system similar in concept to the House approach" but "after careful

consideration the committee [] modified the Federal-State relationship in a number

of important aspects."  S. Rep. 95-1300, at 196 (1978) (A-43). One change the

Committee made was *deleting* the provision authorizing the Secretaries to *open* an

emergency season. *Compare* Title VIII in 95-1300 at 26–32 (A-34–40), *with*

Section 705(d)(2) in H.R. 39, 96th Cong., 2d Sess. (1978) (A-85) (version passed

by House, received by Senate, and sent to Senate's Committee on Energy and

Natural Resources). And Congress passed the version of the bill that no longer

contained that provision. "Few principles of statutory construction are more

compelling than the proposition that Congress does not intend *sub silentio* to enact

statutory language that it has earlier discarded in favor of other language." *I.N.S. v.*

*Cardoza-Fonseca*, 480 U.S. 421, 442–43 (1987); *see also United States v.*

*$814,254.76, in U.S. Currency, Contents of Valley Nat. Bank Acct. No. 1500-8339,*

51 F.3d 207, 212 (9th Cir. 1995) ("This explicit deletion of a provision the only purpose of which was to provide for retroactive enforcement is strong evidence that Congress intended only prospective application."); *Century Sw. Cable Television, Inc. v. CIIF Assocs.*, 33 F.3d 1068, 1071 (9th Cir. 1994) (presuming that Congress did not mean to authorize cable companies to install boxes, wires, bolts, and screws to buildings because Congress deleted a provision that would have authorized such installation from an earlier version of a bill).

Despite the fact that Congress declined to give the Secretaries the authority to *open* hunts, that is precisely the authority the Board has purported to give itself through regulation. 50 C.F.R. § 100.19 and 36 C.F.R. § 242.19 (giving itself authority to act in emergency situations for reasons of "public safety" to "open . . . public lands for the taking of fish and wildlife for subsistence uses"). The Board acted ultra vires when it opened the Kake hunt because it had no statutory authority to open seasons regardless the reason. ANILCA does not provide authority to open hunts for "public safety" (i.e., because a village fears food insecurity due to meat at the supermarket being more expensive or less readily available). 2-ER-336, 338, 340. It is true that ANILCA authorizes the Secretaries to temporarily *close* federal public lands "if necessary for reasons of public safety," but the power to "close" does not include the power to "open." This Court should conclude that ANILCA

does not give the Secretaries the authority to open hunting seasons and enjoin the Board from doing so in the future.

### C. ANILCA did not preempt State management of its wildlife under the sustained yield principle.

"States have broad trustee and police powers over wild animals within their jurisdictions." *Kleppe*, 426 U.S. at 545; *see also Ctr. for Biological Diversity v. Bernhardt*, 946 F.3d 553, 558 (9th Cir. 2019). To that point, when Congress passed the Alaska Statehood Act of 1958, it provided that the *State*, not the federal government, would manage fish and wildlife throughout Alaska. Pub. L. 85-508, § 6(e), 72 Stat. 341. The State's core function in managing wildlife is to conserve wildlife under its constitutional sustained yield principle, making sure that its resources (like moose, deer, and caribou) are sustained from year to year to support a high level of human harvest of game, subject to preferences among beneficial uses. Alaska Const. art. 8 § 4; Alaska Stat. 16.05.255(k)(5). In fact, the Secretary of the Interior recognized that the State, which manages its wildlife resources pursuant to the sustained yield principle, manages wildlife "in the broad national interest." Executive Order 10857, 25 Fed. Reg. 33 (Dec. 29, 1959).

While Congress may, pursuant to the Property Clause, choose to preempt state management of fish and wildlife on federal lands, the Property Clause is not self-executing. *See Kleppe*, 426 U.S. at 542–43; *see also* U.S. Const. art. IV, § 3, cl. 2. In order to preempt state law, Congress must choose to do so.

Congress did not, in passing ANILCA, choose to preempt the State's

management of hunting throughout its borders under its sustained yield principle.

To the contrary, Congress maintained the status quo. 16 U.S.C. § 3202.

Section 3202, titled "Taking of fish and wildlife," provides, in relevant part:

**(a) Responsibility and authority of State of Alaska**

Nothing in this Act is intended to enlarge or diminish the
responsibility and authority of the State of Alaska for management of
fish and wildlife on the public lands except as may be provided in
subchapter II [Title VIII] of this chapter, or to amend the Alaska
constitution.

**(b) Responsibility and authority of Secretary**

Except as specifically provided otherwise by this Act, nothing in this
Act is intended to enlarge or diminish the responsibility and authority
of the Secretary over the management of the public lands.

Subsection (a) directs that except as provided in Title VIII of ANILCA, the State's

authority over the taking of wildlife is sustained. And prior to ANILCA, the State

regulated hunting throughout all its borders including on federal lands.[13]

---

[13]     When Congress enacted a law invalidating a federal rule that purported to
manage wildlife statewide, Pub. L. 115-20, 131 Stat. 86 (2017), the Alaska
delegation reiterated: "The Alaska National Interest Lands Conservation Act in
1980 further, in fact, verified what the Statehood Act did: protecting the right of
the State to manage fish and game"; Alaska's "congressional delegation fought to
include explicit provisions in [ANILCA] that made it abundantly clear that the
State of Alaska still had primacy in managing fish and game throughout the entire
State—State lands and Federal lands"; and in passing the Alaska Statehood Act
and ANILCA "Congress made it clear: Alaska, you are to manage the fish and
wildlife within your borders." 163 Cong. Rec. H1260, 2017 WL 640640 (Feb. 16,
2017) (remarks of Congressman Young); 163 Cong. Rec. S1864–65, S1868, 2017
WL 1066358 (Mar. 21, 2017) (remarks of Sens. Sullivan and Murkowski).

Subsection (b) maintains the Secretaries' authority over federal public lands as it was prior to the passage of ANILCA, except as specifically provided otherwise in the Act. Prior to ANILCA's passage, the Secretaries had certain responsibilities under other federal laws such as the Endangered Species Act and the Marine Mammal Protection Act, that can affect public lands and wildlife on those lands.

Title VIII does not give the Secretaries authority to preempt the State's primacy in managing wildlife throughout the state. Rather, it provides a priority to federally-qualified subsistence users by authorizing only *restrictions* on non-federally-qualified users and only when necessary for certain enumerated reasons. *See* 16 U.S.C. §§ 3112(2), 3114, 3125(3); *see also* S. Rep. 96-413, at 269–70 (1979) (A-22–23); S. Rep. 95-1300, at 221 (1978) (A-48). Title VIII does not authorize the Secretaries to supplant their view on how to sustainably manage wildlife and open a season that the State has closed for conservation purposes.

Nonetheless, the Federal Subsistence Board upended the State's conservation of its resources by opening a hunting season that the State had closed. The Kake hunt, which allowed the taking of two moose and five deer, may seem modest at first glance. 2-ER-336. But during the prior hunting season, there were only 26 bucks taken from the Kake area, and 55 total bulls harvested from the entire island on which Kake is located. 2-ER-336. While the State's management of deer and moose meant that there were no conservation concerns to the resource

*before* the Board opened the hunt, increasing the available take like the Board did had the potential to *create* a conservation concern. 2-ER-336. To maintain a sustainable population, the State determines how many deer and moose must survive from year to year and sets hunting limits based on the harvestable surplus. *See, e.g.*, 2-ER-103 (discussing how opening a season the State has closed creates a "harvest debt"), 2-ER-108 (explaining how the "State determines the harvestable surplus to assure sustainable populations"), 2-ER-104 (explaining how State uses hunting data "in conjunction with population, composition, and habitat data to make informed management decisions ensuring the sustainability of the harvest and populations"). It is the State, rather than the federal land manager, that collects and analyzes the biologic and population data. When the Board opens a new season and takes from the baseline population necessary to sustain the species, the Board effectively preempts the State's managerial role in conserving the species. When Congress passed ANILCA, it simply did not intend to give the Secretaries that quintessential State authority.

> **D.** **Chevron deference is inappropriate here because ANILCA did not authorize the Board to *open* a hunting season and because Congress did not clearly mean to preempt the State's management of game under the sustained yield principle.**

The Board is not entitled to *Chevron* deference because there is no statutory ambiguity that would authorize *opening* seasons. *See Sturgeon v. Frost*, 139 S. Ct. 1066, 1080 n.3 (2019) (declining to apply *Chevron* deference after finding no

ambiguity in a different section of ANILCA). To effectuate the subsistence priority, the text of Title VIII authorizes only *restrictions*. *See* infra Argument Section I.B–C. The legislative history accords. *See id. Chevron* deference simply does not apply because Congress's intent here was clear: to give the Secretaries the limited authority to override state regulation by *restricting* taking wildlife when necessary for the continuation of subsistence uses.

Even if there were some statutory ambiguity, *Chevron* deference is also inappropriate in this instance because such a shift in the balance of federal-state management requires clear, rather than ambiguous, congressional intent. *See Solid Waste Agency of N. Cook County v. U.S. Army Corp of Eng'rs*, 531 U.S. 159, 172–73 (2001) ("*SWANCC*") (refusing to give *Chevron* deference "where the administrative interpretation alters the federal-state framework by permitting federal encroachment upon a traditional state power"); *United States v. Bass*, 404 U.S. 336, 349 (1971) ("[U]nless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance."). States traditionally manage wildlife throughout their territory as part of their police power. *Kleppe*, 426 U.S. at 545. Congress may legislate in areas traditionally regulated by states, but courts assume that the states' police powers are not superseded by a federal act unless Congress makes its intention "unmistakably clear." *Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991) ("Congress should makes its

intention 'clear and manifest' if it intends to pre-empt the historic powers of the States[.]"). *Chevron* deference, which defers to reasonable agency interpretations when there is an "ambiguity," is simply irreconcilable with the presumptions against preemption, which finds preemption only when Congress is unambiguous and "unmistakably clear."

In passing ANILCA, Congress expressly maintained state management of wildlife except as provided in Title VIII. 16 U.S.C. § 3202(a). It did not authorize the Secretaries to supersede the State's determination of how many moose and caribou may be taken and when. Those questions—which are critical to the maintenance of sustainable game populations—are for the State's Board of Game. If Congress intended to preempt the state's core police powers, it had to do so clearly. *Gregory*, 501 U.S. at 461; *SWANCC*, 531 U.S. at 172–73.

## II. The Federal Subsistence Board's closure of Subunits 13A and 13B was arbitrary and capricious and not in accordance with law.

When Congress passed ANILCA, it attempted to balance multiple important interests including scientific, recreational, historic, cultural, and scenic. 16 U.S.C. § 3101. One, but not the only, purpose of the Act was "to provide the opportunity for rural residents engaged in a subsistence way of life to continue to do so." 16 U.S.C. § 3101(c). To effectuate this purpose, Congress enacted certain substantive provisions, including, as relevant here, the subsistence priority. 16 U.S.C. § 3114. This priority, defined in Title VIII of the Act, applies to all rural

Alaska residents who depend on renewable resources for subsistence use. 16 U.S.C. § 3113. Congress anticipated that the State would effectuate this priority, but if the State did not, Congress instructed the Secretaries to step in and apply the priority. 16 U.S.C. § 3115(d).

Crucially, Congress limited when the priority would be applied. The priority can be used to restrict hunting by non-federally-qualified users, but only for a very limited number of reasons. In fact, before Congress passed ANILCA, it amended the Limitations Clause in the section on subsistence to "clarif[y] that the subsistence management and use title is not intended to restrict nonsubsistence uses of fish and wildlife permitted on the public lands *except as necessary*" for certain enumerated reasons. S. Rep. 96-413, at 235 (1979) (A-19) (emphasis added). Accordingly, the Limitations and Savings Clause in Title VIII forbids restricting non-federally-qualified users from hunting on federal public lands unless an enumerated exception applies. 16 U.S.C. § 3125(3). Relevant to this lawsuit, restrictions are allowed only (i) when "necessary . . . to continue subsistence uses" of certain populations of wildlife, or (ii) when "necessary . . . for the reasons set forth in section 3126," and that section allows temporary closures of federal public land "if necessary for reasons of public safety." 16 U.S.C. §§ 3125, 3126.

Here, the Board's reasons for closing federal public lands in Subunits 13A and 13B do not meet the factual or legal requirement of being "necessary . . . to continue subsistence uses." 16 U.S.C. § 3125. Nor do the reasons meet the factual or legal requirement that such restrictions be "necessary . . . [for] public safety." 16 U.S.C. §§ 3125, 3126. Indeed, the Board denied strikingly similar requests to close federal public lands in Unit 13 in 2002 and 2019, and determined that "the requested closure [of federal public lands in Unit 13] was not warranted for conservation, continuation of subsistence uses or safety reasons." 2-ER-80. Even if a closure were necessary—which was not the case—the Board violated its own regulation that requires minimizing the duration of any closure. 50 C.F.R. § 100.19(b)(2); 36 C.F.R. § 242.19(b)(2).

### A. Closing Subunits 13A and 13B was unlawful because it was not necessary for the continuation of subsistence hunting.

Congress knew that there was competition between federally-qualified users and non-federally-qualified users when it passed ANILCA. It expressly found that "the continuation of the opportunity for subsistence uses of resources on public and other lands in Alaska is threatened by the increasing population of Alaska, with resultant pressure on subsistence resources" and by, among other reasons, "increased accessibility of remote areas containing subsistence resources." 16 U.S.C. § 3111. Knowing this, Congress foresaw that increased population (and increased number of hunters and increased competition) *could* strain wildlife

resources and hinder subsistence hunting opportunities. 16 U.S.C. § 3111. But Congress did not permit restrictions on non-rural users simply because of increased competition, a condition it already knew existed. Rather, Congress permitted restrictions on hunting only when conditions made such restrictions *necessary for the continuation of subsistence uses.* 16 U.S.C. § 3125.

The word "necessary" means "required," "compulsory," and "essential." *Necessary*, Merriam-Webster Dictionary, https://www.merriam-webster.com (search for "necessary") (last visited June 12, 2022). And the phrase "continuation of subsistence uses" entails situations when a particular subsistence resource may be threatened with depletion as well as when local communities are *unable* to obtain enough fish and game for their subsistence needs. S. Rep. 96-413, at 269–70 (A-22–23); S. Rep. 95-1300, at 221 (A-48). Had increased competition on federal public lands in Subunits 13A and 13B led to overharvesting of caribou and moose or an *inability* for federally-qualified users to harvest sufficient meat to satisfy subsistence needs, that could create a condition precedent to restricting federal public lands to non-subsistence users. But that is not what happened here.

The Board exceeded its statutory authority when it closed federal public lands in Subunits 13A and 13B to non-federally-qualified users simply because of "overcrowding" and competition between user groups. 2-ER-81–83, 11. The person who requested the closure and the handful of others who spoke in favor of

the closure complained the area was crowded and that local hunters *preferred* to hunt with fewer people around. 2-ER-124, 145–46. Ms. Maas explained that the closure could be deemed successful if it gave local hunters a better "hunting experience." 2-ER-89. If a preference that there be fewer non-local hunters constituted "necessary for the continuation of subsistence hunting," local rural subsistence hunters could unilaterally make it "necessary" to restrict non-federally-qualified hunting by sitting out a season and demanding reduced or eliminated competition on federal public lands before re-engaging in hunting. If Congress meant to give rural subsistence hunters the power to close lands to non-rural hunters whenever they wanted to, Congress would have used different language (such as whenever it is "preferential" to federally-qualified hunters). Instead, Congress limited such closures to situations only when *necessary*.

The competition on federal public lands in Unit 13 did not deplete moose or caribou populations. To the contrary, the Board expressly noted that "moose and caribou populations are within or above management objectives." 2-ER-83; *see also* 2-ER-137–43. In fact, because habitat could not support the growing Nelchina Herd, the Alaska Department of Fish and Game had, the prior year, extended caribou hunting season to reduce the size of the herd. 2-ER-80. Even the person requesting the closure acknowledged how the caribou population had grown too

large to be sustainable, and there needed to be more harvest of that population to reduce such a large surplus. 2-ER-122.

Nor did the competition undermine the amount of harvest necessary to sustain subsistence uses. Each year, the State determines how much of a particular population of game is necessary to be harvested to satisfy subsistence use, which includes both rural and non-rural statewide subsistence uses. 2-ER-133, 158–60. The State, by actively managing wildlife, has been satisfying the amount necessary for subsistence for caribou and moose throughout Unit 13. 2-ER-158–60; Alaska Admin. Code tit. 5 § 92.121. The State presented information to the Board demonstrating that in 2018, the "[h]arvestable surplus and harvest for both caribou and moose in Unit 13 were well above the [amount necessary for subsistence]." 2-ER-160. The Federal Subsistence Board never established a different amount necessary for subsistence. 2-ER-117. Yet, the Board curiously, and unlawfully, concluded that restricting non-federally-qualified use on federal public land was necessary. 2-ER-114.

The record does not show that federally-qualified users were *unable* to participate in subsistence hunting, but rather that some federally-qualified subsistence hunters *preferred* to have the most road-accessible hunting area to themselves. *See, e.g.*, 2-ER-81, 117. Amicus First Alaskans Institute summarized below how some subsistence users "choose not to hunt simply because they

perceive their traditional hunting areas are over-crowded or that their hunt will be less likely to be successful." Dkt. 57-1 (Amicus Brief). Contrary to amicus's argument, this "reluctance [of local subsistence users] to participate" is not what Congress had in mind when it barred restricting non-federally-qualified users unless "necessary" for the continuation of subsistence hunting. *Id.* In fact, the Federal Subsistence Board recognized in 2019 that "local harvesters do experience an influx of non-local hunters and many feel displaced by this activity and alter their subsistence activities as a result," but that this does not mean that closing federal public lands to non-federally qualified users is necessary to continue subsistence uses. 2-ER-163. To the extent the Board reversed course and closed federal public lands to give federally-qualified hunters a less crowded and therefore more preferable "hunting experience," this was legal error.

The Board argued below, and the district court seemed to accept, that the Board could rely on success rates between federally-qualified and non-federally-qualified users as demonstrating that the closure was "necessary . . . to continue subsistence uses." 1-ER-36–38. This was error both as a matter of law and fact. As a matter of law, whether non-federally-qualified hunters are more or less successful than federally-qualified hunters is irrelevant. The question is whether federally-qualified hunters are able to continue to practice subsistence hunting. 16 U.S.C. §§ 3111, 3112, 3125; S. Rep. 96-413, at 269–70 (A-22–23); S. Rep. 95-

1300, at 221 (A-48). The record indicates that some federally-qualified hunters are choosing not to hunt, to hunt less often, or to hunt only on the road corridors on federal public lands despite a surplus of caribou and moose throughout the entirety of Unit 13. 2-ER-137–38, 140–41, 145–47. Those self-imposed restrictions do not make it *necessary* to restrict hunting opportunities for non-federally-qualified hunters.

Even if a disparity in success rates between federally-qualified and non-federally-qualified hunters were legally sufficient to restrict hunting for non-federally-qualified hunters, substantial evidence does not support the Board's conclusion that there is a large disparity between federally-qualified hunter success and non-federally-qualified hunter success rates. The Board, the Board's attorney below, and the district court all misunderstood what the State's "success rate" data means. They all appeared to believe that the data showed that non-federally-qualified hunters were on average 17 percent successful at harvesting moose while federally-qualified hunters were, on average, 11 percent successful at harvest moose. 1-ER-36–37, 93, 143; 2-ER-101, 151. This simply is not what the data shows.

The data shows the difference in success rates in the federal and state permitting systems. As the State explained in its comments to the Board and as the Board's own staff analysis described, many federally-qualified hunters use a state

permit so that they can hunt on state, private, and federal lands and are not limited to hunting only on the federal lands portion of Unit 13, which is relatively small. 2-ER-150, 161. A federal permit authorizes hunting on federal land only. *See* 50 C.F.R. § 100.3 (scope of federal regulations apply on "public land"), § 100.6 (regulating subsistence permits for taking wildlife "on public lands"), § 100.4 (defining "public land" as *federal* lands). The Board's own staff explained that "some Federally qualified subsistence users report successful harvests by Federal permit, while others report harvests under State regulations depending on where and when they harvest." 2-ER-150; *see also* 2-ER-161. The 11 percent federal permit success rate for moose showed only those federally-qualified users who chose to hunt on federal lands with a federal permit and who reported success under their federal permits. 2-ER-161. The 17 percent success rate for moose represented both federally-qualified and non-federally-qualified hunters who hunted throughout all of Unit 13, which comprises both state and federal lands, and who reported under the state permit system. 2-ER-151. As for the federal permit success rates for caribou, those rates are related "to availability and caribou[, which] have not been available on Federal public lands in recent years." 2-ER-83, 149. Substantial evidence does not support the conclusion there was a large discrepancy between success rates for federally-qualified hunters and non-federally-qualified hunters.

**B.     Closing Subunits 13A and 13B was unlawful because it was not necessary for public safety.**

There is no dispute that there are longstanding safety concerns in Unit 13. 2-ER-161. But to restrict non-federally qualified uses on federal public lands within Unit 13, doing so has to be *necessary* for reasons of public safety. 16 U.S.C. § 3125(3) (cross-referencing 16 U.S.C. § 3126).[14] Enacting a restriction that will not alleviate public safety concerns cannot be considered "necessary."

As the Board previously found just one year prior to the instant decision, the closure of federal public lands to non-federally-qualified users was not justified for public safety because traffic jams and unsafe parking on narrow stretches along the Richardson Highway would still occur because "non-Federally qualified users would still be able to cross Federal public lands to access State and private lands." 2-ER-163; *see also* 2-ER-161, 195. No new information about public safety was

---

[14]     This cross-reference to "public safety" appears to be included in § 3125 to avoid absurd results, rather than to provide the Secretaries with an independent reason for closing public lands only to non-federally-qualified hunters. Section 3126 provides that the Secretaries may close public lands to non-federally-qualified users for public safety reasons. For instance, if there is a campground on public lands, the Secretaries can close hunting by federally-qualified users near that campground for public safety. The Savings and Limitations Clause in § 3125 likely incorporates § 3126 so that when the Secretaries restrict hunting on that nearby campground by federally-qualified users, they are also able to restrict hunting by non-federally-qualified users. Whether public safety can be an independent reason to close public lands that applies only to non-federally-qualified users was not raised or conceded by the State below, nor did the district court squarely address this issue.

presented to the Board in 2020 that differed from information presented in 2019.

*Compare* 2-ER-146–47, 187–88, 267, 271, 277, 282–83, 286 (2019 testimony and summary of public safety issues in 2019), *with* 2-ER-81, 136–37, 221, 225, 229–30, 233–34 (2020 testimony and staff summary of public safety issues in 2020). And, just as the Interagency Staff Committee acknowledged in 2019, "unethical hunting activities, such as trespass or shooting from the road, are already illegal and would not be resolved by approving [the request to close to non-federally qualified users federal public lands in Unit 13]." 2-ER-195. Those public safety concerns turned on "[a] lack of sufficient enforcement during the hunting season." 2-ER-195. The record shows that closing down road accessible federal lands in Unit 13 would, at best, "simply reshuffle the implicit dangers associated with many people hunting along the road system." 2-ER-195.

That the closure would not actually alleviate any safety issues is also supported by the scope of the Board's closure. The Board did not close just the federal public lands bordering the highway, where the handful of testifiers focused their comments as being too crowded. 2-ER-114, 128, 147. The Board also closed the federal public lands around the Delta and Gulkana Wild and Scenic Rivers. 2-ER-114, 128. Furthermore, the Board did not close all hunting by non-federally-qualified hunters. It closed hunting for moose and caribou. 2-ER-114. Because closing the federal public lands in Subunits 13A and 13B to non-federally-qualified

users would not alleviate any public safety concerns, the closures were not

necessary.

**C.    Closing Subunits 13A and 13B was arbitrary and capricious because the Board did not provide a reasoned explanation to support its changed position after denying an identical proposal the previous year.**

The Board's decision to close federal public lands in Subunits 13A and 13B

was arbitrary and capricious because it previously concluded that closing these

lands in Unit 13 was not necessary to the continuation of subsistence hunting and

would not mitigate the safety issues. No new information or reasoned explanation

rationalized the agency's reversal of its position.

This Court has explained that an agency is not precluded from changing a

prior decision, but that when it does so it must (1) display an awareness that it is

changing its position, (2) show that the new policy is permissible under the statute,

(3) believe the new policy is better, and (4) "provide[] good reasons for the new

policy, which if the new policy rests upon factual findings that contradict those

which underlay its prior policy, must include a reasoned explanation . . . for

disregarding facts and circumstances that underlay or were engendered by the prior

policy." *Organized Village of Kake*, 795 F.3d at 966 (internal quotation marks

omitted) (citing *FCC v. Fox Television Stations, Inc.*, 566 U.S. 502 (2009)).

As explained above, closing the federal public lands within Subunits 13A

and 13B to non-federally-qualified users may have been *preferable* for some local

hunters but it was not *necessary* as required by ANILCA, and therefore the

Board's new decision is not "permissible" under ANILCA. *See infra* Argument

II.A–B. Nor did the Board provide good reasons for reversing course.

In 2019, the Board did not believe the closure of federal public lands within

Unit 13 to non-federally-qualified users was necessary for the continuation of

subsistence uses or public safety. 2-ER-163. The district court reasoned that

reducing the amount of land to be closed (from federal public lands within Unit 13

to federal public lands within two subunits of Unit 13) and the "success rate" data

provided sufficient new information to reverse course. 1-ER-46–47. This was

error.

As discussed above, there was no new data showing that federally-qualified

hunters were less successful than non-federally-qualified hunters. The data simply

showed success rates under different permitting systems, one that spans all of Unit

13 and includes both federally-qualified and non-federally-qualified users and one

that is limited to federal lands and federally-qualified users.

As for narrowing the geographic scope of the closure at issue, that difference

could not meaningfully change the analysis for whether the closure was necessary.

Closing the federal public lands in all of Unit 13 is not significantly different to

closing the federal public lands in Subunits 13A and 13B. To understand why the

Board's changing the geographic scope presents no meaningful difference, it is

helpful to look at the map of Unit 13 (below). The map (also at 2-ER-128) shows where federal public lands exist within each subunit:



Unit 13 is divided into five subunits: 13A, 13B, 13C, 13D, and 13E. Subunit 13C contains almost no federal public lands. The federally-managed lands in Subunit 13E are either part of Denali National Park (where hunting is not permitted) or Bureau of Land Management lands (where hunting is uncommon because it is about 25 miles or more from a road or is glaciated).[15] And nearly all

---

[15]    At the bottom of this map is a scale and distances to the Glenn and Richardson Highways and can be measured accordingly. This particular map does not show topography, but this map can be compared to a judicially-noticeable

of the road-accessible federal public lands in Subunit 13D are part of the Tonsina Controlled Use Area, which is closed to motorized hunting and which has limited moose hunting in any event. 2-ER-125, 128, 136, 140.[16] The district court concluded that the Board weighed the evidence differently in 2019 and 2020 because the geographic scope of the closure was different. But there is little practical difference in closing all federal public lands in Unit 13 and only those in Subunits 13A and 13B. The closures are not meaningfully different enough to merit the reversed policy.

In sum, the Board's reversal was arbitrary and capricious because the Board did not provide "good reasons" for reversing its position. *Organized Village of Kake*, 795 F.3d at 966. The new "success rate" data it perceived as showing a large discrepancy between federally-qualified users and non-federally-qualified users was not a "good reason" to change course because there was no such data. The Board simply misinterpreted the success rates under different permitting schemes

---

topographical map to see that the federal lands in the northern section of Subunit 13E comprise glaciers.

[16]     In 2020, the harvest objective for moose for all of Unit 13 was 1,050 – 2,180, and the objective for all of Subunit 13D (both federal and state lands) was 75-190 moose. 2-ER-140. This means that Subunit 13D, which encompasses mostly state but some federal lands, accounts for less than ten percent of the total objective of harvested moose in all of Unit 13. Put another way, it was not a significant difference to keep open the federal lands in Subunit 13D to non-federally qualified users, rather than restricting non-federally qualified hunting on federal public lands within Unit 13.

despite being presented with information from the State and the Board's own staff explaining what those numbers actually represented. And the change in the geographic scope to the requested closure did not provide a "good reason" to reverse course because the requested and adopted closures were not meaningfully different. The Board acted arbitrarily and capriciously because it did not provide a reasoned explanation for why it disregarded its former conclusions that the closure was not necessary for the continuation of subsistence uses or public safety.

### D. The Board violated its own regulation by closing Subunits 13A and 13B for two regulatory seasons.

The Board unlawfully closed federal public lands in Subunits 13A and 13B because its own regulations require that special actions be "confined to the minimum time period" that the Board determines "to be necessary under the circumstances" and "[i]n any event . . . will not extend longer than the end of the current regulatory cycle." 50 C.F.R. § 100.19(b)(2); 36 C.F.R. § 242.19(b)(2). Here, a person requested that federal public lands in Unit 13 be closed for a season to non-federally-qualified moose and caribou hunters. 2-ER-118. Instead of closing federal public lands for one season, the Board closed the lands for two seasons, ostensibly to reduce the "administrative burden" associated with actually analyzing whether closing non-federally-qualified use for a second season would be necessary for the continuation of subsistence use or public safety. 2-ER-93.

Closing moose and caribou hunting to non-federally-qualified hunters for the entire regulatory cycle simply to reduce any administrative burden makes meaningless the regulatory phrase "confined to the minimum time period." 50 C.F.R. § 100.19(b)(2); 36 C.F.R. § 242.19(b)(2). Making closures coterminous with the end of the regulatory cycle will always reduce the administrative burden of analyzing anew whether a closure is necessary. But the regulation directs that closures be minimized in duration, with the outer bounds being the end of the regulatory cycle. *Id.* By the Board's logic, all requests to close areas to non-federally-qualified users should extend two years to reduce any administrative burden. Reading the regulation this way would make superfluous the limitation that closures be "confined to the minimum time period." The Board thus violated its own regulation.

## CONCLUSION

For these reasons, the Court should reverse the district court's decision. This Court should conclude that the State's challenge to the Kake hunt is not moot, the Board exceeded its authority to open a hunting season and is precluded from doing so in the future. As for the closure in Subunits 13A and 13B, this Court should conclude the agency restricted hunting to non-federally qualified hunters for reasons outside the scope of ANILCA and did so arbitrarily and capriciously.

Dated: June 13, 2022.

TREG R. TAYLOR
ATTORNEY GENERAL

/s/ Laura Wolff
Laura Wolff
Alaska Bar No. 1411108

## STATEMENT OF RELATED CASES

The State is not aware of any related cases pending before this Court.

## CERTIFICATE OF SERVICE

I hereby certify that on June 13, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date:  June 13, 2022.

TREG R. TAYLOR
ATTORNEY GENERAL

*/s/ Laura Wolff*
Laura Wolff

Attorney for Appellant
State of Alaska

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 22-35097

I am the attorney or self-represented party.

**This brief contains** | 12,343 | **words**, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- ⦿ complies with the word limit of Cir. R. 32-1.
- ○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- ○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- ○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- ○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*
    - ○ it is a joint brief submitted by separately represented parties;
    - ○ a party or parties are filing a single brief in response to multiple briefs; or
    - ○ a party or parties are filing a single brief in response to a longer joint brief.
- ○ complies with the length limit designated by court order dated [          ].
- ○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Laura Wolff | **Date** | Jun 13, 2022

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** | *Rev. 12/01/2018*

# ADDENDUM CONTENTS

**Federal Statutes**

16 U.S.C. § 3111 ................................................................. A-2

16 U.S.C. § 3112 ................................................................. A-2

16 U.S.C. § 3114 ................................................................. A-3

16 U.S.C. § 3125 ................................................................. A-4

16 U.S.C. § 3126 ................................................................. A-5

16 U.S.C. § 3202 ................................................................. A-5

**Federal Regulations**

50 C.F.R. § 100.19 & 36 C.F.R. § 242.19 ........................................ A-6

**Legislative History**

House. Comm. On Interior and Insular Affairs, Calendar, H.R. 39 (1980) ......... A-9

S. Rep. 96-413 (1979) ......................................................... A-12

S. Rep. 95-1300 (1978) ........................................................ A-32

H. Rep. 95-1045 (1978) ........................................................ A-58

95 Cong. Rec. S9383 (June 19, 1978) ........................................... A-68

H.R. 39, 96th Cong., 2d Sess. (1978) .......................................... A-69

## 16 U.S.C. § 3111. Congressional declaration of findings

The Congress finds and declares that--

**(1)** the continuation of the opportunity for subsistence uses by rural residents of Alaska, including both Natives and non-Natives, on the public lands and by Alaska Natives on Native lands is essential to Native physical, economic, traditional, and cultural existence and to non-Native physical, economic, traditional, and social existence;

**(2)** the situation in Alaska is unique in that, in most cases, no practical alternative means are available to replace the food supplies and other items gathered from fish and wildlife which supply rural residents dependent on subsistence uses;

**(3)** continuation of the opportunity for subsistence uses of resources on public and other lands in Alaska is threatened by the increasing population of Alaska, with resultant pressure on subsistence resources, by sudden decline in the populations of some wildlife species which are crucial subsistence resources, by increased accessibility of remote areas containing subsistence resources, and by taking of fish and wildlife in a manner inconsistent with recognized principles of fish and wildlife management;

**(4)** in order to fulfill the policies and purposes of the Alaska Native Claims Settlement Act and as a matter of equity, it is necessary for the Congress to invoke its constitutional authority over Native affairs and its constitutional authority under the property clause and the commerce clause to protect and provide the opportunity for continued subsistence uses on the public lands by Native and non-Native rural residents; and

**(5)** the national interest in the proper regulation, protection, and conservation of fish and wildlife on the public lands in Alaska and the continuation of the opportunity for a subsistence way of life by residents of rural Alaska require that an administrative structure be established for the purpose of enabling rural residents who have personal knowledge of local conditions and requirements to have a meaningful role in the management of fish and wildlife and of subsistence uses on the public lands in Alaska.

## 16 U.S.C. § 3112. Congressional statement of policy

It is hereby declared to be the policy of Congress that--

**(1)** consistent with sound management principles, and the conservation of healthy populations of fish and wildlife, the utilization of the public lands in Alaska is to cause the least adverse impact possible on rural residents who depend upon subsistence uses of the resources of such lands; consistent with management of fish and wildlife in accordance with recognized scientific principles and the purposes for each unit established, designated, or expanded by or pursuant to titles II through VII of this Act, the purpose of this subchapter is to provide the opportunity for rural residents engaged in a subsistence way of life to do so;

**(2)** nonwasteful subsistence uses of fish and wildlife and other renewable resources shall be the priority consumptive uses of all such resources on the public lands of Alaska when it is necessary to restrict taking in order to assure the continued viability of a fish or wildlife population or the continuation of subsistence uses of such population, the taking of such population for nonwasteful subsistence uses shall be given preference on the public lands over other consumptive uses; and

**(3)** except as otherwise provided by this Act or other Federal laws, Federal land managing agencies, in managing subsistence activities on the public lands and in protecting the continued viability of all wild renewable resources in Alaska, shall cooperate with adjacent landowners and land managers, including Native Corporations, appropriate State and Federal agencies, and other nations.


## 16 U.S.C. § 3114. Preference for subsistence uses

Except as otherwise provided in this Act and other Federal laws, the taking on public lands of fish and wildlife for nonwasteful subsistence uses shall be accorded priority over the taking on such lands of fish and wildlife for other purposes. Whenever it is necessary to restrict the taking of populations of fish and wildlife on such lands for subsistence uses in order to protect the continued viability of such populations, or to continue such uses, such priority shall be implemented through appropriate limitations based on the application of the following criteria:

**(1)** customary and direct dependence upon the populations as the mainstay of livelihood;

**(2)** local residency; and

**(3)** the availability of alternative resources.

## 16 U.S.C. § 3125. Limitations and savings clauses

Nothing in this subchapter shall be construed as--

**(1)** granting any property right in any fish or wildlife or other resource of the public lands or as permitting the level of subsistence uses of fish and wildlife within a conservation system unit to be inconsistent with the conservation of healthy populations, and within a national park or monument to be inconsistent with the conservation of natural and healthy populations, of fish and wildlife. No privilege which may be granted by the State to any individual with respect to subsistence uses may be assigned to any other individual;

**(2)** permitting any subsistence use of fish and wildlife on any portion of the public lands (whether or not within any conservation system unit) which was permanently closed to such uses on January 1, 1978, or enlarging or diminishing the Secretary's authority to manipulate habitat on any portion of the public lands;

**(3)** authorizing a restriction on the taking of fish and wildlife for nonsubsistence uses on the public lands (other than national parks and park monuments) unless necessary for the conservation of healthy populations of fish and wildlife, for the reasons set forth in section 3126 of this title, to continue subsistence uses of such populations, or pursuant to other applicable law; or

**(4)** modifying or repealing the provisions of any Federal law governing the conservation or protection of fish and wildlife, including the National Wildlife Refuge System Administration Act of 1966 (80 Stat. 927; 16 U.S.C. 668dd-jj), section 100101(b)(1), chapter 1003, and sections 100751(a), 100752, 100753, and 102101 of Title 54, the Fur Seal Act of 1966 (80 Stat. 1091; 16 U.S.C. 1187), the Endangered Species Act of 1973 (87 Stat. 884; 16 U.S.C. 1531-1543), the Marine Mammal Protection Act of 1972 (86 Stat. 1027; 16 U.S.C. 1361-1407), the Act entitled "An Act for the Protection of the Bald Eagle", approved June 8, 1940 (54 Stat. 250; 16 U.S.C. 742a-754), the Migratory Bird Treaty Act (40 Stat. 755; 16 U.S.C. 703-711), the Federal Aid in Wildlife Restoration Act (50 Stat. 917; 16 U.S.C. 669-669i), the Magnuson-Stevens Fishery Conservation and Management Act (90 Stat. 331; 16 U.S.C. 1801-1882), the Federal Aid in Fish Restoration Act (64 Stat. 430; 16 U.S.C. 777-777k), or any amendments to any one or more of such Acts or such title.

### 16 U.S.C. § 3126. Closure to subsistence uses

#### (a) National parks and park monuments in Alaska; authorization of subsistence uses and sport fishing

All national parks and park monuments in Alaska shall be closed to the taking of wildlife except for subsistence uses to the extent specifically permitted by this Act. Subsistence uses and sport fishing shall be authorized in such areas by the Secretary and carried out in accordance with the requirements of this subchapter and other applicable laws of the United States and the State of Alaska.

#### (b) Closure for public safety, administration, or the continued viability of fish and wildlife population

Except as specifically provided otherwise by this section, nothing in this subchapter is intended to enlarge or diminish the authority of the Secretary to designate areas where, and establish periods when, no taking of fish and wildlife shall be permitted on the public lands for reasons of public safety, administration, or to assure the continued viability of a particular fish or wildlife population. Notwithstanding any other provision of this Act or other law, the Secretary, after consultation with the State and adequate notice and public hearing, may temporarily close any public lands (including those within any conservation system unit), or any portion thereof, to subsistence uses of a particular fish or wildlife population only if necessary for reasons of public safety, administration, or to assure the continued viability of such population. If the Secretary determines that an emergency situation exists and that extraordinary measures must be taken for public safety or to assure the continued viability of a particular fish or wildlife population, the Secretary may immediately close the public lands, or any portion thereof, to the subsistence uses of such population and shall publish the reasons justifying the closure in the Federal Register. Such emergency closure shall be effective when made, shall not extend for a period exceeding sixty days, and may not subsequently be extended unless the Secretary affirmatively establishes, after notice and public hearing, that such closure should be extended.

### 16 U.S.C. § 3202. Taking of fish and wildlife

#### (a) Responsibility and authority of State of Alaska

Nothing in this Act is intended to enlarge or diminish the responsibility and authority of the State of Alaska for management of fish and wildlife on the public lands except as may be provided in subchapter II of this chapter, or to amend the Alaska constitution.

**(b) Responsibility and authority of Secretary**

Except as specifically provided otherwise by this Act, nothing in this Act is intended to enlarge or diminish the responsibility and authority of the Secretary over the management of the public lands.

**(c) Areas controlled; areas closed, exceptions**

The taking of fish and wildlife in all conservation system units, and in national conservation areas, national recreation areas, and national forests, shall be carried out in accordance with the provisions of this Act and other applicable State and Federal law. Those areas designated as national parks or national park system monuments in the State shall be closed to the taking of fish and wildlife, except that--

**(1)** notwithstanding any other provision of this Act, the Secretary shall administer those units of the National Park System, and those additions to existing units, established by this Act and which permit subsistence uses, to provide an opportunity for the continuance of such uses by local rural residents; and

**(2)** fishing shall be permitted by the Secretary in accordance with the provisions of this Act and other applicable State and Federal law.


**50 C.F.R. § 100.19 & 36 C.F.R. § 242.19 Special actions.**

(a) Emergency special actions. In an emergency situation, if necessary to ensure the continued viability of a fish or wildlife population, to continue subsistence uses of fish or wildlife, or for public safety reasons, the Board may immediately open or close public lands for the taking of fish and wildlife for subsistence uses, or modify the requirements for take for subsistence uses, or close public lands to take for nonsubsistence uses of fish and wildlife, or restrict the requirements for take for nonsubsistence uses.

(1) If the timing of a regularly scheduled meeting of the affected Regional Council so permits without incurring undue delay, the Board may seek Council recommendations on the proposed emergency special action. Such a Council recommendation, if any, will be subject to the requirements of § 100.18(a)(4).

(2) The emergency action will be effective when directed by the Board, may not exceed 60 days, and may not be extended unless the procedures for adoption of a temporary special action, as set forth in paragraph (b) of this section, have been followed.

(b) Temporary special actions. After adequate notice and public hearing, the Board may temporarily close or open public lands for the taking of fish and wildlife for subsistence uses, or modify the requirements for subsistence take, or close public lands for the taking of fish and wildlife for nonsubsistence uses, or restrict take for nonsubsistence uses.

(1) The Board may make such temporary changes only after it determines that the proposed temporary change will not interfere with the conservation of healthy fish and wildlife populations, will not be detrimental to the long-term subsistence use of fish or wildlife resources, and is not an unnecessary restriction on nonsubsistence users. The Board may also reopen public lands to nonsubsistence uses if new information or changed conditions indicate that the closure is no longer warranted.

(i) Prior to implementing a temporary special action, the Board will consult with the State of Alaska and the Chairs of the Regional Councils of the affected regions.

(ii) If the timing of a regularly scheduled meeting of the affected Regional Council so permits without incurring undue delay, the Board will seek Council recommendations on the proposed temporary special action. Such Council recommendations, if any, will be subject to the requirements of § 100.18(a)(4).

(2) The length of any temporary action will be confined to the minimum time period or harvest limit determined by the Board to be necessary under the circumstances. In any event, a temporary opening or closure will not extend longer than the end of the current regulatory cycle.

(c) The Board may reject a request for either an emergency or a temporary special action if the Board concludes that there are no time-sensitive circumstances necessitating a regulatory change before the next regular proposal cycle. However, a special action request that has been rejected for this reason may be deferred, if appropriate and after consultation with the proponent, for consideration during the next regular proposal cycle. The Board will consider changes to customary and traditional use determinations in subpart C of this part only during the regular proposal cycle.

(d) The Board will provide notice of all regulatory changes adopted via special action by posting the change on the Office of Subsistence Management Web site (http://alaska.fws.gov/asm/index.cfml). When appropriate, notice may also include distribution of press releases to newspapers, local radio stations, and local contacts, as well as direct notification to the proponent and interested parties. The Board will publish notice and reasons justifying the special action in the Federal Register as soon as practicable.

(e) The decision of the Board on any proposed special action will constitute its final administrative action.

(f) Regulations authorizing any individual agency to implement closures or restrictions on public lands managed by the agency remain unaffected by the regulations in this part.

(g) Fish and wildlife may not be taken in violation of any restriction, closure, or change authorized by the Board.

**\*H.R. 39 (Serial No. 95-16)**                                    O
(H.R. 1974)
(H.R. 2876)
(H.R. 5505)
(H.R. 6564)
(H.R. 9473)
(H.R. 10467)
(H.R. 10888)
(H.R. 11213)
(H.R. 11599)
(H.R. 12625)
(H.R. 12703)
(See also H.R. 1454, H.R. 5605, H.R. 8651)

MR. UDALL (FOR HIMSELF), MR. PHILLIP BURTON, MR. BINGHAM, MR. ANDERSON OF ILLINOIS, MR. BRODHEAD, MR. CARR, MR. DELLUMS, MR. DRINAN, MR. EDGAR, MR. EDWARDS OF CALIFORNIA, MR. FRASER, MR. HARRINGTON, MR. JEFFORDS, MR. KASTENMEIER, MR. MINETA, MR. MOAKLEY, MR. MOFFETT, MR. NOLAN, MR. OTTINGER, MR. RONCALIO, MR. SEIBERLING, MR. WAXMAN, MR. TSONGAS, AND MR. WEAVER

To designate certain lands in the State of Alaska as units of the National Park, National Wildlife Refuge, Wild and Scenic Rivers and National Wilderness Preservation System, and for other purposes. (H.R. 2063, 94th Cong.). (Alaska National Interest Lands Conservation Act).

Jan. 4, 1977—Introduced.
Mar. 3, 1977—Briefing concerning the Status of d-2 Lands and the Alaska Native Claims Settlement Act, by the Department of the Interior.
Apr. 21, 1977—Subcommittee hearing.
Apr. 22, 1977—Subcommittee hearing.
Apr. 25, 1977—Subcommittee hearing.
Apr. 28, 1977—Subcommittee hearing.
Apr. 29, 1977—Subcommittee hearing.
May 2, 1977—Subcommittee hearing.
May 3, 1977—Subcommittee hearing.
May 7, 1977—Field hearing, Chicago, Illinois.
May 14, 1977—Field hearing, Atlanta, Georgia.
June 4, 1977—Field hearing, Denver, Colorado.
June 18, 1977—Field hearing, Seattle, Washington.
June 23, 1977—Briefing on the Status of Mineral Resource Assessment in Alaska, by the United States Geological Survey and the Bureau of Mines, Department of the Interior.
July 1-10, 1977—Subcommittee traveled to Southeast Alaska for field inspection of proposed wilderness areas and forest management practices in the Tongass National Forest, and for public hearings and town meetings on H.R. 39.

July 3, 1977—Town meeting, Pelican, Alaska.
July 3, 1977—Town meeting, Hoonah, Alaska.
July 4, 1977—Town meeting, Petersburg, Alaska.
July 4, 1977—Town meeting, Kake, Alaska.
July 5, 1977—Field hearing, Sitka, Alaska.
July 6, 1977—Town meeting, Angoon, Alaska.
July 7, 1977—Field hearing, Juneau, Alaska.
July 9, 1977—Field hearing, Ketchikan, Alaska.
July 19, 1977—Briefing on Management Practices and wilderness proposals in the Tongass and Chugach National Forests, Alaska by the U.S. Forest Service, Dept. of Agriculture.
July 21-22, 1977—Hearings on delays in conveyance of public lands under the Alaska Native Claims Settlement Act.
Aug. 2, 1977—Report requested from Interior.
Aug. 2, 1977—Report requested from Agriculture on provisions which would designate portions of the Chugach and Tongass National Forests as wilderness.
Aug. 6-21, 1977—Subcommittee traveled to Alaska for public hearings, town meetings, and field inspections of areas proposed in H.R. 39 as additions to the National Park, National Wildlife Refuge, National Forest, National Wild and Scenic Rivers, and National Wilderness Preservation Systems.
Aug. 8, 1977—Town meeting, Bethel, Alaska.
Aug. 9, 1977—Town meeting, Chevak, Alaska.
Aug. 9, 1977—Town meeting, Togiak, Alaska.
Aug. 10, 1977—Town meeting, Dillingham, Alaska.
Aug. 10, 1977—Town meeting Nondalton, Alaska.
Aug. 11, 1977—Town meeting, English Bay, Alaska.

Continued

~ **199**

**A-9**

Aug. 12, 1977—Field hearing, Anchorage, Alaska.
Aug. 13, 1977—Town meeting, Glennallen, Alaska.
Aug. 13, 1977—Town meeting, Yakutat, Alaska.
Aug. 14, 1977—Town meeting, Fort Yukon, Alaska.
Aug. 17, 1977—Town meeting, Ambler, Alaska.
Aug. 17, 1977—Town meeting, Anaktuvuk Pass, Alaska.
Aug. 17, 1977—Town meeting, Kotzebue, Alaska.
Aug. 18, 1977—Town meeting, Noatak, Alaska.
Aug. 18, 1977—Town meeting, Shishmaref, Alaska.
Aug. 19, 1977—Town meeting, Galena, Alaska.
Aug. 20, 1977—Field hearing, Fairbanks, Alaska.
Sept. 12, 1977—Continuation of hearings on delays in conveyance of public lands under the Alaska Native Claims Settlement Act.
Sept. 15, 1977—Subcommittee hearing on Administration's
    proposal.
Sept. 21, 1977—Interior. Favorable, if amended.
Sept. 21, 1977—Subcommittee hearing on Administration's
    proposed amendments.
Oct. 13, 1977—Staff briefing.
Oct. 17, 1977—Staff briefing.
Oct. 18, 1977—Staff briefing.
Oct. 20, 1977—Staff briefing.
Oct. 25, 1977—Staff briefing.
Oct. 27, 1977—Staff briefing.
Oct. 28, 1977—Staff briefing.
Oct. 31, 1977—Staff briefing.
Nov. 1, 1977—Staff briefing.
Nov. 3, 1977—Staff briefing.
Jan. 17, 1978—Subcommittee markup.
Jan. 18, 1978—Subcommittee markup.
Jan. 19, 1978—Subcommittee markup.
Jan. 20, 1978—Subcommittee markup.
Jan. 23, 1978—Subcommittee markup.
Jan. 24, 1978—Subcommittee markup.
Jan. 26, 1978—Subcommittee markup.
Jan. 27, 1978—Subcommittee markup.
Jan. 30, 1978—Subcommittee markup.
Jan. 31, 1978—Subcommittee markup.
Feb. 2, 1978—Subcommittee markup.
Feb. 3, 1978—Subcommittee markup.
Feb. 6, 1978—Subcommittee markup.
Feb. 7, 1978—Subcommittee markup. Reported to Full Committee, amended.
Feb. 28, 1978—Full Committee markup.
Mar. 1, 1978—Full Committee markup.
Mar. 2, 1978—Full Committee markup.
Mar. 3, 1978—Full Committee markup.
Mar. 6, 1978—Full Committee markup.
Mar. 8, 1978—Full Committee markup.
Mar. 8, 1978—Agriculture. Comments on Wilderness in
    Southeast Alaska.
Mar. 8, 1978—Agriculture. Supplemental comments and
    proposed amendments to February 15, 1978, Committee
    Print.
Mar. 13, 1978—Full Committee markup.
Mar. 14, 1978—Full Committee markup.
Mar. 15, 1978—Full Committee markup.
Mar. 21, 1978—Full Committee ordered reported, amended. (32
    yeas, 13 nays).
Apr. 7, 1978—Report filed in House. **H.Rept. 95-1045 (Part I)**
Apr. 7, 1978—Sequentially referred to House Merchant Marine
    and Fisheries Committee.
May 4, 1978—Reported from Merchant Marine and Fisheries
    Committee. H.Rept. 95-1045 (Part II).
May 10, 1978—Rule requested.
May 16, 1978—Rule (open) granted making the text of H.R.
    12625 in order as an amendment in the nature of a substitute for H.R. 39. (H.Res. 1186, H.Rept. 95-1199).
May 17, 1978—Rule adopted. (H.Res. 1186 - 354 yeas, 42 nays)
    and debate began.
May 18, 1978—Floor debate.
May 19, 1978—Passed House, amended. (277 yeas, 31 nays).
Oct. 9, 1978—Reported in Senate. **S.Rept. 95-1300**
(No Senate action was taken on H.R. 39. With an objective of
    maintaining the status quo until Congress could act, on October 14, 1978, the House of Representatives passed, by
    unanimous consent, S. 658, amended, to extend protective
    withdrawals of all federal lands within boundaries of all areas
    either contained in H.R. 39 as passed by the House, encompassed in Senate Report 95-1300 as reported by the Senate
    Committee on Energy and Natural Resources, or as recommended by the Administration, which ever is largest, for a
    period of time not to exceed one year. The bill failed to pass
    the Senate).

200

Jan. 15, 1979—Introduced.

Feb. 1, 1979—Briefing by Secretary of Interior Cecil D. Andrus on administrative actions taken to protect Alaska national interest lands; and by Assistant Secretary of Agriculture M. Rupert Cutler on the present status of national forest land allocations in Alaska.

Feb. 6–8, 1979—Committee hearings.

Feb. 13, 1979—Committee hearing.

Feb. 22, 1979—Agriculture. Recommendations.

Feb. 26, 1979—Interior. Recommendations.

Feb. 27, 1979—Committee markup.

Feb. 28, 1979—Full Committee ordered reported, amended. (23 yeas, 20 nays). (Text of H.R. 2199, amended, adopted as substitute to language of H.R. 39).

Mar. 1, 1979—Full Committee met.

Mar. 5, 1979—Reports requested from Interior, Agriculture on H.R. 39 as ordered reported.

Mar. 13, 1979—Interior. Unfavorable to bill as ordered reported.

Mar. 15, 1979—Agriculture. Favorable, if amended.

Mar. 16, 1979—Agriculture. Supplemental. Unfavorable to bill as ordered reported.

Mar. 19, 1979—Referral to the Committees on Interior and Insular Affairs, and Merchant Marine and Fisheries extended for an additional period ending not later than April 23, 1979.

Mar. 21, 1979—Rule requested.

Apr. 18, 1979—Reported to House. **H.Rept. 96-97 (Part I)**

Apr. 23, 1979—Reported from House Merchant Marine and Fisheries Committee. H.Rept. 96-97 (Part II).

May 1, 1979—Rule (open) granted, making in order the Interior Committee amendment (Huckaby) as the original text, the Merchant Marine Committee amendment (Breaux-Dingell) in order as a substitute for the Interior Committee bill, and H.R. 3651 (Udall-Anderson) in order as a substitute for the Merchant Marine bill. (H.Res. 243, H.Rept. 96-113).

May 4, 1979—Rule adopted. (H.Res. 243 - 236 yeas, 18 nays). Debate began.

May 10, 1979—Floor debate.

May 15, 1979—Floor debate.

May 16, 1979—Passed House, amended. (360 yeas, 65 nays). Prior to final passage, the language of H.R. 3651 (the Udall-Anderson substitute), amended, was adopted. (268 yeas, 157 nays).

Nov. 14, 1979—Reported in Senate. **S.Rept. 96-413**

July 21, 22, 23, 24, 25, 1980—Senate floor debate.

Aug. 4, 5, 18, 1980—Senate floor debate.

Aug. 19, 1980—Passed Senate, amended. (78 yeas, 14 nays).

Nov. 12, 1980—House agreed to the Senate amendment.

Dec. 2, 1980—Approved. **P.L. 96-487**

| 96TH CONGRESS<br>1st Session | SENATE | REPORT<br>No. 96-413 |
|---|---|---|

# ALASKA NATIONAL INTEREST LANDS

---

# REPORT

## OF THE

## COMMITTEE ON ENERGY AND NATURAL RESOURCES UNITED STATES SENATE

together with

. ADDITIONAL VIEWS

TO ACCOMPANY

## H.R. 39



NOVEMBER 14 (legislative day, NOVEMBER 5), 1979.—Ordered to be printed

2535

# CONTENTS

|  |  | Page |
|---|---|---|
| H.R. 39, as reported | | 1 |
| I. Purpose of the measure | | 126 |
| II. Summary of major provisions | | 127 |
| III. Background and need | | 129 |
| IV. Legislative history | | 134 |
| V. Committee recommendation and tabulation of votes | | 135 |
| VI. Committee amendments | | 136 |
| VII. Section-by-section analysis | | 266 |
| VIII. Cost and budgetary considerations | | 334 |
| IX. Regulatory impact evaluation | | 344 |
| X. Executive communications | | 345 |
| XI. Additional views | | 369 |
| XII. Changes in existing law | | 448 |

(III)

2538

the area's existing pulp and saw mills. Some 10 mmbf. of State lands timber annually may also have impact.

Set forth below in tabular form is a summary of the Committee's action last year relative to timber availability and wilderness designation in the Tongass. While some of the base data has changed slightly since the completion of the TLUMP, the assumptions and approach employed by the Committee in designating wilderness in Southeast Alaska are still valid.

| Estimated Timber Yield Available for Harvest Each Year:[1] | Million board feet |
|---|---|
| Total potential sustained yield from all classifications (excludes State or Native timber) | 1,180 |
| Unregulated (reserved, small parcels, 75-plus percent slopes, soil hazards) | −290 |
| Other reserved and not available (various timber retention factors applied for resource protection) | −172 |
| Total potential sustained yield less unregulated and other reserved | 718 |
| Marginal (available but subject to economic or technical restraints | −158 |
| Net total sustained annual yield of standard and special categories or "available average annual harvest" | 560 |
| Estimated Effect of Committee Wilderness Package: | |
| Total annual potential yield less what is reserved, non-harvestable, or marginal "A-base" | 560 |
| 10,000,000 per year investment for increased timber yield and $5,000,000 loan fund | 60 |
| Impact of Native timber | 36 |
| Estimated allowable cut before deductions | 656 |
| Additional Reduction for Proposed Wilderness Designation | −80 |
| Additional reduction for possible relocation of Native timber off Admiralty Island | −7 |
| Annual allowable cut less wilderness and Native timber relocation | 569 |

[1] Assumes the "A-base" Alternative from the Tongass Land Use Management Plan including a $1,600,000 investment for preroading into selected areas.

Thus, it appears that the Committee recommendations will indeed protect the existing timber industry in Southeast while providing wilderness designation for several key areas.

The Committee realizes that there is some disagreement regarding the figures presented above relative to timber availability, potential yield investment opportunities, etc. During its deliberations, the Committee was unable to obtain a consistent set of data from the Forest Service regarding these factors. However, the Committee feels that the numbers employed in the calculations above are fair estimates of the effect the Committee actions will have on timber supply levels from the Tongass.

### TITLE VIII—SUBSISTENCE MANAGEMENT AND USE

#### OVERVIEW

Alaska's more than 200 rural villages are unique in that they are the last communities in the United States in which a substantial number of residents are still dependent upon the harvest of renewable re-

2768

sources on the public lands for their sustenance. The importance of subsistence uses of such resources to the physical, economic and cultural well-being of Alaska Natives and other rural residents has been exhaustively chronicled in testimony presented at hearings, town meetings and workshops held by the committee during consideration of both the Alaska Native Claims Settlement Act and the Alaska National Interest Lands Conservation Act. The committee notes that the report of the Committee on Interior and Insular Affairs of the House of Representatives on H.R. 39 (House Report No. 95–1045, Part I, pp. 181–187) documents the importance of such uses in considerable detail.

### HISTORY OF CONCERN

The Committee has had a long-standing concern for the protection of subsistence resources and uses in Alaska. In Section 21 of S. 35, the Senate version of the Alaska Native Claims Settlement Act, the Secretary was directed to establish subsistence zones on the public lands, and, in circumstances in which subsistence resources or uses were threatened, to exercise his closure authority by prohibiting all consumptive uses of such resources within a zone except for subsistence uses by Alaska Natives. The conferees failed to adopt this provision in the conference report; however, the statement of the managers clearly established the intent of the Congress that the Secretary exercise his closure authority in a manner consistent with the purposes of Section 21:

> The conference committee, after careful consideration believes that all Native interest in subsistence resource lands can and will be protected by the secretary through the exercise of his existing withdrawal authority. The secretary could, for example, withdraw appropriate lands and classify them in a manner which would protect native subsistence needs and requirements by closing appropriate lands to entry by nonresidents when the subsistence resources of these lands are in short supply or otherwise threatened. The conference committee expects both the secretary and the state to take any action necessary to protect the subsistence needs of the natives.

In 1973, the committee adopted, and the Congress enacted, provisions in the Trans-Alaska Oil Pipeline Act (P.L. 93–153) which provided for strict liability of the pipeline right-of-way holder for "fish, wildlife, biotic or other natural resources relied upon by Alaska Natives, Native organizations, or others for subsistence or economic purposes" and required stipulations in all oil and gas pipeline right-of-way permits to protect the "interests of individuals living in the general area of the right-of-way permit who rely on the fish, wildlife, and biotic resources of the area for subsistence purposes." Other Acts of Congress also have recognized the unique dependence of rural Alaskans on subsistence resources. For example, the Marine Mammal Protection Act includes a subsistence exemption for Native residents of coastal villages in Alaska (16 U.S.C. 1371(b)). Similarly, subsistence uses by Alaska Natives and other residents of Native villages are exempted from coverage of the Endangered Species Act (16 U.S.C. 1539(e)).

2769

The subsistence management provisions of S. 9 as introduced reflect a delicate balance between the traditional responsibility of the State of Alaska for the regulation of fish and wildlife populations within the State and the responsibility of the Federal Government for the attainment of national interest goals, including the protection of the traditional lifestyle and culture of Alaska Natives.

The Committee amendment differs from Title VII of H.R. 39, as passed by the House of Representatives in two respects. The first relates to subsistence hunting by local residents within national parks and monuments. Under the Committee amendment, parks and monuments are closed to all forms of hunting unless subsistence uses are permitted by this Act. Subsistence resources commissions are to be established to recommend a program for subsistence hunting in such parks and monuments.

The second major difference is the means for enforcement of the subsistence preference. The House bill requires the Secretary to take certain administrative actions if he determines that the State has failed to establish a subsistence program or to implement such a program in a manner which adequately satisfies the preference for subsistence uses. While the committee has retained broad Federal guidelines to ensure the adequate implementation of the subsistence preference on the public lands and the Secretary's ongoing responsibility to monitor the State's implementation of such preference, the Committee believes that the responsibility of the Secretary to ensure the protection of subsistence uses and the satisfaction of subsistence needs of Alaska Natives and other rural residents can best be met by providing legal representation for such residents before the United States District Court in appropriate instances in which the Secretary has determined, after consultation with the State, that the State has not timely or adequately provided for the preference for subsistence uses. Although it is the intent of the committee to neither enlarge nor diminish any existing authority of the Secretary to take appropriate administrative action to protect subsistence uses and satisfy subsistence needs of rural residents of Alaska, the committee believes that the responsibilities and authorities of the Secretary and the United States District Court set forth in section 804–807 ensure the protection of subsistence activities and the discharge of Federal responsibilities.

During consideration of Alaska National Interest Lands legislation, the Committee adopted several changes to the subsistence management and use title in S. 9 which clarify the Committee's intent and improve the workability of the subsistence management system.

Major changes adopted by the Committee include:

*The Conservation of Healthy Populations of Fish and Wildlife*

Long-term protection of fish and wildlife populations is necessary to ensure the continuation of the opportunity for a subsistence way of life. Consequently, subsistence uses on the public lands must be conducted in a manner consistent with "the conservation of healthy populations of fish and wildlife", an approach emphasized by the Committee in a series of amendments to incorporate that concept into the language of Sections 802(1), 808(b), and 815 (1) and (3). It also

2770

should be noted that a recommendation of a regional council pursuant to Section 805 would not be supported by substantial evidence if the recommendation is inconsistent with the conservation of healthy populations of fish and wildlife. The Committee intends the phrase "the conservation of healthy populations of fish and wildlife" to mean the maintenance of fish and wildlife resources and their habitats in a condition which assures stable and continuing natural populations and species mix of plants and animals in relation to their ecosystems, including recognition that local rural residents engaged in subsistence uses may be a natural part of that ecosystem; minimizes the likelihood of irreversible or long-term adverse effects upon such populations and species; and ensures maximum practicable diversity of options for the future. The greater the ignorance of the resource parameters, particularly of the ability and capacity of a population or species to respond to changes in its ecosystem, the greater the safety factor must be. Thus, in order to insure that subsistence uses are compatible with the maintenance of healthy populations of fish and wildlife, it must be recognized that the likelihood of irreversible or long-term adverse effects to a population or species must be proportional to the magnitude of the risks caused by a proposed use of such population or species.

The Committee recognizes that the management policies and legal authorities of the National Park System and the National Wildlife Refuge System may require different interpretations and application of the "healthy population" concept consistent with the management objectives of each system. Accordingly, the Committee recognizes that the policies and legal authorities of the managing agencies will determine the nature and degree of management programs affecting ecological relationships, population dynamics, and manipulation of the components of the ecosystem.

*Definition of "Subsistence Uses"*

Although many residents of cities such as Ketchikan, Juneau, Anchorage, and Fairbanks harvest renewable resources from the public lands for personal or family consumption, by its very nature a "subsistence use" is something done only by Native and non-Native residents of "rural" Alaska. The Committee adopted an amendment to clarify this point by limiting application of the definition to areas of "rural" Alaska including communities such as Dillingham, Bethel, Nome, Kotzebue, Barrow, and other Native and non-Native villages scattered throughout the State. However, the Committee does not intend to imply that the rural nature of such communities is a static condition; the direction of the economic development and rural character of such communities may change over time. It should be emphasized that this amendment is not intended to impose a "durational" rural residency requirement in the definition or impede the traditional movement of Alaska residents between the rural areas and the major population centers and vice versa. Nor does the amendment prohibit the taking of fish and wildlife on certain public lands by normal residents. Rather, nonsubsistence uses may continue in accordance with existing law but do not enjoy any preference on the public lands, and, consequently, may be restricted pursuant to Section 804 when necessary to protect subsistence resources or to ensure the satisfaction of the subsistence needs of rural residents.

2771

The definition has been modified to eliminate the "for personal or family consumption" limitation upon the taking of wild, renewable resources for "customary trade". The Committee does not intend that "customary trade" be construed to permit the establishment of significant commercial enterprises under the guise of "subsistence uses". The Committee expects the Secretary and the State to closely monitor the "customary trade" component of the definition and promulgate regulations consistent with the intent of the subsistence title.

*Local And Regional Participation*

An amendment to section 805 clarifies that regardless of whether the regional council system is established by the Secretary or the State, the relationship between the regional councils and the Secretary or the State is the same; that is, either the Secretary or the State may choose not to follow a recommendation made by a council if the recommendation is not supported by substantial evidence, violates recognized principles of fish and wildlife conservation, or would be detrimental to the satisfaction of subsistence needs. Another important amendment clarifies that if the State enacts and implements laws of general applicability which satisfy the requirements of Sections 803, 804, and 805, then, unless and until repealed, such State laws shall supersede Sections 803, 804, and 805 insofar as such sections govern State responsibility for the taking of fish and wildlife on the public lands for subsistence uses.

*Judicial Enforcement*

The major amendment to Section 807 clarifies that while the Secretary is not required to hold a hearing (either informal or pursuant to formal procedures set forth in the Administrative Procedures Act) prior to bringing a civil action against the State on behalf of a local committee or regional council, he is required, prior to bringing such action, to make a determination in writing setting forth substantial evidence that the State has failed to make adequate and timely provision of the subsistence preference after having been provided a reasonable opportunity to do so, and that such failure threatens the ability of local residents to satisfy their subsistence needs.

*Subsistence and Land-Use Decisions*

The Committee adopted two important technical amendments to Section 810. The first substitutes the well-recognized legal standard of "reasonable" in place of "adequate" to describe the steps which the head of a Federal agency must take to minimize adverse impacts on subsistence uses prior to permitting a withdrawal, reservation, lease, permit, or other use, occupancy, or disposition of the public lands which would significantly restrict subsistence uses, although it should be recognized that steps which are "inadequate" to minimize adverse impacts will rarely be "reasonable" within the meaning of this section. The second amendment clarifies that the requirements of Section 810 are "procedural" in that until the requirements of the section have been satisfied the proposed action may not proceed, but once the requirements of the section are satisfied and incorporated into existing land use planning processes the proposed action may proceed even though its effect may be adverse to subsistence uses.

2772

**A-18**

*Elimination of the 10-Year Level of Use*

The Committee adopted an amendment to Section 815(1) which eliminated the 10-year standard of measurement on the level of subsistence uses on the public lands. In place of the 10-year standard the Committee substituted language to clarify that nothing in the subsistence management and use title is intended to permit the level of subsistence uses of fish and wildlife within a conservation system unit to be inconsistent with "the conservation of healthy populations, and within a national park or monument to be inconsistent with the conservation of natural and healthy populations, of fish and wildlife". The reference to "natural and healthy populations" with respect to national parks and monuments recognizes that the management policies of those units may entail methods of resource and habitat protection different from methods appropriate for other types of conservation system units.

*Nonsubsistence Uses of Fish and Wildlife on the Public Lands*

An amendment to Section 815(3) clarifies that the subsistence management and use title is not intended to restrict nonsubsistence uses of fish and wildlife permitted on the public lands except as necessary pursuant to Sections 804 and 816. Nonsubsistence uses also may be appropriately restricted in accordance with other applicable laws in addition to the subsistence title.

The amendments described above are the major clarifying amendments to the subsistence management and use title adopted by the Committee. However, the Committee also adopted a number of technical amendments which are consistent with the title developed last year and which improve the technical workability of the subsistence management system. It also should be noted that nothing in Sections 802, 804, or 807 is intended to affect the Secretary's closure authority pursuant to Section 816.

TITLE IX—IMPLEMENTATION OF THE ALASKA NATIVE CLAIMS SETTLEMENT ACT AND THE ALASKA STATEHOOD ACT

Title IX of S. 9, as introduced, established an expedited legislative conveyance procedure for Native land selections under the Alaska Native Claims Settlement Act and for State selections under the Alaska Statehood Act. Several other provisions designed to facilitate State and native land conveyances were also included in Title IX. The title was adopted by the Committee as a means, along with the designation of national interest lands in the remainder of the bill, to help resolve Alaska's uncertain land ownership status with respect to State and Native land selections and conveyances. Title IX contains the substantive provisions which follow from the finding in Title I, that a prompt and thorough resolution of the status of Alaska public lands is in the best interest of everyone in the Nation.

Several minor amendments to Title IX were agreed to by the Committee and are described in the discussion below.

H.R. 39, as passed by the House, contains language which is similar to the Committee amendment with respect to conveyances to village corporations and other provisions related to native lands, but does not include a provision comparable to Section 902 (other Conveyances to Native Corporations).

2773

cultural, or scientific resources of the special management area would be adversely affected.

Subsection 706(c) withdraws the land in special management areas from the operation of the United States Mining law. The provision for classification and opening of these lands are identical to those provided for national conservation areas established pursuant to Title IV. The Committee does not intend that these lands be managed as wilderness.

Subsection 706(d) directs the Secretary of Agriculture to monitor timber supply and demand in Southeastern Alaska, At any time after ten years after the date of enactment, the Secretary is directed to request a waiver of the prohibition on timber sales if he finds that timber in any special management area must be sold to maintain the supply to dependent industry at a rate of 520 million board feet per year.

Subsections 706 (e) and (f) provide an expedited procedure for a Congressional approval of any waiver request.

Subsection 706(g) gives the State of Alaska standing to seek a Federal Court Order directing the Secretary of Agriculture to make the finding required and transmit a proposed statutory waiver. The Committee included this provision so as to give the State an opportunity to challenge the Secretary's failure to seek a waiver if it believes that the Secretary of Agriculture should have made the finding required by subsection 706(d). Of course, the State would have to present evidence substantiating its claim and the Secretary of Agriculture would have the opportunity to rebut such evidence.

*Section 707: National Forest Timber Utilization Program*

Section 707 establishes a special timber utilization program for the Tongass National Forest. The program is designed to help make Federal timber available from marginal lands. The program includes construction and maintenance of forest development roads under subsection 707(a) and a special loan program to assist timber purchasers under subsection 707(b).

## Title VIII—Subsistence Management and Use

*Section 801: Findings*

The findings are based on the hearings, town meetings and workshops held by the committee in Alaska and Washington. The findings provide the factual and legal foundation for Congressional action to protect subsistence resources and uses on the public lands. The committee recognizes the importance of continued subsistence uses to the economy and lifestyle of rural Alaska, and particularly to the culture of the Alaska Natives. Alternative food sources generally are not available in most rural village to offset a diminution of the traditional subsistence harvest. However, the continuation of subsistence uses in rural Alaska is threatened by the rapid population growth of Anchorage, Fairbanks and other urban centers and the resultant pressure which urban residents engaged in subsistence and sports uses have placed upon important fish and wildlife populations in heretofore remote areas of the State. The subsistence management and use title is the culmination of Congressional action initiated

*2805*

by Congress by the Alaska Native Claims Settlement Act to protect and provide for continued subsistence uses by Alaska Natives and other rural residents, and is based upon the constitutional authority of Congress over Native affairs and its authority under the Property Clause and the Commerce Clause. The committee also has determined that the protection of the subsistence way of life and the fish and wildlife populations upon which that lifestyle depends necessitates the establishment of an administrative structure which enables rural residents with personal knowledge of local conditions and requirements to have a meaningful role in the regulations and management of fish and wildlife and subsistence uses on the public lands.

*Section 802: Policy*

Based upon the findings in the preceding section, three basic policies have been established which shall guide the activities of the Federal government and the State on the public lands: that the utilization of the public lands is to cause the least adverse impact possible upon rural residents who depend upon subsistence uses for their economic and physical well-being and cultural vitality; the nonwasteful subsistence uses of fish, wildlife and other renewable resources, e.g., berries, timber, grasses, shall be the first priority consumptive use of such resources on the public lands, and when or where it is necessary to restrict the taking of such resources, taking for nonwasteful subsistence uses shall be given preference over other consumptive uses; and that the successful management of subsistence resources and activities requires long term cooperation between adjacent landowners and managers, including appropriate State and Federal agencies, Native corporations, and other nations.

*Section 803: Definition*

The committee has adopted a definition of "subsistence uses" based on the definition of that term set forth in section 15, ch. 151 SLA 1978 (A.S. 16.05.940) of the Alaska Statutes. In turn, the State definition was modeled on section 703 of the House bill." "Subsistence uses" are defined as the customary and traditional use in Alaska of fish, wildlife and other renewable resources for direct personal or family consumption, for the making and selling of handicraft articles from the nonedible by-products of fish and wildlife taken for direct personal or family consumption, and for customary trade, barter, or sharing for personal or family consumption. The definition of "family" recognizes extended family patterns common to all of Alaska's Native cultures. "Family" includes any person living in a household on a permanent basis as well as those persons living outside the household who are related by blood, marriage or adoption (legal or equitable). "Barter" means the exchange or trade of fish or wildlife, or their parts, for other fish or wildlife, or their parts, or for other food or nonedible items other than money if the exchange is of a limited and noncommercial nature. This definition of "barter" recognizes that in many rural villages the subsistence diet must be supplemented with other foods which may be available from the village store and other sources, and that the limited noncommercial barter of subsistence resources for nonedible items is an essential element of the rural subsistence lifestyle. The definition of "subsistence uses" is intended to include all

2806

**A-21**

Alaska residents who utilize renewable resources for direct personal or family consumption.

However, the phrase "customary and traditional" is intended to place particular emphasis on the protection and continuation of the taking of fish, wildlife, and other renewable resources in areas of, and by persons (both Native and non-Native) resident in, areas of Alaska in which such uses have played a long established and important role in the economy and culture of the community and in which such uses incorporate beliefs and customs which have been handed down by word of mouth or example from generation to generation. The factors of local residency, economic dependence, and availability of alternative resources have been included in section 804 rather than in the definition. Although a truly comprehensive definition of "subsistence uses" must include a mix of those factors, the committee has determined that they should be incorporated through appropriate action by the State rulemaking authority in conjunction with the recommendations of the regional councils established pursuant to section 805 to implement the subsistence preference set forth in section 804. Sections 803–805 are intended to establish a dynamic process for the regulation of subsistence resources and uses which will enable rural people to participate in the decisionmaking process of the State rulemaking authority in the inclusion of the local residency, economic dependence, and availability of alternative resources factors into the definition of "subsistence uses" on a case-by-case basis to meet the needs of a particular management situation in a particular area.

*Section 804: Preference for Subsistence Uses*

This section requires both the State and the Federal government to accord nonwasteful subsistence uses a preference over the taking of such resources for other purposes on the public lands. Although the committee recognizes that only rarely will the failure to adequately provide for the preference result in the threat of literal starvation, in many instances the failure to obtain fish to dry for winter use or fresh meat to supplement other foods can engender considerable individual, community and cultural trauma and hardship. Consequently, this section envisions that governmental action affecting subsistence resources and uses shall be undertaken in a manner which adequately provides for the preference on an ongoing basis and not only when critical allocation decisions may be necessary because a particular subsistence resource may be threatened with depletion, so long as such action is conducted in a manner which is consistent with the protection of the continued viability of fish and wildlife populations which may be affected by such action. If a particular fish or wildlife population (e.g. salmon, moose or caribou) in a particular area is sufficient to sustain a harvest by all persons engaged in subsistence and other uses, the implementation of restrictions on taking set forth in this section need not be imposed by the State rulemaking authority. However, if the continued viability of a particular population or the ability of rural subsistence-dependent residents to satisfy their subsistence needs would be threatened by a harvest by all such persons, the State rulemaking authority, in conjunction with the recommendations of the regional council representing the affected area, is required by this section

*2807*

to establish regulations which restrict the taking of such population to Alaska residents engaged in subsistence uses.

If "subsistence uses" must be further restricted to protect the continued viability of the population or to ensure the satisfaction of rural subsistence needs, the State rulemaking authority, in conjunction with the recommendations of the regional council, must limit such uses to local residents of the affected area, or, if necessary, only those local residents with the most customary and direct dependence on the population as the mainstay of livelihood and with the least access to alternative food supplies. In the latter situation, the committee believes that in making such difficult allocation decisions, the State rulemaking authority, in conjunction with the recommendations of the regional council, should endeavor to utilize the special knowledge of local conditions and requirements of the local advisory committees within the affected region. This section also requires the Secretary of the Interior and the Secretary of Agriculture to give subsistence uses preferential consideration in their management activities on the public lands which directly relate to the taking of fish and wildlife, and to take appropriate action to protect such uses and the continued viability of fish and wildlife populations upon which the continuation of such uses depend.

*Section 805: Local and Regional Participation*

The committee has determined that the opportunity for rural residents of Alaska with personal knowledge of local conditions and requirements to participate effectively in the management and regulation of subsistence resources on the public is important in order to assure both the continued viability of fish and wildlife populations of national importance and the ability of rural people engaged in a subsistence lifestyle to continue to do so. Although the State has indicated that it intends to provide greater support to its existing local advisory committees and establish a system of regional councils throughout the rural areas of the state which will have a major role in the State rulemaking authority's establishment of seasons, bag limits and the provision of the preference for subsistence uses in their respective areas, the State still is in the process of establishing such a system. Section 805 implements section 801(5) by requiring the Secretary of the Interior to establish a regional council, and if necessary a local committee, system on the public lands if within one year from the date of enactment of this Act the State has not yet established a system for local and regional participation which satisfies the requirement of this section.

The State system of local and regional participation shall be in compliance with the requirements of this section and the Secretary shall not establish local committees or regional councils if the State: (1) divides the public lands into at least six regions. The number and boundaries of the regions must be sufficient to assure that regional differences in subsistence uses are adequately accommodated.

However, it is the intent of the Committee that the number and boundaries of the regions be established in a manner which does not permit the large urban population centers to dominate the regional council system and exercise control over the regulation of subsistence resources in the rural areas; (2) strengthens the existing State local

fish and game advisory committee system by adequately funding committee activities, assigning appropriate staff and distributing available support data to the committees, and encouraging the committees to work closely with the regional councils to develop a recommended strategy for the management of subsistence resources within each region and recommendations concerning policies, standards, guidelines, and regulations to implement the strategy; (3) establishes a regional council within each region composed of residents of the region with duties and responsibilities analoguous to those set forth in section 805(a)(3), and asigns staff and distributes available support data to the councils; and (4) provides by statute or regulation that recommendations made by the regional councils to the State rulemaking authority concerning the taking of fish and wildlife populations on the public lands within their respective regions for subsistence uses shall be considered by the authority during the course of its administrative proceedings.

The rulemaking authority may choose not to follow a recommendation if it determines that based on the evidence presented during the course of the administrative proceedings of the board the recommendation is not supported by substantial evidence, violates recognized principles of fish and wildlife conservation, or would be detrimental to the satisfaction of subsistence needs. If the authority makes such a determination and chooses not to follow the recommendation it shall set forth the factual basis and the reasons for its decision.

So long as the State is in full compliance with the requirements of this section, the Secretary of the Interior shall reimburse the State for reasonable costs relating to the operation of the local committees and the establishment and operation of the regional councils. Such reimbursement may not exceed 50 per centum of such costs in any fiscal year, and total payments to the State shall not exceed the sum of $5,000,000 in any one fiscal year.

If the Secretary determines, one year after the date of this Act and after notice and hearing, that the State is not in full compliance with the requirements of this section, he shall establish a regional council system, and if necessary a local committee system, on the public lands pursuant to the requirements of this section. In performing this monitoring responsibility pursuant to section 806 and in the exercise of his closure and other administrative authority over the public lands the Secretary of the Interior and the Secretary of Agriculture shall be guided by the annual report and advice of the regional councils established by the Secretary of the Interior pursuant to this section, and shall follow such advice unless he determines in writing that such evidence is not supported by substantial evidence, violates recognized principles of fish and wildlife conservation, or would be detrimental to the satisfaction of subsistence needs.

*Section 806: Federal Monitoring*

This section requires the Secretary of the Interior to monitor the State's provision of the preference for subsistence uses on the public lands including, in consultation with the Secretary of Agriculture, units of the National Forest System. Such monitoring responsibilities should include ongoing communication and cooperation between Federal land and resources managers and Alaska Department of Fish and

2809

Game personnel, local fish and game advisory committees, regional councils, the State Board of Game and the State Board of Fisheries. In addition, the Secretary must develop a capability to monitor both the status of fish and wildlife populations on the public lands harvested for subsistence uses and State regulatory and enforcement activities to provide the preference for subsistence uses, particularly in the rural areas of Alaska. The monitoring capability must enable the Secretary to aid in the identification of potential problems before fish or wildlife populations become threatened with depletion with resultant hardship to rural subsistence-dependent residents, and communicate information about, and suggested recommendations for the solutions of, such problems to the State, the local committees, and the regional councils in a timely manner. However, such monitoring capability need not necessarily require the creation of a new or separate administrative structure within the Departmnet of the Interior.

*Section 807: Judicial Enforcement*

In addition to his monitoring responsibilities set forth in section 806, this section requires the Secretary of the Interior to investigate any allegation made by a local committee or regional council established by the Secretary or the State pursuant to section 805 that the State is not adequately providing for the preference for subsistence uses within a particular area of the public lands, as to the taking of a particular fish or wildlife population on such lands, or in some other manner. The Secretary shall investigate and report publicly on the results of his investigation. After communicating the results of his investigation to the State, if the Secretary determines that the State still is not adequately providing for the preference after having had a reasonable opportunity to do so, he shall file a civil action against the State in the District Court on behalf and at the request of the local committee or regional council which made the allegation to require the State to take such actions as are necessary to adequately and timely provide such preference.

The failure to adequately restrict the harvest of a particular fish or wildlife population by persons engaged in subsistence or other uses in a particular area (e.g. salmon on the Copper River, moose on the lower Yukon, or caribou in the northwest arctic) pursuant to the criteria set forth in section 804 may threaten such population with immediate and irreparable harm and engender considerable hardship among residents of rural communities which are depndent upon such populations. Consequently, the committee believes that in many situations time may be of the essence to prevent such threat of harm to subsistence resources or human hardship and that temporary judicial relief may be necessary.

The committee also recognizes that because of the location of the Federal courts, inclement weather, poor communication and transportation systems, and the geographical, and in many instances cultural, isolation of many rural communities, timely and effective temporary relief may not be possible under normal judicial procedures. In recognition of these unusual circumstances, this section requires that upon the filing of the complaint, if the District Court makes appropriate findings based upon the pleadings as set forth in this section it shall issue an order to the State to show cause why relief requested in the

2810

complaint should not be granted, and also requires the court to expedite the action in every way. However, no order granting temporary relief shall be issued until the State has been provided an opportunity for hearing. Temporary relief may not be necessary in every case and should terminate upon the alleviation of the circumstances which required such relief. Based upon the circumstances of each situation, the court should endeavor to give due deference to the expertise of the Alaska Department of Fish and Game in regulating and conserving fish and wildlife populations in Alaska which are the subject of subsistence uses. Temporary relief should be limited to an order directing the State to issue an emergency regulation either closing a portion of the public lands to the taking of a particular fish or wildlife population except for subsistence uses by local residents of the affected area (or the most subsistence dependent residents of the area), or, less frequently, opening the harvest of such population to such residents. The taking of fish or wildlife for subsistence uses as directed in the order shall be conducted in conformance with applicable State regulations governing such taking which are not directly related to the regulations which have been superseded by the order, or are not in conflict with such order.

To the extent practicable the court should endeavor to fashion a temporary order which draws upon the expertise and special knowledge of the Alaska Department of Fish and Game. Permanent relief shall be limited to directing the State to submit new regulations to the court which adequately provide for the preference for subsistence uses in the situation which gave rise to the action. When, and if, the court determines that such regulations adequately provide for the preference such regulations shall be incorporated as part of the final order. Such final order shall terminate upon the expiration of the normal period of validity under State law (generally one year) of the regulations which were superseded by the regulations incorporated in the order. Although local committee or regional council may obtain immediate judicial review in State court of a determination of the Board of Game or Board of Fisheries that a regional recommendation should not be adopted because it is not supported by substantial evidence, violates recognized principles of fish and wildlife conservation or would be detrimental to the satisfaction of rural subsistence needs, this section shall be the sole Federal judicial remedy created by this title for a local committee or regional council which determines that the preference for subsistence uses has not been adequately provided by the State in its region. Consequently, such board or council could simultaneously seek judicial review in State court of the refusal of the Board of Game or Board of Fisheries to adopt a regional recommendation and request an investigation by the Secretary, and potentially the filing of a civil action, pursuant to this section.

*Section 808: Park and Monument Resources Commissions*

This section establishes a subsistence resources commission for each national park or monument within which subsistence uses are permitted by this Act. Each council shall be composed of nine members: Three members appointed by the Secretary of the Interior, three members appointed by the the Governor of Alaska, and three members

appointed by the regional council established by the Secretary or the State pursuant to section 805 which has jurisdiction within the area in which the park or monument is located. Members of the commission appointed by the regional council must be a member of either the regional council or a local committee within the region, and also a resident of a village within or adjacent to the park or monument or whose residents engage in subsistence uses within the park or monument. The commissions shall be established within one year from the date of enactment of this Act, and within eighteen months from the date of enactment of this Act shall devise and recommend a program which provides for subsistence uses of wildlife within the park or monument. Each commission should work closely with the local committees and regional boards in its region and with local communities whose residents are dependent upon the continuation of subsistence uses within the park or monument.

Each year thereafter each commission shall make recommendations to the Secretary and the Governor for any changes in the program or its implementation which it deems necessary, if any. The Secretary shall promptly implement the subsistence program, or yearly recommendations, unless he determines in writing that such program, or yearly recommendation, violates recognized principles of wildlife conservation, is contrary to the purposes for which the park or monument is established, or would be detrimental to the satisfaction of subsistence needs. Pending development and implementation of the subsistence program in each park or monument, the Secretary shall manage such park or monument to permit subsistence uses by local residents.

*Section 809: Cooperative Agreements*

This section authorizes and encourages the Secretary of the Interior and the Secretary of Agriculture to enter into cooperative agreements and otherwise cooperate with other Federal agencies, the State, Native corporations, and other appropriate persons and organizations, including other nations, to manage and protect fish and wildlife resources utilized for subsistence purposes and to otherwise effectuate the purposes and policies of this title.

*Section 810: Subsistence and Land Use Decisions*

This section requires all Federal land managers and Federal agencies with primary jurisdiction over the public lands, including conservation system unit managers and the Bureau of Land Management, to evaluate the effect on subsistence uses and needs in determining whether to withdraw, reserve, lease or otherwise permit the use, occupancy, or disposition of the public lands under any provision of law authorizing such actions. Prior to any withdrawal, reservation, lease, permit, or other use, occupancy or disposition of such lands which would significantly restrict subsistence uses, the head of the appropriate Federal agency shall give notice to the appropriate State agency and local committees and regional councils, give notice to local residents of the area and hold a hearing in the vicinity of the area involved, and determine that such a significant restriction of subsistence uses is necessary and consistent with sound management principles for the utilization of the public lands, that the proposed activity will involve the minimal amount of public lands necessary to accom-

2812

plish the purposes of the proposed action, and that reasonable steps will be taken to minimize adverse impacts upon subsistence uses and resources. If the Secretary is also required to prepare an environmental impact statement pursuant to the National Environmental Policy Act as well as comply with the requirements of this section, he shall provide the notice and hearing as part of the preparation of, and include the findings required by this section in, such environmental impact statement. This section is not to be construed as prohibiting, impairing or in any manner affecting the selection by, and conveyance to the State of Alaska or any Native corporation of any portion of the public lands selected or conveyed pursuant to the Alaska Statehood Act or the Alaska Native Claims Settlement Act.

*Section 811: Access*

This section requires the Secretary of the Interior and Secretary of Agriculture to ensure that residents engaged in subsistence uses shall have appropriate access to subsistence resources on the public lands, and shall permit the taking of fish and wildlife for subsistence uses in areas of Alaska designated as national preserves, national conservation areas, national recreation areas, national parks nd monuments in which subsistence uses specifically are permitted by this Act, and areas of the National Wildlife Refuge, National Forest, and Wild and Scenic Rivers Systems in accordance with the requirements of this title and other applicable laws of the United States and the State of Alaska.

The committee intends that access to fish and wildlife populations shall be provided to local residents engaged in subsistence uses regardless of where such populations may be located in the future (except that the section is not intended to permit the subsistence use of wildlife in national parks and monuments which are permanently closed to such uses). Traditional habitat and migration routes may be altered by transportation systems and development activities on the public lands. By focusing on access to the resource itself, rather than on the particular portion of the public lands upon which the resources may presently be located, this section provides the flexibility necessary to ensure the continuation of subsistence uses in the future, subject to reasonable regulation.

This section also recognizes the importance of the use of snowmachines, motorboats, and other means of surface transportation traditionally employed for subsistence purposes on the public lands. Although aircraft are not included within the purview of this section, reference to means "traditionally employed" for subsistence purposes is not intended to foreclose the use of new, as yet unidentified means of surface transportation, so long as such means are subject to reasonable regulation necessary to prevent waste or damage to fish, wildlife or terrain.

*Section 812: Research*

This section requires the Fish and Wildlife Service and the National Park Service to work in close cooperation with each other and with the State of Alaska and other appropriate Federal agencies in conducting new and ongoing research on fish and wildlife populations utilized for subsistence purposes on the public lands, and on the subsistence use of such populations. The section requires both agencies to utilize the

2813

special knowledge of local conditions and requirements of local residents engaged in subsistence uses in their area.

The expertise of the local committees and regional councils also is a valuable source of information about subsistence resources and uses, and the committee expects all Federal agencies engaged in subsistence related research to inform the appropriate committees and councils about research projects being planned or conducted in their respective areas and work closely with those organizations. The results and data obtained from research conducted pursuant to this section shall be made available to the State, the local committees and regional councils, and other appropriate persons and organizations. The committee also respects that research conducted pursuant to this section will be undertaken in a manner which does not disrupt the traditional activities of rural residents engaged in subsistence uses, as well as the communities and cultures of which such residents may be a part.

*Section 813: Periodic Reports*

Four years after the date of enactment of this Act and every three years thereafter, the Secretary of the Interior, in consultation with the Secretary of Agriculture, shall prepare and submit a report to the congress which shall include a description and evaluation of monitoring activities undertaken pursuant to section 806, the status of fish and wildlife populations on the public lands harvested for subsistence uses, a description of the nature and extend of subsistence and other uses of fish and wildlife on the public lands, a description of the role of subsistence uses in the economy and culture of rural Alaska, comments on the report by the State of Alaska, the local committees and regional councils and other appropriate persons and organizations, a description of those actions taken by the Secretary or the State, or which may need to be taken in the future to protect and continue subsistence uses on the public lands, and such other recommendations as the Secretary deems appropriate. A notice of the report shall be published in the Federal Register and the report made available to the public.

*Section 814: Regulations*

This section requires the Secretary of the Interior and the Secretary of Agriculture to prescribe such regulations as are necessary and appropriate to carry out their respective responsibilities under this title.

*Section 815: Limitations; Savings Clauses*

This section provides that nothing in this Act is intended to be construed as granting any property right in any subsistence resource on the public lands; permitting the level of subsistence uses to be inconsistent with the conservation of healthy populations of fish and wildlife, within a conservation system unit, and with the conservation of natural and healthy populations within a national park or monument; permitting any privilege which may be granted by the State to any person with respect to subsistence uses to be assigned; permitting any subsistence use of fish or wildlife on any portion of the public lands which was permanently closed to such uses on January 1, 1978; vesting elsewhere than in the Secretary any authority to manipulate habitat on any portion of the public lands; enlarging or diminishing the responsibility and authority of the State of Alaska for the management

2814

of fish and wildlife on the public lands except as specifically provided in this Act; amending the Alaska constitution; or modifying or repealing the provisions of any Federal law governing the conservation or protection of fish and wildlife.

*Section 816: Closure to Subsistence Uses*

This section provides that all national parks and monuments in Alaska shall be closed to the taking of wildlife except for subsistence uses to the extent specifically permitted by this Act. Subsistence and sport fishing shall be permitted in such areas in accordance with the provisions of this title and other applicable laws of the United States and the State of Alaska. Except as specifically provided in this section nothing in this title is intended to enlarge or diminish the authority of the Secretary under existing law including the Wildlife Refuge Administration Act, and the BLM Organic Act, to designate areas where, and establish periods when, no taking of fish or wildlife shall be permitted on the public lands for reasons of public safety, administration, to assure the continued viability of a particular fish or wildlife population or for other purposes. Thus, the Secretary remains empowered to authorize a more restrictive hunting season than is otherwise permitted by State law. However, in recognition of the importance of subsistence uses by rural residents of Alaska, notwithstanding any other provision of this Act or other law, subsistence uses of a particular fish or wildlife population on the public lands, and such uses by local residents within conservation system units which are open to subsistence uses (including national parks and monuments), may be prohibited on the public lands, or on any portion thereof, only temporarily for reasons of public safety, administration, or to assure the continued viability of such population.

Such a closure must be preceded by consultation with the State and adequate notice and hearing in the vicinity of the area of the closure, unless the Secretary determines that an emergency situation exists and that emergency measures must be taken to protect the public safety or the continued viability of a particular fish or wildlife population. In the latter situation, the Secretary may immediately close the public lands, or any portion thereof, to subsistence uses of a particular fish or wildlife population for a period not to exceed sixty days, which may not be subsequently extended unless the Secretary affirmatively establishes, after notice and hearing, that such an extension is justified. No closure for purposes of administration may be made prior to notice and hearing in the vicinity of the area of the closure. No closure order to the taking of a fish or wildlife population for subsistence uses authorized by this section shall extend longer than necessary to achieve the immediate purpose for the closure established at the hearing held prior to the issuance of such order.

Thus, for example, while the Secretary may prohibit the taking of wildlife for subsistence uses for reasons of public safety in a certain area surrounding a public campground, roadway or hiking trail, such a closure should not be limited to any arbitrary or inflexible time period. Rather, it should remain in effect only so long as reasonably necessary to provide for the public safety during normal periods of consistent public use, and only apply to the minimum portion of

**2815**

the public lands reasonably necessary to achieve this purpose. Although, this section authorizes the restriction of subsistence uses for purposes of administration, recognition of the importance of subsistence activities to most rural residents requires that this authority be utilized narrowly and with consistent restraint. In exercising his authority to protect the continued viability of a fish or wildlife population, it is not the intent of the Committee that actual depletion of a population or an emergency exist before a closure under this section may be justified. Continued subsistence uses by rural residents can only be maintained if the continued viability of fish and wildlife populations utilized for subsistence purposes can be maintained.

### TITLE IX—IMPLEMENTATION OF ALASKA NATIVE CLAIMS SETTLEMENT ACT AND ALASKA STATEHOOD ACT

*Section 901: Conveyances to Village Corporations*

This section provides for the conveyance by legislative action of surface rights to eligible Village Corporations, and in some cases, subsurface rights to eligible Regional Corporations. All conveyances made by this section are subject to valid existing rights and may be subject to public easement reservations as provided in Section 903(a).

Subsection (a) provides that the provisions of this section shall be applicable only to Native corporations which elect to receive conveyance pursuant to this section within 180 days.

Subsection (b) legislatively conveys land to eligible Village Corporations where such land is mandated by ANCSA to be selected by the Village Corporation.

Paragraph (1) conveys to a Village Corporation, found eligible by the Secretary, the surface estate to public land in its "core" township or townships. A "core" township is that township which encloses all or part of the improved area constituting the Village. The conveyance is immediate, subject to valid existing rights, and must be otherwise consistent with provisions of the ANCSA such as acreage limitations, contiguity, and location in respect to Home Rule or First-class cities.

Where two or more Villages, by reason of locality, have claim to the same township, the conveyance is delayed until the Village Corporations involved agree to the division of the township, or such dispute is settled by arbitration (see subsection (c)).

Paragraph (2) conveys to a Village Corporation, found eligible by the Secretary, the surface estate to State of Alaska "selected" lands (such are not public lands under Section 3(e) of the ANCSA) in the "core" township. The conveyance procedures and criteria are the same as for paragraph (1) except that certain types of lands, currently in litigation or dispute, are not conveyed by this legislation. These types of land are those lands selected, but not yet patented to the State, under the School or University Land Grants, the Mental Health Land Grant, or where the State had by December 18, 1971, conditionally granted title to a third party pursuant to the tentative approval authority of Section 6(g) of the Alaska Statehood Act. Should the results of the litigation or settlement of the disputes be in favor of the Native Corporation, the Secretary would be required to subsequently convey such lands under either the procedures of Section 902 or the ANCSA, as appropriate.

2816

**A-31**

| 95TH CONGRESS 2d Session | SENATE | REPORT No. 95-1300 |

# DESIGNATING CERTAIN LANDS IN THE STATE OF ALASKA AS UNITS OF THE NATIONAL PARK, NATIONAL WILDLIFE REFUGE, NATIONAL WILD AND SCENIC RIVERS, AND NATIONAL WILDERNESS PRESERVATION SYSTEMS, AND FOR OTHER PURPOSES

---

# REPORT

OF THE

## COMMITTEE ON ENERGY AND NATURAL RESOURCES UNITED STATES SENATE

together with

## MINORITY, ADDITIONAL, AND SUPPLEMENTAL VIEWS

TO ACCOMPANY

## H.R. 39



OCTOBER 9 (legislative day, SEPTEMBER 28), 1978.—Ordered to be printed

---

U.S. GOVERNMENT PRINTING OFFICE

34-309                    WASHINGTON : 1978

8123

A-32

# CONTENTS

|                                                                              | Page |
|------------------------------------------------------------------------------|------|
| H.R. 39, as reported_____ | 1    |
| I. Purpose of the measure_____ | 103  |
| II. Summary of major provisions_____ | 104  |
| III. Background and need_____ | 107  |
| IV. Legislative history_____ | 112  |
| V. Committee recommendation and tabulation of votes_____ | 113  |
| VI. Committee amendments_____ | 114  |
| VII. Section-by-section analysis_____ | 218  |
| VIII. Cost and budgetary considerations_____ | 279  |
| IX. Regulatory impact evaluation_____ | 290  |
| X. Executive communications_____ | 291  |
| XI. Minority views of Senator Bartlett_____ | 372  |
| XII. Supplemental views_____ | 397  |
| XIII. Changes in existing law_____ | 433  |

(III)

8125

SEC. 709. Except as otherwise expressly provided for in this Act wilderness designated by this Act shall be administered in accordance with applicable provisions of the Wilderness Act governing areas designated by that Act as wilderness, except that any reference in such provisions to the effective date of the Wilderness Act shall be deemed to be a reference to the effective date of this Act, and any reference to the Secretary of Agriculture for areas designated in sections 701 and 702 shall, as applicable, be deemed to be a reference to the Secretary.

## TITLE VIII—SUBSISTENCE MANAGEMENT AND USE

### FINDINGS

SEC. 801. The Congress finds and declares that—

(1) the continuation of the opportunity for subsistence uses by rural residents of Alaska, including both Natives and non-Natives, on the public lands and by Alaska Natives on their Native lands is essential to their physical, economic, traditional, and Native cultural existence;

(2) the situation in Alaska is unique in that, in most cases, no practical alternative means are available to replace the food supplies and other items gathered from fish and wildlife which supply persons dependent on subsistence uses;

(3) continuation of the opportunity for subsistence uses of resources on public and other lands in Alaska is threatened by the increasing population of Alaska, with resultant pressure on subsistence resources, by sudden decline in the populations of some wildlife species which are crucial subsistence resources, by increased accessibility of remote areas containing subsistence resources, and by taking of fish and wildlife in a manner inconsistent with recognized principles of fish and wildlife management;

(4) in order to fulfill the policies and purposes of the Alaska Native Claims Settlement Act and as a matter of equity, it is necessary for the Congress to invoke its constitutional authority over Native affairs and its constitutional authority under the property clause and the commerce clause to protect and provide the opportunity for continued subsistence uses on the public lands by Native and non-Native rural residents;

(5) the national interest in the proper regulation, protection, and conservation of fish and wildlife on the public lands in Alaska and the continuation of the opportunity for a subsistence way of life by the inhabitants of Alaska require that an administrative structure be established for the purpose of enabling people who have personal knowledge of local conditions and requirements to have a meaningful role in the management of fish and wildlife and of subsistence uses on the public lands in Alaska.

### POLICY

SEC. 802. It is hereby declared to be the policy of Congress that—

(1) consistent with sound management principles, the utilization of the public lands in Alaska is to cause the least adverse impact possible on residents who depend upon subsistence uses of the resources of such lands; consistent with management of fish and wildlife in accordance with recognized scientific principles and the purposes for which each unit established, designated, or expanded by or pursuant to titles II through VII of this Act, the purpose of this title is to provide the opportunity for people engaged in a subsistence-oriented lifestyle to continue to do so;

(2) nonwasteful subsistence use of fish and wildlife and other renewable resources shall be the first priority consumptive use of all such resources on the public lands of Alaska, and where it is necessary to restrict taking in order to assure the continued viability of a fish or wildlife population or the continuation of subsistence uses of such population, the taking of such population for nonwasteful subsistence uses shall be given preference on the public lands over other consumptive uses; and

(3) except as otherwise provided by this Act or other Federal laws, Federal land managing agencies, in managing subsistence activities on the public lands and in protecting the continued viability of all wild renewable resources in Alaska, shall cooperate with adjacent landowners and land managers,

8151

. including Native corporations, appropriate State and Federal agencies, and other nations.

## DEFINITIONS

SEC. 803. As used in this Act, the term "subsistence uses" means the customary and traditional uses in Alaska of wild, renewable resources for direct personal or family consumption as food, shelter, fuel, clothing, tools, or transportation, for the making and selling of handicraft articles out of nonedible byproducts of fish and wildlife resources taken for personal or family consumption, and for the customary trade, barter, or sharing for personal or family consumption. For the purposes of this section, the term—

(1) "family" means all persons related by blood, marriage, or adoption, or any person living within the household on a permanent basis; and

(2) "barter" means the exchange or trade of fish or wildlife or their parts, taken for subsistence uses—

(A) for other fish or game or their parts; or

(B) for other food or for nonedible items other than money if the exchange is of a limited and noncommercial nature.

## PREFERENCE FOR SUBSISTENCE USES

SEC. 804. Except as otherwise provided in this Act and other Federal laws, the taking on public lands of fish and wildlife for nonwasteful subsistence uses shall be accorded preference over the taking on such lands of fish and wildlife for other purposes. Whenever it is necessary to restrict the taking of populations of fish and wildlife on such lands for subsistence uses in order to protect the continued viability of such populations, or to continue such uses, such preference shall be based on—

(1) customary and direct dependence upon the populations as the mainstay of livelihood;

(2) local residency; and

(3) the availability of alternative resources.

## LOCAL AND REGIONAL PARTICIPATION

SEC. 805. (a) Except as otherwise provided in subsection (d) of this section, one year after the date of enactment of this Act, the Secretary shall establish—

(1) at least five Alaska subsistence resource regions which, taken together, include all public lands. The number and boundaries of the regions shall be sufficient to assure that regional differences in subsistence uses are adequately accommodated;

(2) such local advisory committees within each region as he finds necessary at such time as he may determine, after notice and hearing, that the existing State fish and game advisory committees do not adequately perform the functions of the local committee system set forth in paragraph (3) (D) (iv) of this subsection; and

(3) a regional advisory council in each subsistence resource region.
Each regional council shall be composed of residents of the region and shall have the following functions:

(A) the review and evaluation of proposals for regulations, policies, management plans, and other matters relating to subsistence uses of fish and wildlife within the region;

(B) the provision of a forum for the expression of opinions and recommendations by persons interested in any matter related to the subsistence uses of fish and wildlife within the region;

(C) the encouragement of local and regional participation in the decision-making process affecting the taking of fish and wildlife on the public lands within the region for subsistence uses;

(D) the preparation of an annual report to the Secretary which shall contain—

(i) an identification of current and anticipated subsistence uses of fish and wildlife populations within the region;

(ii) an evaluation of current and anticipated subsistence needs for fish and wildlife populations within the region;

(iii) a recommended strategy for the management of fish and wildlife populations within the region to accommodate such subsistence uses and needs; and

8152

(iv) recommendations concerning policies, standards, guidelines, and regulations to implement the strategy. The State fish and game advisory committees or such local committees as the Secretary may establish pursuant to paragraph (2) of this subsection may provide advice to, and assist, the regional advisory councils in carrying out the functions set forth in this paragraph.

(b) The Secretary shall assign adequate qualified staff to the regional advisory councils and make timely distribution of all available relevant technical and scientific support data to the regional advisory councils and the State fish and game advisory committees or such local committees as the Secretary may establish pursuant to paragraph (2) of subsection (a).

(c) The Secretary, in performing his monitoring responsibility pursuant ·to section 806 and in the exercise of his closure and other administrative authority over the public lands, shall be guided by the annual report and advice of the regional councils concerning the management of fish and wildlife on the public lands within their respective regions for subsistence uses. The Secretary shall follow the advice of such councils unless he determines in writing that such advice is not supported by substantial evidence, violates recognized principles of fish and wildlife conservation, or would be determined to the satisfaction of subsistence needs.

(d) The Secretary shall not implement subsection (a), (b), and (c) of this section if within one year from the date of enactment of this Act, the State divides the public lands into at least five regions as set forth in subsection (a) (1) ; adequately maintains its local fish and game advisory committee structure; establishes a regional council in each region composed of residents of the region with duties and responsibilities analogous to those set forth in subsection (a)(3) ; assigns staff and distributes available support data to the local committees and regional councils as set forth in subsection (b) ; and provides that the State rulemaking authority shall consider the advice and recommendations·of the regional councils concerning the taking of fish and wildlife populations on public lands within their respective regions for subsistence uses. The regional councils may present recommendations, and the evidence upon which such recommendations are based, to the State rulemaking authority during the course of the administrative proceedings of such authority. The State rulemaking authority may choose not to follow any recommendation which it determines is not supported by substantial evidence presented during the course of its administrative proceedings, violates recognized principles of fish and wildlife conservation or would be detrimental to the satisfaction of rural subsistence needs. If a recommendation is not adopted by the State rulemaking authority, such authority shall make findings of fact detailing the basis for its failure to adopt the recommendation.

(e) (1) The Secretary may reimburse the State, from funds appropriated to the Department of the Interior, for reasonable costs relating to the establishment and operation of the regional advisory councils established by the State in accordance with subsection (d) and the operation of the State fish and game advisory committees so long as such committes are not superseded by the Secretary pursuant to paragraph (2) of subsection (a). Such reimbursement may not exceed 50 per centum of such costs in any fiscal year. Such costs shall be verified in a statement which the Secretary determines to be adequate and accurate. Sums paid under this subsection shall be in addition to any grants, payments, or other sums to which the State is entitled from appropriations to the Department of the Interior.

(2) Total payments to the State under this subsection shall not exceed the sum of $5,000,000 in any one fiscal year. The Secretary shall advise the Congress at least once in every five years as to whether or not the maximum payments specified in this subsection is adequate to ensure the effectiveness of the program established by the State to provide the preference for subsistence uses of fish and wildlife set forth in section 804.

SEC. 806. The Secretary shall monitor the provisions by the State of the subsistence preference set forth in section 804 and shall advise the State and the Committee on Interior and Insular Affairs of the House of Representatives and the Committee on Energy and Natural Resources of the Senate annually and at such other times as he deems necessary of his views on the effectiveness of the

State in providing such preference, any exercise of his closure or other administration authority to protect subsistence resources or uses, the views of the State, and any recommendations he may have.

### JUDICIAL ENFORCEMENT

SEC. 807. In performance of his monitoring responsibilities required in section 806, if the Secretary and appropriate State agency are notified in writing by a local committee or regional council established by the Secretary or the State pursuant to section 805 that the preference for subsistence uses set forth in section 804 is not adequately provided in its region, setting forth the facts upon which such belief is based and detailing efforts to obtain timely relief through available State grievance procedures, the Secretary shall investigate and report publicly on the results of his investigation. If the Secretary determines that the preference for subsistence uses is not adequately provided and that timely relief has not been obtained, he shall submit his views to the Governor and seek to ensure the adequate and timely provision of such preference through discussions with the State. The Secretary shall inform the committee or council which submitted the notification to him of the results of such discussions. If the Secretary determines that the State has failed to make adequate and timely provision for the preference for subsistence uses after having been provided a reasonable opportunity to do so and that such failure threatens the ability of subsistence-dependent Alaska residents to satisfy their subsistence needs, at the request of the committee or council which submitted the notification to him, the Secretary shall bring an action in the United States district court on behalf of such committee or council to require the State to take such actions as are necessary to provide such preference. Such action shall be assigned for hearing at the earliest possible date, shall take precedence over all other matters pending on the docket of the district court at that time and shall be expedited in every way by such court. Upon the filing of the complaint, if the pleadings indicate that the State has failed to adequately provide for the preference for subsistence uses, that such failure imminently threatens the ability of subsistence-dependent residents to satisfy their subsistence needs, that immediate relief is necessary to assure that those residents who may have been adversely affected by such failure are provided a timely opportunity to satisfy such needs, and that immediate relief will not threaten the continued viability of fish and wildlife populations toward which such relief may be directed, the district court shall issue an order directing the State to show cause why the features of the State's provision of the preference which render such provision inadequate should not be enjoined and the State be directed to permit the taking of such fish or wildlife populations only for subsistence uses by those residents who have been adversely affected by the State's failure to provide for the preference. No order granting such temporary relief shall be issued until the State has been provided an opportunity for hearing, and such order shall provide that such taking for subsistence uses shall be subject to regulation by the State in a manner which adequately provides for the satisfaction of the subsistence preference requirement. The court shall provide relief, other than temporary relief, by directing the State to submit regulations which satisfy the subsistence preference requirement. When approved by the court, such regulations shall be incorporated as part of the final judicial order. Such order shall be valid only for such period as normally provided for the regulations at issue by State law. This section shall constitute the sole Federal judicial remedy created by this title for a local committee or regional council which determines that the preference for subsistence uses set forth in subsection 804 has not been adequately provided by the State in its region.

### PARK AND MONUMENT SUBSISTENCE RESOURCE COMMISSIONS

SEC. 808. (a) Within one year from the date of enactment of this Act. the Secretary and the Governor shall each appoint four members to a subsistence resources commission for each national park or monument within which subsistence uses are permitted by this Act. The regional council established pursuant to section 805 which has jurisdiction within the area in which the park or monument is located shall appoint four members to the commission each of whom is a member of either the regional council or a local committee within the region and also is a resident of a village within or adjacent to the park or monument or whose

34-309—78——3

8154

residents engage in subsistence uses within the park or monument. Within eighteen months from the date of enactment of this Act, each commission shall devise and recommend to the Secretary and the Governor a program for subsistence hunting within the park or monument. Such program shall be prepared using technical information and other pertinent data assembled or produced by necessary field studies or investigations conducted jointly or separately by the technical and administrative personnel of the State and the Department of the Interior, information submitted by, and after consultation with the appropriate local committees and regional councils, and any testimony received in a public hearing or hearings held by the commission prior to preparation of the plan at a convenient location or locations in the vicinity of the park or monument. Each year thereafter, the commission, after consultation with the appropriate local committees and regional councils, considering all relevant data and holding one or more additional hearings in the vicinity of the park or monument, shall make recommendations to the Secretary and the Governor for any changes in the program or its implementation which the commission deems necessary.

(b) The Secretary shall promptly implement the program and recommendations submitted to him by each commission unless he finds in writing that such program or recommendations violates recognized principles of wildlife conservation, threatens the continued viability of wildlife populations in the park or monument, are contrary to the purposes for which the park or monument is established, or would be detrimental to the satisfaction of subsistence needs. Upon notification by the Governor, the Secretary shall take no action on a submission of a commission for sixty days during which period he shall consider any proposed changes in the program or recommendations submitted by the commission which the Governor provides him.

(c) Pending the implementation of a program under subsection (a) of this section, the Secretary shall permit subsistence uses by local residents in accordance with the provisions of this title and other applicable Federal and State law.

### COOPERATIVE AGREEMENTS

SEC. 809. The Secretary may enter into cooperative agreements or otherwise cooperate with other Federal agencies, the State, Native Corporations, other appropriate persons and organizations, and, acting through the Secretary of State, other nations to effectuate the purposes and policies of this title.

### SUBSISTENCE AND LAND USE DECISIONS

SEC. 810. (a) In determining whether to withdraw, reserve, lease, or otherwise permit the use, occupancy, or disposition of public lands under any provision of law authorizing such actions, the head of the Federal agency having primary jurisdiction over such lands or his designee shall evaluate the effect of such use, occupancy, or disposition on subsistence uses and needs, the availability of other lands for the purposes sought to be achieved, and other alternatives which would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes. No such withdrawal, reservation, lease, permit, or other use, occupancy or disposition of such lands which would significantly restrict subsistence uses shall be effected until the head of such Federal agency—

(1) gives notice to the appropriate State agency and the appropriate local committees and regional councils established pursuant to section 805,

(2) gives notice of, and holds, a hearing in the vicinity of the area involved, and

(3) determines that (A) such a significant restriction of subsistence uses is necessary, consistent with sound management principles for the utilization of the public lands, (B) the proposed activity will involve the minimal amount of public lands necessary to accomplish the purposes of such use, occupancy, or other disposition, and (C) adequate steps will be taken to minimize adverse impacts upon subsistence uses and resources resulting from such actions.

(b) If the Secretary is required to prepare an environmental impact statement pursuant to section 102(2) (C) of the National Environmental Policy Act, he shall provide the notice and hearing and include the findings required by subsection (a) as part of such environmental impact statement.

(c) Nothing herein shall be construed to prohibit or impair the ability of the State or any Native Corporation to make land selections and receive land con-

8155

veyances pursuant to the Alaska Statehood Act or the Alaska Native Claims Settlement Act.

## ACCESS

SEC. 811. The Secretary shall ensure that persons engaged in subsistence uses shall have appropriate access to subsistence resources on the public lands.

## SNOWMOBILES AND MOTORBOATS

SEC. 812. Notwithstanding any other provision of this Act or other law, the Secretary shall permit on the public lands appropriate use for subsistence purposes of snowmobiles, motorboats, and other means of surface transportation traditionally employed for such purposes by local residents, subject to such regulations as are necessary to prevent waste, or damage to fish, wildlife, or terrain.

## RESEARCH

SEC. 813. The Secretary, acting through the United States Fish and Wildlife Service and the National Park Service and in cooperation with the State and other appropriate Federal agencies, shall undertake research on fish and wildlife and subsistence uses on the public lands; seek data from, consult with and make use of, the special knowledge of subsistence users; and make the results of such research available to the State, the local and regional councils established by the Secretary or State pursuant to section 805, and other appropriate persons and organizations.

## PERIODIC REPORTS

SEC. 814. Within four years after the date of enactment of this Act, and within every three-year period thereafter, the Secretary, in consultation with the Secretary of Agriculture, shall prepare and submit a report to the President of the Senate and the Speaker of the House of Representatives on the implementation of this title. The report shall include—

(1) an evaluation of the results of the monitoring undertaken by the Secretary as required by section 804;

(2) the status of fish and wildlife populations on public lands that are subject to subsistence uses;

(3) a description of the nature and extent of subsistence uses and other uses of fish and wildlife on the public lands;

(4) the role of subsistence uses in the economy and culture of rural Alaska;

(5) comments on the Secretary's report by the State, the local councils and regional councils established by the Secretary or the State pursuant to section 805, and other appropriate persons and organizations;

(6) a description of those actions taken, or which may need to be taken in the future, to permit the opportunity for continuation of activities relating to subsistence uses on the public lands; and

(7) such other recommendations the Secretary deems appropriate.

A notice of the report shall be published in the Federal Register and the report shall be made available to the public.

## REGULATIONS

SEC. 815. Each Secretary shall prescribe such regulations as are necessary and appropriate to carry out their respective responsibilities under this title.

## LIMITATIONS, SAVINGS CLAUSES

SEC. 816. Nothing in this Act shall be construed as—

(1) granting any property right in any fish or wildlife or other resource of the public lands or as permitting the level of subsistence uses of fish and wildlife on such lands to be significantly expanded beyond the level of such uses occurring during the ten-year period before January 1, 1978. No privilege which may be granted by the State to any individual with respect to subsistence uses may be assigned to any other individual:

(2) permitting any subsistence use of fish and wildlife on any portion of the public lands (whether or not within any conservation system unit) which

8156

was permanently closed to such uses on January 1, 1978, or as vesting elsewhere than in the Secretary any authority to manipulate habitat on any portion of the public lands;

(3) enlarging or diminishing the responsibility and authority of the State of Alaska for management of fish and wildlife on public lands as specifically provided in this Act, or as amending the Alaska constitution; or

(4) modifying or repealing the provisions of any Federal law governing the conservation or protection of fish and wildlife, including the Fur Seal Act of 1966 (80 Stat. 1091; 16 U.S.C. 1151–1187), the Endangered Species Act of 1973 (87 Stat. 884; 16 U.S.C. 1531–1543). the Marine Mammal Protection Act of 1972 (86 Stat. 1027; 16 U.S.C. 1361–1407), the Act entitled "An Act for the Protection of the Bald Eagle", approved June 8, 1940 (54 Stat. 250; 16 U.S.C. 742a–754), the Migratory Bird Conservation Act (45 Stat. 1222; 16 U.S.C. 715–715s), the Federal Aid in Wildlife Restoration Act (50 Stat. 917; 16 U.S.C. 669–669i), the Fishery Conservation and Management Act of 1976 (90 Stat. 331; 16 U.S.C. 1801–1882), the Federal Aid in Fish Restoration Act (64 Stat. 430; 16 U.S.C. 777–777K), or any amendments to any one or more of such Acts.

CLOSURE TO SUBSISTENCE USES

SEC. 817. (a) All national parks and monuments in Alaska shall be closed to the taking of wildlife except for subsistence uses to the extent specifically permitted by this Act. Subsistence and sport fishing shall be authorized in such areas by the Secretary and carried out in accordance with the requirements of this title and other applicable laws of the United States and the State of Alaska.

(b) Except as specifically proved otherwise by this section, nothing in this title is intended to enlarge or diminish the authority of the Secretary to designate areas where, and establish periods when, no taking of fish and wildlife shall be permitted on the public lands for reasons of public safety, administration, or to assure the continued viability of a particular fish or wildlife population. Notwithstanding any other provision of this Act or other law, the Secretary, after consultation with the State and adequate notice and public hearing, may temporarily close any public lands (including those within any conservation system unit), or any portion thereof, to subsistence uses of a particular fish or wildlife population only if necessary for reasons of public safety, administration, or to assure the continued viability of such population. If the Secretary determines that an emergency situation exists and that extraordinary measures must be taken for public safety or to assure the continued viability of a particular fish or wildlife population, the Secretary may immediately close the public lands, or any portion thereof, to the subsistence uses of such population and shall publish the reasons justifying the closure in the Federal Register. Such emergency closure shall be effective when made, shall not extend for a period exceeding sixty days, and may not subsequently be extended unless the Secretary affirmatively establishes, after notice and public hearing, that such closure should be extended.

TITLE IX—IMPLEMENTATION OF ALASKA NATIVE CLAIMS SETTLEMENT ACT AND ALASKA STATEHOOD ACT

CONVEYANCES TO VILLAGE CORPORATIONS

SEC. 901. (a) "CORE" TOWNSHIPS, ETC.—(1) (A) Except to the extent that conveyance of a surface estate would be inconsistent with section 12(a), 14(a), 14(b). or 22(1) of the Alaska Native Claims Settlement Act, subject to valid existing rights and section 903(a) of this Act, there is hereby conveyed to and vested in each Village Corporation for a Native village which is determined by the Secretary to be eligible for land under sections 11 or 16 of the Alaska Native Claims Settlement Act. and which did not elect to acquire a former reserve under section 19(b) of such Act, all of the right, ttile and interest of the United States in and to the surface estate in the public lands, as defined in such Act, in the township or townships withdrawn pursuant to section 11(a) (1) or 16(a) of such Act in which all or any part of such village is located. As used in this paragraph the term "Native village" has the same meaning such term has in section 3(c) of the Alaska Native Claims Settlement Act.

(B) Where two or more Village Corporations are entitled to the same land by virtue of the same township or townships embracing all or part of the Native

8157

A-40

# IV. Legislative History

The Committee had 11 bills relating to the Alaska National Interest Lands pending before it during the 95th Congress. S. 499, containing the 1973 proposals of Interior Secretary Rogers C.B. Morton and S. 500, the Alaska Coalition proposal, were introduced by Senators Jackson and Hansen (by request), on January 28, 1977.

On May 12, 1977, Senator Metcalf introduced S. 1500 as a substitute for S. 500. Senator Durkin introduced an amendment to S. 1500 (No. 2176) on May 16, 1978. Senator Stevens' proposal, S. 1787 was introduced June 30, 1977. S. 2465, the Carter Administration proposal was introduced by request on January 31, 1978. Senator Gravel introduced his bill, S. 2944, on April 15, 1973.

H.R. 39, as passed by the House, was referred to the Committee on June 8, 1978.

In addition to comprehensive Alaska lands legislation, S. 1546, introduced by Senator Abourezk creating a National Preserve on Admiralty Island, S. 3016 proposed by Senator Gravel and Stevens and S. 3303, proposed by the Administration containing numerous provisions to improve the implementation of the Alaska Native Claims Settlement Act, were referred to the Committee on Energy and Natural Resources.

The Full Committee held 7 days of hearings in Washington on the Alaska National Interest Lands bills during the 95th Congress. During the 94th Congress 2 days of hearings were held on S. 1687, the Administration "d-2" proposal. In addition the Committee staff conducted workshops in 7 Alaska villages during September 1977 and chaired 7 days of workshops in February, 1978.

Committee markup of the pending legislation, commenced on June 22, 1978. After 46 markup sessions, the Committee ordered favorably reported H.R. 39 with an amendment in the nature of a substitute, on October 5, 1978.

(112)

8237

**A-41**

| Estimated Effect of Committee Wilderness Package: | Million board feet |
|---|---|
| Total annual potential yield less what is reserved, non-harvestable, or marginal "A-base" | 560 |
| 10,000,000 per year investment for increased timber yield and $5,000,000 loan fund | 60 |
| Impact of Native timber | 36 |
| Estimated allowable cut before deductions | 656 |
| Additional Reduction for Proposed Wilderness Designation | —80 |
| Additional reduction for possible relocation of Native timber off Admiralty Island | —7 |
| Annual allowable cut less wilderness and Native timber relocation | 569 |

Thus, it appears that the Committee recommendations will indeed protect the existing timber industry in Southeast while providing wilderness designation for several key areas.

The Committee realizes that there is some disagreement regarding the figures presented above relative to timber availability, potential yield investment opportunities, etc. During its deliberations, the Committee was unable to obtain a consistent set of data from the Forest Service regarding these factors. However, the Committee feels that the numbers employed in the calculations above are fair estimates of the effect the Committee actions will have on timber supply levels from the Tongass.

## Title VIII—Subsistence Management and Use

### OVERVIEW

Alaska's more than 200 rural villages are unique in that they are the last communities in the United States in which a substantial number of residents are still dependent upon the harvest of renewable resources on the public lands for their sustenance. The importance of subsistence uses of such resources to the physical, economic and cultural well-being of Alaska Natives and other rural residents has been exhaustively chronicled in testimony presented at hearings, town meetings and workshops held by the committee during consideration of both the Alaska Native Claims Settlement Act and the Alaska National Interest Lands Conservation Act. The committee notes that the report of the Committee on Interior and Insular Affairs of the House of Representatives on H.R. 39 (House Report No. 95-1045, Part I, pp. 181-187) documents the importance of such uses in considerable detail.

### HISTORY OF CONCERN

The Committee has had a long-standing concern for the protection of subsistence resources and uses in Alaska. In Section 21 of S. 35, the Senate version of the Alaska Native Claims Settlement Act, the Secretary was directed to establish subsistence zones on the public lands, and, in circumstances in which subsistence resources or uses were threatened, to exercise his closure authority by prohibiting all consumptive uses of such resources within a zone except for subsistence uses by Alaska Natives. The conferees failed to adopt this provision

8320

in the conference report; however, the statement of the managers clearly established the intent of the Congress that the Secretary exercise his closure authority in a manner consistent with the purposes of Section 21:

> The conference committee, after careful consideration believes that all Native interest in subsistence resource lands can and will be protected by the secretary through the exercise of his existing withdrawal authority. The secretary could, for example, withdraw appropriate lands and classify them in a manner which would protect native subsistence needs and requirements by closing appropriate lands to entry by nonresidents when the subsistence resources of these lands are in short supply or otherwise threatened. The conference committee expects both the secretary and the state to take any action necessary to protect the subsistence needs of the natives."

In 1973, the committee adopted, and the Congress enacted, provisions in the Trans-Alaska Oil Pipeline Act (P.L. 93–153) which provided for strict liability of the pipeline right-of-way holder for "fish, wildlife, biotic or other natural resources relied upon by Alaska Natives, Native organizations, or others for subsistence or economic purposes" and required stipulations in all oil and gas pipeline right-of-way permits to protect the "interests of individuals living in the general area of the right-of-way permit who rely on the fish, wildlife, and biotic resources of the area for subsistence purposes". Other Acts of Congress also have recognized the unique dependence of rural Alaskans on subsistence resources. For example, the Marine Mammal Protection Act includes a subsistence exemption for Native residents of coastal villages in Alaska (16 U.S.C. 1371(b)). Similarly, subsistence uses by Alaska Natives and other residents of Native villages are exempted from coverage of the Endangered Species Act (16 U.S.C. 1539(e)).

### FEDERAL AND STATE RESPONSIBILITY

The subsistence management provisions of H.R. 39 as passed by the House of Representatives reflect a delicate balance between the traditional responsibility of the State of Alaska for the regulation of fish and wildlife populations within the State and the responsibility of the Federal government for the attainment of national interest goals, including the protection of the traditional lifestyle and culture of Alaska Natives. Although the committee has adopted a subsistence management system similar in concept to the House approach, after careful consideration the committee has modified the Federal-State relationship in a number of important aspects.

Section 704 of the House bill requires the State to develop and implement a subsistence management program which includes a regionalized regulatory system for the management of fish and wildlife on the public lands for subsistence uses, and laws or regulations which provide preference for nonwasteful subsistence uses by local residents consumptive uses of fish and wildlife on the public lands. The State regulations must further provide preferences for subsistence uses shall

8321

be based upon local residency, customary and direct dependence upon such populations as the mainstay of livelihood and the availability of alternative resources. The committee determined that inclusion of these requirements as part of a federally mandated State program is an unnecessary intrusion into traditional State responsibility for fish and wildlife management. Consequently, the committee retained both of these requirements in sections 804 and 805 respectively, but has eliminated the requirement that they be included as part of a formal State program.

Section 705(c) of the House bill requires the Secretary to take certain administrative action if he determines that the State has failed to establish a subsistence program or to implement such a program in a manner which adequately satisfies the preference for subsistence uses. While the committee has retained broad Federal guidelines to ensure the adequate implementation of the subsistence preference on the public lands and the Secretary's ongoing responsibility to monitor the State's implementation of such preference, the Committee believes that the responsibility of the Secretary to ensure the protection of subsistence uses and the satisfaction of subsistence needs of Alaska Natives and other rural residents can best be met by providing legal representation for such residents before the United States District Court in appropriate instances in which the Secretary has determined, after consultation with the State, that the State has not timely or adequately provided for the preference for subsistence uses. Although it is the intent of the committee to neither enlarge nor diminish any existing authority of the Secretary to take appropriate administrative action to protect subsistence uses and satisfy subsistence needs of rural residents of Alaska, the committee believes that the responsibilities and authorities of the Secretary and the United States District Court set forth in section 804–807 ensure the protection of subsistence activities and the discharge of Federal responsibilities.

### TITLE IX—IMPLEMENTATION OF THE ALASKA NATIVE CLAIMS SETTLEMENT ACT AND THE ALASKA STATEHOOD ACT

Title IX was adopted by the Committee as a means, along with the designation of national interest lands in the remainder of the bill, to help resolve Alaska's uncertain land ownership status, with respect to State and Native land selections and conveyances. Title IX contains the substantive provisions which follow from the finding in Title I, that a prompt and thorough resolution of the status of Alaska public lands is in the best interests of everyone in the Nation.

*Native land interests*

Section 14 of the Alaska Native Claims Settlement Act required the Secretary to issue conveyances to Native village and regional corporations immediately after the lands were selected from the withdrawals. This mandate for immediate conveyance was consistent with the Congressional commitment in section 2(b) of the Act that the settlement should "be accomplished rapidly. with certainty, in conformity with the real economic and social needs of the Natives, without litigation (and) with maximum participation by Natives in decisions affecting their rights and property . . .".

8322

## VII. Section-by-Section Analysis

In general, the table of contents and the language of the Committee substitute speak for themselves. However, the language in title VII relative to the Special Management Areas and Forest Utilization Program; title VIII, Subsistence Management and Use; title IX, Implementation of Alaska Native Claims Settlement Act and Alaska Statehood Act; title X, Federal North Slope Lands Study Program; title XI, Transportation and Utility Systems In and Across, and Access Into, Conservation System Units; title XII, Federal State Cooperation; title XIII, Administrative Provision; title XIV, Amendments to the Alaska Native Claims Settlement Act and Related Provisions; the title XV, National Need Mineral Activity Recommendation Process, is technical in nature and is therefore analyzed in greater detail in the following section of the report.

### Title VII—National Wilderness Reservation Systems

*Section 703(b): Designation of Wilderness in the National Forests System*

The Committee amendment, like the House-passed bill, includes language urging the Secretary of Agriculture to negotiate in good faith with the Native Corporations who have selections on Admiralty Island in an effort to find lands of comparable value on another part of the forest. The Committee is hopeful that an option can be presented to those corporations in the near future so that their full entitlements may be conveyed without extensive resource damage to Admiralty Island.

As these selections rights are located on portions of Admiralty Island designated as a special management area under the Committee amendment, any timber on these lands currently withdrawn from the allowable cut is to be included in the cut should an exchange take place.

*Section 705. Designation of special management areas within the Tongass National Forest*

This section designates nine areas of national forest land as "Special Management Areas" to protect the lands now and to provide management flexibility. Thus, the designation recognizes the important public values of these lands and the many existing uncertainties about future timber supply and demand in Southeastern Alaska.

*Section 706: Management rules for special management areas*

This section sets forth the management rules for special management areas. Under subsection 706(b) timber sales from these lands are prohibited for at least ten years after date of enactment. Despite this prohibition the timber volume on these lands will be included in determining the annual allowable sale quantity on the Tongass National Forest. This provision does not affect timber sales made prior to enactment of this Act.

(218)

8343

219

Subsection 706(c) withdraws the land in special management areas from the operation of the United States Mining law. The provision for classification and opening of these lands are identical to those provided for national conservation areas established pursuant to Title IV. The Committee does not intend that these lands be managed as wilderness.

Subsection 706(d) directs the Secretary of Agriculture to monitor timber supply and demand in Southeastern Alaska. At any time after ten years after the date of enactment, the Secretary is directed to request a waiver of the prohibition on timber sales if he finds that timber in any special management area must be sold to maintain the supply to dependent industry at a rate of 520 million board feet per year.

Subsections 706 (e) and (f) provide an expedited procedure for a Congressional approval of any waiver request.

Subsection 706(g) gives the State of Alaska standing to seek a Federal Court Order directing the Secretary of Agriculture to make the finding required and transmit a proposed statutory waiver. The Committee included this provision so as to give the State an opportunity to challenge the Secretary's failure to seek a waiver if it believes that the Secretary of Agriculture should have made the finding required by subsection 706(d). Of course, the State would have to present evidence substantiating its claim and the Secretary of Agriculture would have the opportunity to rebut such evidence.

*Section 707: National forest timber utilization program*

Section 707 establishes a special timber utilization program for the Tongass National Forest. The program is designed to help make Federal timber available from marginal lands. The program includes construction and maintenance of forest development roads under subsection 707(a) and a special loan program to assist timber purchasers under subsection 707(b).

TITLE VIII—SUBSISTENCE MANAGEMENT AND USE

*Section 801 Findings*

The findings are based on the hearings, town meetings and workshops held by the committee in Alaska and Washington. The findings provide the factual and legal foundation for Congressional action to protect subsistence resources and uses on the public lands. The committee recognizes the importance of continued subsistence uses to the economy and lifestyle of rural Alaska, and particularly to the culture of the Alaska Natives. Alternative food sources generally are not available in most rural villages to offset a diminution of the traditional subsistence harvest. However, the continuation of subsistence uses in rural Alaska is threatened by the rapid population growth of Anchorage, Fairbanks and other urban centers and the resultant pressure which urban residents engaged in subsistence and sports uses have placed upon important fish and wildlife populations in heretofore remote areas of the State. The subsistence management and use title is the culmination of Congressional action initiated by Congress by the Alaska Native Claims Settlement Act to protect and provide for continued subsistence uses by Alaska Natives and

*8344*

**A-46**

other rural residents, and is based upon the constitutional authority of Congress over Native affairs and its authority under the Property Clause and the Commerce Clause. The committee also has determined that the protection of the subsistence way of life and the fish and wildlife populations upon which that lifestyle depends necessitates the establishment of an administrative structure which enables rural subsistence-dependent residents with personal knowledge of local conditions and requirements to have a meaningful role in the regulations and management of fish and wildlife and subsistence uses on the public lands.

*Section 802: Policy*

Based upon the findings in the preceding section, three basic policies have been established which shall guide the activities of the Federal government and the State on the public lands: that the utilization of the public lands is to cause the least adverse impact possible upon rural residents who depend upon subsistence uses for their economic and physical well-being and cultural vitality; that nonwasteful subsistence uses of fish, wildlife and other renewable resources, e.g. berries, timber, grasses, shall be the first priority consumptive use of such resources on the public lands, and when or where it is necessary to restrict the taking of such resources, taking for nonwasteful subsistence uses shall be given preference over other consumptive uses; and that the successful management of subsistence resources and activities requires long term cooperation between adjacent landowners and managers, including appropriate State and Federal agencies, Native corporations, and other nations.

*Section 803: Definition*

The committee has adopted a definition of "subsistence uses" based on the definition of that term set forth in section 15, ch. 151 SLA 1978 (A.S. 16.05.940) of the Alaska Statutes. In turn, the State definition was modeled on section 703 of the House bill. "Subsistence uses" are defined as the customary and traditional use in Alaska of fish, wildlife and other renewable resources for direct personal or family consumption, for the making and selling of handicraft articles from the nonedible by-products of fish and wildlife taken for direct personal or family consumption, and for customary trade, barter, or sharing for personal or family consumption. The definition of "family" recognizes extended family patterns common to all of Alaska's Native cultures. "Family" includes any person living in a household on a permanent basis as well as those persons living outside the household who are related by blood, marriage or adoption (legal or equitable). "Barter" means the exchange or trade of fish or wildlife, or their parts, for other fish or wildlife, or their parts, or for other food or nonedible items other than money if the exchange is of a limited and noncommercial nature. This definition of "barter" recognizes that in many rural villages the subsistence diet must be supplemented with other foods which may be available from the village store and other sources, and that the limited noncommercial barter of subsistence resources for nonedible items is an essential element of the rural subsistence lifestyle. The definition of "subsistence uses" is intended to include all Alaska residents who utilize renewable resources for direct personal or family consumption.

8345

However, the phrase "customary and traditional" is intended to place particular emphasis on the protection and continuation of the taking of fish, wildlife, and other renewable resources in areas of, and by persons (both Native and non-Native) resident in, areas of Alaska in which such uses have played a long established and important role in the economy and culture of the community and in which such uses incorporate beliefs and customs which have been handed down by word of mouth or example from generation to generation. The factors of local residency, economic dependence, and availability of alternative resources have been included in section 804 rather than in the definition. Although a truly comprehensive definition of "subsistence uses" must include a mix of those factors, the committee has determined that they should be incorporated through appropriate action by the State rulemaking authority in conjunction with the recommendations of the regional councils established pursuant to section 805 to implement the subsistence preference set forth in section 804. Sections 803–805 are intended to establish a dynamic process for the regulation of subsistence resources and uses which will enable rural people to participate in the decisionmaking process of the State rulemaking authority in the inclusion of the local residency, economic dependence, and availability of alternative resources factors into the defintion of "subsistence uses" on a case-by-case basis to meet the needs of a particular management situation in a particular area.

*Section 804: Preference for subsistence uses*

This section requires both the State and the Federal government to accord nonwasteful subsistence uses a preference over the taking of such resources for other purposes on the public lands. Although the committee recognizes that only rarely will the failure to adequately provide for the preference result in the threat of literal starvation, in many instances the failure to obtain fish to dry for winter use or fresh meat to supplement other foods can engender considerable individual, community and cultural trauma and hardship. Consequently, this section envisions that governmental action affecting subsistence resources and uses shall be undertaken in a manner which adequately provides for the preference on an ongoing basis and not only when critical allocation decisions may be necessary because a particular subsistence resource may be threatened with depletion, so long as such action is conducted in a manner which is consistent with the protection of the continued viability of fish and wildlife populations which may be affected by such action. If a particular fish or wildlife population (e.g. salmon, moose or caribou) in a particular area is sufficient to sustain a harvest by all persons engaged in subsistence and other uses, the implementation of restrictions on taking set forth in this section need not be imposed by the State rulemaking authority. However, if the continued viability of a particular population or the ability of rural subsistence-dependent residents to satisfy their subsistence needs would be threatened by a harvest by all such persons, the State rulemaking authority, in conjunction with the recommendations of the regional council representing the affected area, is required by this section to establish regulations which restrict the taking of such population to Alaska residents engaged in subsistence uses.

34–309—78——15

8346

If "subsistence uses" must be further restricted to protect the continued viability of the population or to ensure the satisfaction of rural subsistence needs, the State rulemaking authority, in conjunction with the recommendations of the regional council, must limit such uses to local residents of the affected area, or, if necessary, only those local residents with the most customary and direct dependence on the population as the mainstay of livelihood and with the least access to alternative food supplies. In the latter situation, the committee believes that in making such difficult allocation decisions, the State rulemaking authority, in conjunction with the recommendations of the regional council, should endeavor to utilize the special knowledge of local conditions and requirements of the local advisory committees within the affected region. This section also requires the Secretary of the Interior and the Secretary of Agriculture to give subsistence uses preferential consideration in their management activities on the public lands which directly relate to the taking of fish and wildlife, and to take appropriate action to protect such uses and the continued viability of fish and wildlife populations upon which the continuation of such uses depend.

*Section 805: Local and regional participation*

The committee has determined that the opportunity for rural residents of Alaska with personal knowledge of local conditions and requirements to participate effectively in the management and regulation of subsistence resources on the public is important in order to assure both the continued viability of fish and wildlife populations of national importance and the ability of rural people engaged in a subsistence lifestyle to continue to do so. Although the State has indicated that it intends to provide greater support to its existing local advisory committees and establish a system of regional councils throughout the rural areas of the state which will have a major role in the State rulemaking authority's establishment of seasons, bag limits and the provision of the preference for subsistence uses in their respective areas, the State still is in the process of establishing such a system. Section 805 implements section 801(5) by requiring the Secretary of the Interior to establish a regional council, and if necessary a local committee, system on the public lands if within one year from the date of enactment of this Act the State has not yet established a system for local and regional participation which satisfies the requirement of this section.

The State system of local and regional participation shall be in compliance with the requirements of this section and the Secretary shall not establish local committees or regional councils if the State: (1) divides the public lands into at least five regions. The number and boundaries of the regions must be sufficient to assure that regional differences in subsistence uses are adequately accommodated. The committee believes that more than five regions may well be necessary to assure such accommodation, but that the Alaska legislature, the Alaska Department of Fish and Game and the rural villages are best suited to finalize this structure.

However, it is the intent of the Committee that the number and boundaries of the regions be established in a manner which does not

8347

permit the large urban population centers to dominate the regional council system and exercise control over the regulation of subsistence resources in the rural areas; (2) strengthens the existing

State local fish and game advisory committee system by adequately funding committee activities, assigning appropriate staff and distributing available support data to the committees, and encouraging the committees to work closely with the regional councils to develop a recommended strategy for the management of subsistence resources within each region and recommendations concerning policies, standards, guidelines, and regulations to implement the strategy; (3) establishes a regional council within each region composed of residents of the region with duties and responsibilities analoguous to those set forth in section 805(a) (3), and assigns staff and distributes available support data to the councils; and (4) provides by statute or regulation that recommendations made by the regional councils to the State Board of Game or Board of Fisheries concerning the taking of fish and wildlife populations on the public lands within their respective regions for subsistence uses shall be considered by the board during the course of its administrative proceedings.

The board may choose not to follow a recommendation if it determines that based on the evidence presented during the course of the administrative proceedings of the board the recommendation is not supported by substantial evidence, violates recognized principles of fish and wildlife conservation, or would be detrimental to the satisfaction of rural subsistence needs. If the board makes such a determination and chooses not to follow the recommendation it shall make findings of fact detailing the basis for its failure to adopt the recommendation.

If a recommendation is not followed by the board as set forth in the preceding sentence, the board may modify the recommendation to provide for, and in a manner consistent with, the preference for subsistence uses set forth in section 804. So long as the State is in full compliance with the requirements of this section, the Secretary of the Interior may reimburse the State for reasonable costs relating to the operation of the local committees and the establishment and operation of the regional councils. Such reimbursement may not exceed 50 per centum of such costs in any fiscal year, and total payments to the State shall not exceed the sum of $5,000,000 in any one fiscal year.

If the Secretary determines, one year after the date of this Act and after notice and hearing, that the State is not in full compliance with the requirements of this section, he shall establish a regional council system, and if necessary a local committee system, on the public lands pursuant to the requirements of this section. In performing his monitoring responsibility pursuant to section 806 and in the exercise of his closure and other administrative authority over the public lands the Secretary of the Interior and the Secretary of Agriculture shall be guided by the annual report and advice of the regional councils established by the Secretary of the Interior pursuant to this section, and shall follow such advice unless he determines in writing that such evidence is not supported by substantial evidence, violates recognized principles of fish and wildlife conservation, or would be detrimental to the satisfaction of rural subsistence needs.

8348

**A-50**

*Section 806: Federal monitoring*

This section requires the Secretary of the Interior to monitor the State's provision of the preference for subsistence uses on the public lands including, in consultation with the Secretary of Agriculture, units of the National Forest System. Such monitoring responsibilities should include ongoing communication and cooperation between Federal land and resources managers and Alaska Department of Fish and Game personnel, local fish and game advisory committees, regional councils, the State Board of Game and the State Board of Fisheries. In addition, the Secretary must develop a capability to monitor both the status of fish and wildlife populations on the public lands harvested for subsistence uses, and State regulatory and enforcement activities to provide the preference for subsistence uses, particularly in the rural areas of Alaska. The monitoring capability must enable the Secretary to aid in the identification of potential problems before fish or wildlife populations become threatened with depletion with resultant hardship to rural subsistence-dependent residents, and communicate information about, and suggested recommendations for the solutions of, such problems to the State, the local committees, and the regional councils in a timely manner. However, such monitoring capability need not necessarily require the creation of a new or separate administrative structure within the Department of the Interior.

*Section 807: Judicial enforcement*

In addition to his monitoring responsibilities set forth in section 806, this section requires the Secretary of the Interior to investigate any allegation made by a local committee or regional council established by the Secretary or the State pursuant to section 805 that the State is not adequately providing for the preference for subsistence uses within a particular area of the public lands, as to the taking of a particular fish or wildlife population on such lands, or in some other manner. The Secretary shall investigate and report publicly on the results of his investigation. After communicating the results of his investigation to the State, if the Secretary determines that the State still is not adequately providing for the preference after having had a reasonable opportunity to do so, he shall file a civil action against the State in the District Court on behalf, and at the request of the local committee or regional council which made the allegation to require the State to take such actions as are necessary to adequately and timely provide such preference.

The failure to adequately restrict the harvest of a particular fish or wildlife population by persons engaged in subsistence or other uses in a particular area (e.g. salmon on the Copper River, moose on the lower Yukon, or caribou in the northwest arctic) pursuant to the criteria set forth in section 804 may threaten such population with immediate and irreparable harm and engender considerable hardship among residents of rural communities which are dependent upon such populations. Consequently, the committee believes that in many situations time may be of the essence to prevent such threat of harm to subsistence resources or human hardship and that temporary judicial relief may be necessary.

The committee also recognizes that because of the location of the Federal courts, inclement weather, poor communication and transpor-

8349

**A-51**

tation systems, and the geographical, and in many instances cultural, isolation of many rural communities, timely and effective temporary relief may not be possible under normal judicial procedures. In recognition of these unusual circumstances, this section requires that upon the filing of the complaint, if the District Court makes appropriate findings based upon the pleadings as set forth in this section it shall issue an order to the State to show cause why relief requested in the complaint should not be granted, and also requires the court to expedite the action in every way. However, no order granting temporary relief shall be issued until the State has been provided an opportunity for hearing. Temporary relief may not be necessary in every case and should terminate upon the alleviation of the circumstances which required such relief. Based upon the circumstances of each situation, the court should endeavor to give due deference to the expertise of the Alaska Department of Fish and Game in regulating and conserving fish and wildlife populations in Alaska which are the subject of subsistence uses. Temporary relief should be limited to an order directing the State to issue an emergency regulation either closing a portion of the public lands to the taking of a particular fish or wildlife population except for subsistence uses by local residents of the affected area (or the most subsistence dependent residents of the area), or, less frequently, opening the harvest of such population to such residents. The taking of fish or wildlife for subsistence uses as directed in the order shall be conducted in conformance with applicable State regulations governing such taking which are not directly related to the regulations which have been superceded by the order, or are not in conflict with such order.

To the extent practicable the court should endeavor to fashion a temporary order which draws upon the expertise and special knowledge of the Alaska Department of Fish and Game. Permanent relief shall be limited to directing the State to submit new regulations to the court which adequately provide for the preference for subsistence uses in the situation which gave rise to the action. When, and if, the court determines that such regulations adequately provide for the preference such regulations shall be incorporated as part of the final order. Such final order shall terminate upon the expiration of the normal period of validity under State law (generally one year) of the regulations which were superceded by the regulations incorporated in the order. Although local committee or regional council may obtain immediate judicial review in State court of a determination of the Board of Game or Board of Fisheries that a regional recommendation should not be adopted because it is not supported by substantial evidence, violates recognized principles of fish and wildlife conservation or would be detrimental to the satisfaction of rural subsistence needs, this section shall be the sole Federal judicial remedy created by this title for a local committee or regional council which determines that the preference for subsistence uses has not been adequately provided by the State in its region. Consequently, such board or council could simultaneously seek judicial review in State court of the refusal of the Board of Game or Board of Fisheries to adopt a regional recommendation and request an investigation by the Secretary, and potentially the filing of a civil action, pursuant to this section.

8350

*Section 808: Park and Monument Resources Commissions*

This section establishes a subsistence resources commission for each national park or monument within which subsistence uses are permitted by this Act. Each council shall be composed of twelve members: Four members appointed by the Secretary of the Interior, four members appointed by the Governor of Alaska, and four members appointed by the regional council established by the Secretary or the State pursuant to section 805 which has jurisdiction within the area in which the park or monument is located. Members of the commission appointed by the regional council must be a member of either the regional council or a local committee within the region, and also a resident of a village within or adjacent to the park or monument or whose residents engage in subsistence uses within the park or monument. The commissions shall be established within one year from the date of enactment of this Act, and within eighteen months from the date of enactment of this Act shall devise and recommend a program which provides for subsistence uses of wildlife within the park or monument. Each commission should work closely with the local committees and regional boards in its region and with local communities whose residents are dependent upon the continuation of subsistence uses within the park or monument.

Each year thereafter each commission shall make recommendations to the Secretary and the Governor for any changes in the program or its implementation which it deems necessary, if any. The Secretary shall promptly implement the subsistence program, or yearly recommendations, unless he determines in writing that such program, or yearly recommendation, violates recognized principles of wildlife conservation, threatens the continued viability of wildlife populations within the park or monument, or would be detrimental to the satisfaction of subsistence needs. Pending development and implementation of the subsistence program in each park or monument, the Secretary shall manage such part or monument to permit subsistence uses by local residents.

*Section 809: Cooperative agreements*

This section authorizes and encourages the Secretary of the Interior and the Secretary of Agriculture to enter into cooperative agreements and otherwise cooperate with other Federal agencies, the State, Native corporations, and other appropriate persons and organizations, including other nations, to manage and protect fish and wildlife resources utilized for subsistence purposes and to otherwise effectuate the purposes and policies of this title.

*Section 810: Subsistence and land use decisions*

This section requires all Federal land managers and Federal agencies with primary jurisdiction over the public lands, including conservation system unit managers and the Bureau of Land Management, to evaluate the effect on subsistence uses and needs in determining whether to withdraw, reserve, lease or otherwise permit the use, occupancy, or disposition of the public lands under any provision of law authorizing such actions. Prior to any withdrawal, reservation, lease, permit, or other use, occupancy or disposition of such lands

8351

which would significantly restrict subsistence uses, the head of the appropriate Federal agency shall give notice to the appropriate State agency and local committees and regional councils, give notice to local residents of the area and hold a hearing in the vicinity of the area involved, and determine that such a significant restriction of subsistence uses is necessary and consistent with sound management principles for the utilization of the public lands, that the proposed activity will involve the minimal amount of public lands necessary to accomplish the purposes of the proposed action, and that adequate steps will be taken to minimize adverse impacts upon subsistence uses and resources. If the Secretary is also required to prepare an environmental impact statement pursuant to the National Environmental Policy Act as well as comply with the requirements of this section, he shall provide the notice and hearing as part of the preparation of, and include the findings required by this section in, such environmental impact statement. This section is not to be construed as prohibiting, impairing or in any manner affecting the selection by, and conveyance to the State of Alaska or any Native corporation of any portion of the public lands selected or conveyed pursuant to the Alaska Statehood Act or the Alaska Native Claims Settlement Act.

*Section 811: Access*

This section requires the Secretary of the Interior and Secretary of Agriculture to ensure that residents engaged in subsistence uses shall have appropriate access to subsistence resources on the public lands, and shall permit the taking of fish and wildlife for subsistence uses in areas of Alaska designated as national preserves, national conservation areas, national recreation areas, national parks and monuments in which subsistence uses specifically are permitted by this Act, and areas of the National Wildlife Refuge, National Forest, and Wild and Scenic Rivers Systems in accordance with the requirements of this title and other applicable laws of the United States and the State of Alaska.

The committee intends that access to fish and wildlife populations shall be provided to local residents engaged in subsistence uses regardless of where such populations may be located in the future (except that the section is not intended to permit the subsistence use of wildlife in national parks and monuments which are permanently closed to such uses). Traditional habitat and migration routes may be altered by transporation systems and development activities on the public lands. By focusing on access to the resource itself, rather than on the particular portion of the public lands upon which the resources may presently be located, this section provides the flexibility necessary to ensure the continuation of subsistence uses in the future, subject to reasonable regulation.

*Section 812: Snowmobiles and motorboats*

This section recognizes the importance of the use of snowmachines, motorboats, and other means of surface transportation traditionally employed for subsistence purposes on the public lands. Although aircraft are not included within the purview of this section, reference to means "traditionally employed" for subsistence purposes is not intended to foreclose the use of new, as yet unidentified means of surface transportation, so long as such means are subject to reasonable regula-

8352

tion necessary to prevent waste or damage to fish, wildlife or terrain. The section requires the Secretary to permit such appropriate uses by local residents, and must be considered as a compliment to section 811 since the provision of access to subsistence resources would not be "appropriate" if the means of surface transportation to utilize such access is unreasonably restricted.

### Section 813: Research

This section requires the Fish and Wildlife Service and the National Park Service to work in close cooperation with each other and with the State of Alaska and other appropriate Federal agencies in conducting new and ongoing research on fish and wildlife populations utilized for subsistence purposes on the public lands, and on the subsistence use of such populations. The section requires both agencies to utilize the special knowledge of local conditions and requirements of local residents of rural villages who are dependent upon the continuation of subsistence uses in their area.

The expertise of the local committees and regional councils also is a valuable source of information about subsistence resources and uses, and the committee expects all Federal agencies engaged in subsistence related research to inform the appropriate committees and councils about research projects being planned or conducted in their respective areas and work closely with those organizations. The results and data obtained from research conducted pursuant to this section shall be made available to the State, the local committees and regional councils, and other appropriate persons and organizations. The committee also respects that research conducted pursuant to this section will be undertaken in a manner which does not disrupt the traditional activities of rural residents engaged in subsistence uses, as well as the communities and cultures of which such residents may be a part.

### Section 814: Periodic reports

Four years after the date of enactment of this Act and every three years thereafter, the Secretary of the Interior, in consultation with the Secretary of Agriculture, shall prepare and submit a report to the congress which shall include a description and evaluation of monitoring activities undertaken pursuant to section 806, the status of fish and wildlife populations on the public lands harvested for subsistence uses, a description of the nature and extent of subsistence and other uses of fish and wildlife on the public lands, a description of the role of subsistence uses in the economy and culture of rural Alaska, comments on the report by the State of Alaska, the local committees and regional councils and other appropriate persons and organizations, a description of those actions taken by the Secretary or the State, or which may need to be taken in the future to protect and continue subsistence uses on the public lands, and such other recommendations as the Secretary deems appropriate. A notice of the report shall be published in the Federal Register and the report made available to the public.

### Section 815: Regulations

This section requires the Secretary of the Interior and the Secretary of Agriculture to prescribe such regulations as are necessary and appropriate to carry out their respective responsibilities under this title.

8353

*Section 816: Limitations; savings clauses*

This section provides that nothing in this Act is intended to be construed as granting any property right in any subsistence resource on the public lands, permitting the level of subsistence uses on the public lands to significantly expand beyond the level of such uses occurring during the ten-year period before January 1, 1978, permitting any privilege which may be granted by the State to any person with respect to subsistence uses to be assigned, permitting any subsistence use of fish or wildlife on any portion of the public lands which was permanently closed to such uses on January 1, 1978, vesting elsewhere than in the Secretary any authority to manipulate habitat on any portion of the public lands, enlarging or diminishing the responsibility and authority of the State of Alaska for the management of fish and wildlife on the public lands except as specifically provided in this Act, amending the Alaska constitution, or modifying or repealing the provisions of any Federal law governing the conservation or protection of fish and wildlife.

*Section 817: Closure to subsistence uses*

This section provides that all national parks and monuments in Alaska shall be closed to the taking of wildlife except for subsistence uses to the extent specifically permitted by this Act. Subsistence and sport fishing shall be permitted in such areas in accordance with the provisions of this title and other applicable laws of the United States and the State of Alaska. Except as specifically provided in this section nothing in this title is intended to enlarge or diminish the authority of the Secretary under existing law including the Wildlife Refuge Administration Act, and the BLM Organic Act, to designate areas where, and establish periods when, no taking of fish or wildlife shall be permitted on the public lands for reasons of public safety, administration, to assure the continued viability of a particular fish or wildlife population or for other purposes. Thus, the Secretary remains empowered to authorize a more restrictive hunting season than is otherwise permitted by State law. However, in recognition of the importance of subsistence uses by rural residents of Alaska, notwithstanding any other provision of this Act or other law, subsistence uses of a particular fish or wildlife population on the public lands, and such uses by local residents within conservation system units which are open to subsistence uses (including national parks and monuments), may be prohibited on the public lands, or on any portion thereof, only temporarily for reasons of public safety, administration, or to assure the continued viability of such population.

Such a closure must be preceded by consultation with the State and adequate notice and hearing in the vicinity of the area of the closure, unless the Secretary determines that an emergency situation exists and that emergency measures must be taken to protect the public safety or the continued viability of a particular fish or wildlife population. In the latter situation, the Secretary may immediately close the public lands, or any portion thereof, to subsistence uses of a particular fish or wildlife population for a period not to exceed sixty days, which may not be subsequently extended unless the Secretary affirmatively establishes, after notice and hearing, that such an extension is justified.

8354

No closure for purposes of administration may be made prior to no-- tice and hearing in the vicinity of the area of the closure. No closure order to the taking of a fish or wildlife population for subsistence uses authorized by this section shall extend longer than necessary to achieve the immediate purpose for the closure established at the hearing held prior to the issuance of such order.

Thus, for example, while the Secretary may prohibit the taking of wildlife for subsistence uses for reasons of public safety in a certain area surrounding a public campground, roadway or hiking trail, such a closure should not be limited to any arbitrary or inflexible time period. Rather, it should remain in effect only so long as reasonably necessary to provide for the public safety during normal periods of consistent public use, and only apply to the minimum portion of the public lands reasonably necessary to achieve this purpose. Although, this section authorizes the restriction of subsistence uses for purposes of administration, recognition of the importance of sub- sistence activities to most rural residents requires that this authority be utilized narrowly and with consistent restraint. In exercising his authority to protect the continued viability of a fish or wildlife popula- tion, it is not the intent of the Committee that actual depletion of a populaion or an emergency exist before a closure under this section may be justified. Continued subsistence uses by local subsistence- dependent residents can only be maintained if the continued viability of fish and wildlife populations utilized for subsistence purposes can be maintained.

TITLE IX—IMPLEMENTATION OF ALASKA NATIVE CLAIMS. SETTLEMENT ACT AND ALASKA STATEHOOD ACT

*Section 901: Conveyances to village corporations*

This section provides for the conveyance by legislative action of surface rights to eligible Village Corporations, and in some cases, sub- surface rights to eligible Village and Regional Corporations. All conveyances made by this section are subject to valid existing rights and may be subject to public easement reservations as provided in Section 903(a).

Subsection (a) legislatively conveys land to eligible Village Cor- porations where such land is mandated by ANCSA to be selected by the Village Corporation.

Paragraph (1) conveys to a Village Corporation, found eligible by the Secretary, the surface estate to public land in its "core" township or townships. A "core" township is that township which encloses all or part of the improved area constituting the Village. The conveyance is immediate, subject to valid existing rights, and must be otherwise consistent with provisions of the ANCSA such as acreage limitations, contiguity, and location in respect to Home Rule or First-class cities.

Where two or more Villages, by reason of locality, have claim to. the same township, the conveyance is delayed until the Village Cor- porations involved agree to the division of the township, or such dis- pute is settled by arbitration (see subsection (c)).

8355

# ALASKA NATIONAL INTEREST LANDS CONSERVATION ACT OF 1978

## REPORT

OF THE

## COMMITTEE ON MERCHANT MARINE AND FISHERIES HOUSE OF REPRESENTATIVES

together with

## ADDITIONAL AND SUPPLEMENTAL VIEWS

TO ACCOMPANY

## H.R. 39

(Including the cost estimate of the Congressional Budget Office)



MAY 4, 1978.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

9676

# CONTENTS

|                                                                                    | Page |
|------------------------------------------------------------------------------------|------|
| Amendments                                                                         | 1    |
| Legislative background                                                             | 31   |
| Background and need for the legislation:                                           |      |
|     Introduction                                               | 35   |
|     National Wildlife Refuge System overview                   | 37   |
|     Proposed National Wildlife Refuge System units:            |      |
|         Alaska Maritime National Wildlife Refuge | 40 |
|         Alaska Peninsula National Wildlife Refuge | 42 |
|         Arctic National Wildlife Refuge     | 43   |
|         Becharof National Wildlife Refuge   | 47   |
|         Copper River National Wildlife Refuge | 48 |
|         Innoko National Wildlife Refuge     | 50   |
|         Kanuti National Wildlife Refuge     | 51   |
|         Kenai National Wildilfe Refuge      | 52   |
|         Kodiak National Wildlife Refuge     | 53   |
|         Koyukuk National Wildlife Refuge    | 53   |
|         North Slope National Wildlife Refuge | 54  |
|         Nowitna National Wildlife Refuge    | 56   |
|         Selawik National Wildlife Refuge    | 56   |
|         Tetlin National Wildlife Refuge     | 58   |
|         Togiak National Wildlife Refuge     | 59   |
|         Yukon Delta National Wildlife Refuge | 61  |
|         Yukon Flats National Wildlife Refuge | 63  |
|     Wilderness:                                                 |      |
|         Alaska Maritime Wilderness          | 66   |
|         Arctic Wilderness                   | 67   |
|         Becharof Wilderness                 | 68   |
|         Kanuti Wilderness                   | 68   |
|         Kenai Wilderness                    | 69   |
|         Innoko Wilderness                   | 69   |
|         Izembek Wilderness                  | 70   |
|         Selawik Wilderness                  | 70   |
|     Bristol Bay Cooperative Region                             | 70   |
|     Areas seaward of coastal refugees                          | 74   |
|     Subsistence                                                | 76   |
| Section-by-section analysis:                                                       |      |
|     Title I—Findings, policy, and definitions                  | 77   |
|     Title III—National Wildlife Refuge System                  | 77   |
|     Title VI—Designation of wilderness within the national wildlife refuge system | 86 |
|     Title VII—Subsistence                                      | 89   |
|     Title IX—Minerals assessments                              | 95   |
|     Title X—Transportation and utility systems on conservation system units | 95 |
|     Title XI—Coordination                                      | 95   |
|     Title XII—Administrative provisions                        | 95   |
|     Title XIII—Miscellaneous                                   | 96   |
| Inflationary impact statement                                                      | 96   |
| Compliance with clause 2(1)(3) of rule XI                                          | 96   |
| Congressional Budget Office cost estimate                                          | 97   |
| Departmental reports                                                               | 105  |
| Changes in existing law made by the bill, as reported                             | 105  |

(III)

9679

A-59

(d) EMERGENCY AUTHORITY.—(1) Notwithstanding any other provision of this Act or other law, the Secretary, after consultation with the State and adequate notice and public hearing, may temporarily close any public lands (including those within any conservation system unit), or any portion thereof, to subsistence uses if necessary for reasons of public safety, administration, or to assure the natural stability and continued productivity of one or more fish or wildlife populations on such lands which are subject to such uses. If the Secretary determines that an emergency situation exists and that extraordinary measures must be taken for public safety or to assure the natural stability and continued productivity of one or more fish and wildlife populations on such lands which are subject to such uses, the Secretary may immediately close the public lands, or any portion thereof, to subsistence uses and shall publish the reasons justifying the closure in the Federal Register. Such emergency closure shall be effective when made, shall not extend for a period exceeding sixty days, and may not subsequently be extended unless the Secretary affirmatively establishes, after adequate notice and public hearing, that such closure should be extended.

(2) If such notice to the State under subsection (a) or (b), the Secretary determines that extraordinary measures must be taken to protect public welfare, he may open public lands, or any portion thereof, to subsistence uses by local residents and publish the reasons justifying such action in the Federal Register. Such emergency action shall be effective when made, but shall not extend for a period of time greater than sixty days, or until such time as the threat to the public welfare which necessitated such action has been resolved, whichever time first occurs.

## COOPERATIVE ARRANGEMENTS

SEC. 706. The Secretary may enter into cooperative agreements or otherwise cooperate with other Federal agencies, the State, Native Corporations, other appropriate persons and organizations, and, acting through the Secretary of State, other nations to effectuate the purposes and policies of this title.

## SUBSISTENCE AND LAND USE DECISIONS

SEC. 707. In determining whether to withdraw, reserve, lease, or otherwise permit the use, occupancy, or disposition of public lands under any provision of law authorizing such actions, the head of the Federal agency having primary jurisdiction over such lands or his designee shall evaluate the effect of such use, occupancy, or disposition on the subsistence needs, the availability of other lands for the purposes sought to be achieved, and other alternatives which would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes. No such withdrawal, reservation,

9707

A-60

areas where it has existed in the past. The committee notes that some commercial trappers in Alaska must, by necessity, use snowmachines for access and feels that the Secretary should not prohibit the use of snowmachines by commercial trappers within Refuge wilderness areas where they have been used in the past, but he may regulate their use.

TITLE VII—SUBSISTENCE

The committee adopted a large number of amendments to title VII as reported by the Interior Committee. These amendments adopt the basic structure of title VII as reported by the Interior Committee, but make several important changes designed to ensure a workable administrative structure and a more effective State-Federal relationship in this area.

*Section 703—Definition*

The committee amended the definition of "subsistence uses" to emphasize that, with the exception of handicraft articles made from the nonedible byproducts of fish and wildlife taken for personal or family use, "subsistence uses" should not include commercial uses of fish and wildlife. It is intended with the above noted caveat that legitimate subsistence uses of wild resources shall be those involving the direct personal or family use for food, shelter, fuel, clothing, tools, or transportation.

The committee, however, recognizes that an important part of the subsistence lifestyle in Alaska involves trading, bartering, and sharing among subsistence users. The inclusion of "trade, barter or sharing among subsistence users" within the purview of the definition of accepted subsistence uses of wild, renewable resources recognizes the use of these subsistence resources by members of the traditional Native community who are dependent upon such resources for personal or family consumption, but have not participated in the actual subsistence harvest. In addition, the definition permits the trade or barter of subsistence resources by subsistence users in exchange for nonsubsistence commodities, so long as the person to whom the reserve is traded or bartered himself utilizes the resources for personal or family consumption. Nevertheless, the committee does not intend that the reference to trade or barter in the definition should permit any commercial or quaisi-commercial use of fish and wildlife resources. The reference to "customary" trading and sharing is intended to emphasize that these activities are sanctioned by this section only to the extent that they have been commonly occurring in Alaska.

The committee notes that the commercial exception for the making and selling of handicraft articles out of nonedible byproducts only applies to fish and wildlife taken for personal or family use. In other words, this provision is not intended to cover the commercial sale of articles from fish and wildlife whose edible parts have not been taken for consumption by the subsistence user or his family.

*Section 704—State regulation*

The committee amendments to section 704 authorizes the State to regulate the taking of fish and wildlife on public lands for subsistence uses by developing a subsistence management program meeting the standards specified in section 704(b).

9769

Section 704(a) authorizes the State to regulate, in a manner consistent with the policies set out in section 702, the taking of fish and wildlife on public lands for subsistence purposes. This regulatory authorization does not, however, override the other provisions of this act or of existing Federal law. The most obvious example of an existing Federal statute which remains unchanged by the language in section 704 would be the National Wildlife Refuge System Administration Act of 1966. The Secretary of the Interior's regulatory jurisdiction over the taking of fish and wildlife within national wildlife refuges would, therefore, remain unaffected by the enactment of this act. Thus, the Secretary would still be empowered to authorize a more restrictive sport hunting season within refuges than is otherwise allowed by State law. Such routine restrictions based upon the authority of the National Wildlife Refuge System Administration Act would not be required to go through the closure process outlined in section 705(c) of this title.

The standards adopted by the committee in section 704(b) parallel those in the Interior Committee version of title VII.

Thus, the State program should include the following elements:

(1) The maintenance of the natural stability and continued productivity of fish and wildlife populations. The committee feels that any State subsistence management program should seek to maintain fish and wildlife populations at healthy levels permitting a sustained yield. The committee recognizes that animal populations tend to fluctuate in the wild naturally, and the reference to "natural stability" recognizes this fact.

(2) A system capable of regulating and monitoring subsistence uses and other consumptive usese of fish and wildlife populations.

(3) A grievance procedure.

(4) The establishment of not less than five management regions. This provision is intended to insure that regional differences in subsistence uses are adequately accommodated. The upper limit of 12 regions adopted by the Interior Committee has been eliminated.

(5) State laws or regulations which—

(a) provide for the regulation of the taking of fish and wildlife by a professionally staffed agency and provide for an enforcement agency. This section recognizes that in Alaska the Department of Fish and Game has primary responsibility for the regulation of fish and game, but the department of public safety has primary enforcement responsibility. This section would permit the continuation of the present arrangement or the transfer of enforcement to the department of fish and game.

(b) provide preference for nonwasteful subsistence uses by local residents over other consumptive uses of fish and wildlife populations. The committee does not intend that this general statement of a preference for local subsistence users should be construed as authorizing different treatment of subsistence versus nonsubsistence users, except as provided in section 704(b) (5) (C).

(c) provide for the establishment of a preference system when necessary in order to reduce hunting or fishing pressure on the resource. Such a system shall be established on the basis of (i) customary and direct dependence upon the resource as the main-

9770

**A-62**

stay of livelihood, (ii) local residency, and (iii) the availability of alternative resources. This section is central to the provision of a preference for subsistence users. It recognizes that in Alaska there may be circumstances where it is necessary to restrict the taking of fish and wildlife in order to assure the continued abundance of fish and wildlife populations. This section establishes a method of restricting the taking of fish and wildlife in such circumstances while permitting those most in need of subsistence resources to continue hunting and fishing. The section also recognizes that in some cases it may be necessary to give preference to one subsistence user over another. In such a situation, preference should be given to the local user who has the greatest need for the resource. The transient subsistence user could, therefore, be precluded under a preference system from taking fish and wildlife.

(6) A system of local and regional fish and wildlife councils within each management region.

Section 704(b)(8) requires the State agency to be guided by the advice of the regional councils concerning the taking of fish and wildlife on public land within their respective region. This section makes it clear that the State agency need be guided by the advice of the councils only if such advice is supported by substantial evidence, does not violate a recognized principle of fish and wildlife conservation or is not detrimental to the satisfaction of subsistence needs.

*Section 705—Enforcement Duties of the Secretary of the Interior*

Section 705 authorizes the Secretary to take special actions to protect the fish and wildlife populations on the public lands and the ability of subsistence-dependent Alaska residents to satisfy their subsistence needs. In contrast to the Interior Committee version of title VII, the Secretary would not be authorized to suspend the State's authority to manage subsistence resources or to take over the management of those resources on the public lands. Rather, the Secretary's discretion would be limited to closing the public lands to subsistence and nonsubsistence uses under certain circumstances and opening the lands to subsistence uses by local residents under very extraordinary circumstances.

Section 705(c) authorizes the Secretary to close the public lands to all consumptive uses, except subsistence uses by local residents, if he determines that the State has either failed to develop a subsistence program or has failed to make necessary changes in the program as indicated by the Secretary pursuant to section 705(a). Before the Secretary could close public lands, however, he would have to make the further finding that the State's failure threatens the natural stability and continued productivity of the fish and wildlife populations on public lands or the ability of subsistence dependent Alaska residents to satisfy their subsistence needs. This closure could only be effective for 60 days before the Secretary would have to affirmatively establish that the State is not in compliance with this title or with its subsistence program, and that the threat to wildlife populations or to subsistence users exists.

Section 705(d) authorizes the Secretary to utilize the full extent of his constitutional authority over Native affairs and the public lands

9771

to close the public lands, including units of the conservation system, or portions thereof, to all consumptive uses, including subsistence uses for one of three reasons. First, the Secretary could close the public lands to subsistence activities for reasons of public safety. As the public's use and enjoyment of the Alaskan parks and refuges increases, so too does the potential danger to human safety resulting from subsistence hunting activities. While recognizing the importance of subsistence uses to rural people in Alaska, units of the conservation system are nevertheless of national importance and the Secretary should be empowered to accommodate subsistence activities to visitor use when warranted for reasons of public safety. Thus, for example, the Secretary might prohibit subsistence hunting within a certain area surrounding public campgrounds or hiking trails. Such restrictions would probably be necessary for as long as the public used the particular park or refuge.

The Secretary would also be authorized to restrict or prohibit subsistence activities for reasons of administration. The committee does not expect this broad authorization to be frivolously used, yet it was felt necessary to give the Secretary sufficient discretion to respond to the needs of a developing park and refuge system in Alaska. This is in addition to his regular authority to protect parks and refuges under existing law.

Finally, the Secretary would be authorized to prohibit subsistence activities in order to ensure the natural stability and continued productivity of one or more populations of fish and wildlife. This authorization merely reflects the obvious: that the subsistence needs of rural people can only be satisfied if healthy and productive populations of fish and wildlife species can be maintained. While according subsistence a priority over sport hunting and other consumptive uses, the committee recognizes that this may not always be enough to maintain a distinct population of a particular species. In such a situation, subsistence users could be required to diminish or halt their consumption of that species. This approach reflects the fact that healthy populations of fish and wildlife on public lands are a national resource of great significance and that all Americans, whether subsistence user or not, must be prepared to contribute to their preservation. This is consistent with the major purposes for the refuge system set forth in section 302.

Two final points need to be stressed concerning Secretarial closures for one of the three enumerated reasons. First, this section recognizes that any total ban on subsistence uses can have a disastrous effect on the well-being of rural Alaskans. Thus, the Secretary could only close the public lands to subsistence uses for 60 days without affirmatively establishing the need for continued closure. The committee notes that the Secretary could initially close the public lands only after providing notice of his intended action to the State and after conducting a public hearing.

Second, although located in a subsection entitled "Emergency Authority", it is not the intent of the committee that an emergency exist before the Secretary may exercise his closure authority. The prudent management of fish and wildlife resources and national parks and refuges would dictate that the Secretary be allowed to act prior to the existence of an actual emergency.

9772

Section 705 (d) (2), however, authorizes the Secretary to open public land to subsistence uses in certain very limited circumstances. In order to take this extraordinary action, the Secretary would first have to provide notice to the State. After providing the requisite notice to the State, the Secretary could open the public lands to subsistence uses by local residents if he determines that extraordinary measures must be taken to protect the public welfare. This extraordinary action could not be extended for greater than 60 days under any circumstances. The committee anticipates that this section would only be employed in very unusual situations.

It should be noted that section 705 gives the Secretary certain oversight responsibilities. Recognizing that a deficient State program can have a significant adverse impact upon subsistence users and upon populations of fish and wildlife, the committee believes that time may be of the essence in the exercise of the Secretary's responsibilities. It is, therefore, the committee's view that formal hearings on the record under the Administrative Procedure Act will be too time-consuming and cumbersome. Therefore, wherever section 705 requires the Secretary to hold a "hearing" before taking a certain action, the committee intends it to be an informal public hearing and not a formal hearing on the record under 5 U/SC § 556.

## Section 706—Cooperative Agreements

Section 706 authorizes the Secretary to enter into cooperative agreements or to otherwise cooperate with other Federal agencies, the State, Native corporations, or other appropriate persons or organizations to protect subsistence resources and uses.

## Section 707—Subsistence and Land-Use Decisions

Section 707 directs the Federal land-managing agencies to consider potential impacts on subsistence of various land-use decisions which may be taken in the future.

## Section 708—Access

Section 708 directs the Secretary to ensure that persons engaged in traditional or customary subsistence activities shall have appropriate access to subsistence resources on the public land.

## Section 709—Snowmobiles and Motorboats

Section 709 requires the Secretary to permit the appropriate use of snowmobiles and motorboats for subsistence purposes on the public lands, subject to reasonable regulations which are necessary to protect the natural values of those lands.

## Section 710—Research

Section 710 recognizes the importance of research in the effective management and protection of fish and wildlife resources and subsistence uses. The committee feels that the United States Fish and Wildlife Service is best suited to coordinate the wildlife research activities of the Federal Government, the Alaska Department of Fish and Game, the University of Alaska and other State agencies. The committee also expects both the Federal Government and the State to engage in additional research pursuant to their expanded responsi-

bilities under this title. Finally, the committee recognizes that many rural residents have special knowledge of subsistence resources which has not been fully utilized in the past in Federally sponsored research. Section 710 requires the Secretary to consult with and utilize the special knowledge of subsistence users.

### Section 711—Periodic Reports

Section 711 directs the Secretary to report to the Congress on the implementation of this title within 4 years after enactment and every 3 years thereafter.

### Section 712—Regulations

Section 712 authorizes the Secretary of the Interior and the Secretary of Agriculture to issue such regulations as may be necessary to carry out their duties under this title.

### Section 713—Other laws

Section 713 provides that this title is not intended to modify or repeal the provisions of any Federal law governing the conservation or protection of fish and wildlife. The list of laws covered by this provision includes those listed in section 713 of H.R. 39 as reported by the Interior Committee and any other appropriate Federal law.

The committee decided against compiling a long list of Federal environmental statutes dealing with fish and wildlife matters which would remain unaffected by the language of title VII. Such a compendium approach would inevitably overlook conservation statutes otherwise qualifying for exemption. In order to be all inclusive, the Committee adopted general language exempting existing Federal conservation statutes. It is, however, the clear intent of the committee that statutes like the Migratory Bird Treaty Act, 16 U.S.C. § 703 et seq., and the Marine Mammal Protection Act, 16 USC § 1361 et seq. fit within this language and are exempted from the provisions of title VII.

### Section 714—Limitations

Section 714 makes it clear that nothing in this title is to be construed as granting a property right in subsistence resources, as permitting the level of subsistence uses of fish and wildlife on the public lands to be significantly expanded beyond those occuring between January 1, 1968, and January 1, 1978, as opening to subsistence uses any public lands now closed to such uses, or as vesting elsewhere than in the Secretary any authority to manipulate habitat on any portion of the public lands. The ten-year period preceding January 1, 1978, was chosen as the benchmark period because the data base on levels of harvest are the best during these years. It was also believed that this time-period would be of sufficient length to take into account fluctuations in harvest resulting from the natural shifts in wildlife population levels.

This section recognizes that Alaska is nearly stretched to the limit in its ability to satisfy the subsistence needs of its rural residents. The committee is concerned that the rural Alaskan population will continue to increase, thereby putting even more pressure on the beleaguered wildlife population. This section is intended to set an outer limit on the level of subsistence uses in Alaska. The committee's intent is not to measure the level of future subsistence uses against the hypotheti-

9774

**A-66**

cal statistical yardstick, but rather to reflect congressional concern for the protection of the opportunity for subsistence uses by persons now residing in rural areas. Thus, what constitutes a "significant" expansion in harvest would be expected to vary from species to species. While acknowledging the need for some expansion in the level of harvest in subsequent years, the committee nevertheless feels that such expansion should not adversely affect the natural stability and continued productivity of the fish and wildlife populations in Alaska.

Thus, if increased subsistence pressures prevent a particular fish or wildlife population from expanding its numbers or maintaining its population, the provisions of this subsection would require the imposition of restrictions on subsistence activities by the State or the Secretary.

*Section 715—Reimbursement to the State*

Section 715 authorizes reimbursement to the State for not to exceed 50 percent of the costs relating to the operation of the local and regional councils established pursuant to section 704(b)(6) and requires the Secretary to ensure that payments pursuant to this section and other sums are expended in a manner consistent with the policies set forth in section 702.

## TITLE IX—MINERALS ASSESSMENTS, EXPLORATION, DEVELOPMENT, AND EXTRACTION ON CONSERVATION SYSTEM UNITS

The committee only adopted technical and conforming amendments to title IX as reported by the Interior Committee.

*Section 903—Continuation of mineral assessment programs in Alaska*

The amendment to section 903 provides that the mineral assessment program shall not apply to units of the National Wildlife Refuge System.

*Section 905—Areas subject to the mineral access process*

The amendment adopted by the committee makes a conforming change in section 905. The amendment deletes national wildlife refuges from the minerals access process and deletes any reference to the Arctic Range Special Study Area.

*Section 906—Initiation of the minerals access process by application of secretarial motion*

The amendment adopted by the committee makes a conforming change in this section to delete any references to the Arctic Range Special Study Area.

## TITLE X—TRANSPORTATION AND UTILITY SYSTEMS ON CONSERVATION SYSTEM UNITS

The committee did not adopt any amendments to title X.

## TITLE XI—COORDINATION

The committee did not adopt any amendments to title XI.

## TITLE XII—ADMINISTRATIVE PROVISIONS

The committee amendments merely make conforming changes in title XII.

9775

| BILL | DATE | PAGE(S) |
|------|------|---------|
| H.R. 39 | Jun 19, 1978 | S9383 |

ACTION

Remarks by Mr. Stevens

## RESOLUTION OF ALASKA BOARDS OF FISHERIES AND GAME

Mr. STEVENS. Mr. President, recently I have been notified of the Joint Alaska Boards of Fisheries and Game Resolution No. 78–2–JB relating to the Alaska D–2 land legislation. The Alaska Boards of Fisheries and Game find those provisions of H.R. 39 specifically addressing access to public lands, subsistence, and land designations unacceptable to the State of Alaska.

As you are well aware, I too believe the provisions of H.R. 39 as presently drafted would have adverse effects on Alaska. I have been asked to place this resolution in the record, and I ask unanimous consent to print in the RECORD the Alaska Boards of Fisheries and Game Resolution No. 78–2–JB.

There being no objection, the resolution was ordered to be printed in the RECORD, as follows:

ALASKA BOARDS OF FISHERIES AND GAME RESOLUTION No. 78–2–JB RELATING TO 17(d) (2) LEGISLATION

Whereas 17(d) (2) legislation (HR 39) has passed the House Interior and Insular Affairs Committee; and

Whereas the House Merchant Marine and Fisheries Committee is considering this bill; and

Whereas Senator Gravel has drafted proposed legislation with major titles similar to those in HR 39; and

Whereas the Senate Energy and Natural Resources Committee will be preparing for mark-up sessions on (d) (2); and

Whereas 17(d) (2) legislation involves critical provisions relative to the State of Alaska and states' abilities to manage state fish and wildlife resources

Now therefore, the Alaska Boards of Fisheries and Game hereby resolve that the following provisions of HR 39 as now drafted are unacceptable to the State of Alaska:

1. Access to public lands and waters, including easements;

2. Fish and wildlife management provisions including those on subsistence which essentially supplant an integrated statewide management system with a fragmented system under federal government direction;

3. Excessive land designations that are closed or restrict hunting, fishing, trapping, and other recreational pursuits in much of the critical acreage of the State.

Be it further resolved, That the Boards of Fisheries and Game hereby direct the Department of Fish and Game to provide copies of this resolution with supporting information to all Fish and Game Advisory Committees in Alaska requesting their immediate consideration and action in the form of resolutions to be directed to Alaska's Governor and Congressional representatives.

Be it further resolved, That the Boards of Fisheries and Game request Governor Hammond, Senator Stevens, Senator Gravel, and Congressman Young to accept no compromise which in any way infringes upon the authority of the State of Alaska to manage the fish and wildlife within its boundaries.

GORDON JENSEN, Chairman,
Alaska Boards of Fisheries and Game.

Date: April 7, 1978, Anchorage, Alaska.

9196

A-68

95TH CONGRESS
2D SESSION

# H. R. 39

## IN THE SENATE OF THE UNITED STATES

MAY 23 (legislative day, MAY 17), 1978
Received

JUNE 8 (legislative day, MAY 17), 1978
Read twice and referred to the Committee on Energy and Natural Resources

# AN ACT

To designate certain lands in the State of Alaska as units of the National Park, National Wildlife Refuge, National Wild and Scenic Rivers, and National Wilderness Preservation Systems, and for other purposes.

1    *Be it enacted by the Senate and House of Representa-*

2  *tives of the United States of America in Congress assembled,*

3       SHORT TITLE AND TABLE OF CONTENTS

4       SECTION 1. This Act, together with the following table

5  of contents, may be cited as the "Alaska National Interest

6  Lands Conservation Act".

II—O

9207

## TABLE OF CONTENTS

Sec. 1. Short title and table of contents.

### TITLE I—FINDINGS, POLICY, AND DEFINITIONS

Sec. 101. Findings.
Sec. 102. Policy.
Sec. 103. Definitions.

### TITLE II—NATIONAL PARK SYSTEM

Sec. 201. Establishment of new areas.
Sec. 202. Additions to existing areas.
Sec. 203. Administrative provisions.

### TITLE III—NATIONAL WILDLIFE REFUGE SYSTEM

Sec. 301. Definitions.
Sec. 302. Purposes of refuges.
Sec. 303. Administration of refuges.
Sec. 304. Establishment of refuges.
Sec. 305. Cooperative management agreements.
Sec. 306. Bristol Bay Cooperative region.
Sec. 307. Barren Ground Caribou Study.
Sec. 308. Miscellaneous provisions.

### TITLE IV—NATIONAL FOREST SYSTEM

Sec. 401. Additions to national forests.

### TITLE V—NATIONAL WILD AND SCENIC RIVERS SYSTEM

Sec. 501. Additions to the National Wild and Scenic Rivers System.
Sec. 502. Potential additions.
Sec. 503. Administrative provisions.
Sec. 504. Wulik River.

### TITLE VI—DESIGNATION OF WILDERNESS AND WILDER-NESS STUDY WITHIN UNITS OR ADDITIONS TO UNITS OF THE NATIONAL PARK, NATIONAL WILDLIFE REFUGE, AND NATIONAL FOREST SYSTEMS

Sec. 601. Findings and purposes.
Sec. 602. Designation of wilderness within the National Park System.
Sec. 603. Designation of wilderness study within units of the National Park System.
Sec. 604. Designation of wilderness within the National Wildlife Refuge System.
Sec. 605. Wilderness reviews within conservation system units other than National Park System units.
Sec. 606. Designation of wilderness within the National Forest System.
Sec. 607. Special provisions.
Sec. 608. Administration.
Sec. 609. Acquisition authority.

9208

TABLE OF CONTENTS—Continued

TITLE VII—SUBSISTENCE

Sec. 701. Findings.
Sec. 702. Policy.
Sec. 703. Definition.
Sec. 704. State regulation.
Sec. 705. Enforcement duties of the Secretary.
Sec. 706. Cooperative arrangements.
Sec. 707. Subsistence and land use decisions.
Sec. 708. Access.
Sec. 709. Snowmobiles and motorboats.
Sec. 710. Research.
Sec. 711. Periodic reports.
Sec. 712. Regulations.
Sec. 713. Other laws.
Sec. 714. Limitations.
Sec. 715. Reimbursement to the State.

TITLE VIII—IMPLEMENTATION OF ALASKA NATIVE CLAIMS SETTLEMENT ACT AND ALASKA STATE-HOOD ACT

Sec. 801. Conveyances to village corporations.
Sec. 802. Other conveyances to Native Corporations.
Sec. 803. Administrative provisions.
Sec. 804. Tax moratorium extension.
Sec. 805. State selections and conveyances.
Sec. 806. Alaska Native Land Bank.
Sec. 807. Protection of Native Lands in contingency areas under timber sales.
Sec. 808. Use of protraction surveys.
Sec. 809. Action to enforce; jurisdiction.
Sec. 810. National Environmental Policy Act.
Sec. 811. Technical amendments to Public Law 94-204.

TITLE IX—TRANSPORTATION AND UTILITY SYSTEMS ON CONSERVATION SYSTEM UNITS

Sec. 901. Purposes.
Sec. 902. Use permits under existing authorities.
Sec. 903. Use permits under new authority.
Sec. 904. Coordination of right-of-way requirements.
Sec. 905. Congressional approval procedure.
Sec. 906. Issuance of permits.

TITLE X—COORDINATION

Sec. 1001. Alaska Advisory Coordinating Council.
Sec. 1002. Functions of the council.
Sec. 1003. Cooperative agreements.
Sec. 1004. Termination.

9209

4

TABLE OF CONTENTS—Continued

TITLE XI—ADMINISTRATIVE PROVISIONS

Sec. 1101. Land acquisitions and exchanges.
Sec. 1102. Access.
Sec. 1103. Archeological and paleontological sites.
Sec. 1104. Cooperative information centers.
Sec. 1105. Administrative sites and visitor facilities.
Sec. 1106. Revenue-producing visitor services.
Sec. 1107. Local hire.
Sec. 1108. Management plans.
Sec. 1109. Taking of fish and wildlife.
Sec. 1110. Maps.
Sec. 1111. Major Federal actions.
Sec. 1112. Congressional review.

TITLE XII—MISCELLANEOUS

Sec. 1201. Iditarod National Historic Trail.
Sec. 1202. Klondike Gold Rush National Historical Park.
Sec. 1203. Navigation aids and other facilities.
Sec. 1204. Amendments to Naval Petroleum Reserves Production Act of
        1976.
Sec. 1205. Withdrawals; mineral rights.
Sec. 1206. Scenic highway study.
Sec. 1207. Bureau of Land Management Land Reviews.
Sec. 1208. Alaska Natural Gas Transportation Act.
Sec. 1209. Authorization for appropriation.

TITLE XIII—MINERALS ASSESSMENTS, EXPLORATION, DE-
    VELOPMENT, AND EXTRACTION ON CONSERVATION
    SYSTEM UNITS

Sec. 1301. Purposes.
Sec. 1302. Continuation of mineral assessment programs in Alaska.
Sec. 1303. Presidential report.

1    TITLE I—FINDINGS, POLICY, AND DEFINITIONS

2                        FINDINGS

3        SEC. 101. Congress finds and declares that—

4            (1) through passage of the Alaska Statehood Act

5        and the Alaska Native Claims Settlement Act, the Con-

6        gress established policies for the disposition of the public

7        lands in Alaska and provided for future economic, social,

8        and cultural development in Alaska and for the fair and

9        just settlement of claims of Natives and Native groups

9210

1 in volume, species, grade, and accessibility for timber on
2 relevant lands within such units.

ACQUISITION AUTHORITY

4 SEC. 609. The Secretary of Agriculture is authorized, in
5 accordance with the provisions of section 1101, to acquire
6 privately owned land within the boundary of any area desig-
7 nated as wilderness within the national forest by this Act.

TITLE VII—SUBSISTENCE

FINDINGS

10 SEC. 701. The Congress finds and declares that—

11 (1) the continuation of the opportunity for subsist-
12 ence uses by Natives of Alaska on the public lands and
13 on their Native lands is essential to their physical, eco-
14 nomic, and cultural existence;

15 (2) the continuation of the opportunity for subsist-
16 ence uses by some other residents of the State of Alaska
17 on the public lands is essential to their physical, eco-
18 nomic, and traditional existence;

19 (3) the situation in Alaska is unique in that, in
20 most cases, no practical alternative means are available
21 to replace the food supplies and other items gathered
22 from fish and wildlife which supply persons dependent
23 on subsistence uses;

24 (4) continuation of the opportunity for subsistence
25 uses of resources on public and other lands in Alaska is

9309

1    threatened by the increasing population of Alaska, with

2    resultant pressure on subsistence resources, by sudden

3    decline in the populations of some wildlife species which

4    are crucial subsistence resources, by increased accessibil-

5    ity of remote areas containing subsistence resources, and

6    by taking of fish and wildlife in a manner inconsistent

7    with recognized principles of fish and wildlife

8    management;

9    (5) in order to fulfill the policies and purposes of

10    the Alaska Native Claims Settlement Act, and as a

11    matter of equity, it is necessary for the Congress to

12    invoke its constitutional authority over Native affairs

13    and over management of the public lands to protect and

14    provide for continued subsistence uses on public lands

15    by Alaska Natives and other Alaska residents; and

16    (6) the national interest in the proper regulation,

17    protection, and conservation of fish and wildlife on the

18    public lands in Alaska and the continuation of the op-

19    portunity for a subsistence way of life by the inhabitants

20    of Alaska require that an administrative structure be

21    established for the purpose of enabling people who have

22    personal knowledge of local conditions and require-

23    ments to have a meaningful role in the management

24    of fish and wildlife and of subsistence uses on the public

25    lands in Alaska.

9310

/

1

2  SEC. 702. It is hereby declared to be the policy of

3  Congress that—

4      (1) management policies on the public lands in

5  Alaska are to cause the least adverse impact possible on

6  rural people who traditionally and consistently depend

7  upon subsistence uses of the resources of such lands;

8  consistent with management of fish and wildlife in ac-

9  cordance with recognized scientific principles and the

10  purposes for which each conservation system unit is

11  established, designated, or expanded by or pursuant to

12  this Act, the purpose of this title is to provide the oppor-

13  tunity for people engaged in a genuinely subsistence-

14  oriented lifestyle to continue to do so if they desire and

15  to allow such people to decide for themselves their own

16  degree of subsistence dependency and the rate at which

17  acculturation or adjustment to a nonsubsistence way of

18  life may take place;

19      (2) nonwasteful subsistence use of fish and wildlife

20  and other renewable resources shall be the first priority

21  consumptive use of all such resources on the public lands

22  of Alaska, and where it is necessary to restrict taking in

23  order to assure the natural stability and continued pro-

24  ductivity of a fish or wildlife resource or the continuation

25  of subsistence uses of such resource, the taking of such

9311

1      resource for nonwasteful subsistence uses shall be given

2      preference on the public lands over recreational, sport,

3      or other consumptive uses; and

4         (3) except as otherwise provided by this Act or

5      other Federal laws, Federal land managing agencies, in

6      managing subsistence activities on the public lands and

7      in protecting the continued viability of all wild renew-

8      able resources in Alaska, shall cooperate with adjacent

9      landowners and land managers, including Native cor-

10     porations, appropriate State and Federal agencies, and

11     other nations.

12                 DEFINITION

13     SEC. 703. As used in this Act, the term "subsistence

14   uses" means the noncommercial (except as provided under

15   paragraph (2)) customary and traditional utilization with-

16   in the State of wild, renewable resources for—

17         (1) direct personal or family use for food, shelter,

18     fuel, clothing, tools, or transportation;

19         (2) the making and selling of handicraft articles

20     (including clothing), but only out of nonedible by-

21     products of fish and wildlife taken for such personal

22     or family use; or

23         (3) customary trade, barter, or sharing among

24     subsistence users for personal or family use.

9312

SEC. 704. IN GENERAL.—Except as otherwise provided
by this Act and other Federal laws, the State may regu-
late, in a manner consistent with the policies set forth in
section 702, the taking of fish and wildlife on public
lands for subsistence uses by developing and implement-
ing a subsistence management program which meets the
requirements set forth in subsection (b).

(b) STATE PROGRAM REQUIREMENTS.—The subsist-
ence management program of the State shall include at
least the following elements:

(1) The maintenance of the natural stability and
continued productivity of fish and wildlife popula-
tions which are on public lands and which are the
subject of subsistence uses.

(2) A system capable of regulating and monitoring
subsistence uses and other consumptive uses of such
populations to ensure that timely and appropriate
State action will be taken to carry out the purposes
and policies of this title.

(3) A grievance procedure whereby any local coun-
cil or regional council, required to be established under
paragraph (6), which determines that the State is not
in compliance, in whole or in part, with the State
subsistence management program can obtain timely

9313

A-77

1      review of such determination by, and obtain appro-

2      priate relief from, the State agency referred to in

3      paragraph (5) (A) or any other State rulemaking

4      authority.

5      (4) The establishment of not less than five man-

6      agement regions which, taken together, shall include

7      all public lands where the State is exercising regu-

8      latory authority under this title. The number and bound-

9      aries of the management regions shall be sufficient to

10      assure that regional differences in subsistence uses are

11      adequately accommodated.

12      (5) State laws or regulations which—

13      (A) provide for the regulation by a profes-

14      sionally staffed agency of the taking of fish and

15      wildlife populations on the public lands for sub-

16      sistence uses, provide that such agency have an

17      administrative structure compatible with the pro-

18      visions of this section, and provide for an agency

19      which has adequate enforcement authority;

20      (B) provide preference for nonwasteful sub-

21      sistence uses by local residents over other con-

22      sumptive uses of fish and wildlife populations on

23      the public lands; and

24      (C) provide, whenever it is necessary to re-

25      strict the taking of such populations on public lands

9314

1    for subsistence uses in order to protect their natural

2    stability and continued productivity, or to continue

3    such uses, for the establishment of appropriate re-

4    strictions and limitations on, and preferences for,

5    such uses which shall be based on—

6        (i) customary and direct dependence upon

7    the populations as the mainstay of livelihood,

8        (ii) local residency, and

9        (iii) the availability of alternative re-

10    sources.

11    (6) A system of local and regional fish and

12    wildlife councils within each management region

13    established pursuant to paragraph (4). Each regional

14    council shall be composed of residents of the region con-

15    cerned and shall have the following functions:

16    (A) The review, development, and evaluation

17    of proposals for regulations, policies, management

18    plans, and other matters relating to the conserva-

19    tion and utilization of fish and wildlife within

20    such region.

21    (B) The provision of a forum for the expres-

22    sion of opinions and recommendations by persons

23    interested in any phase of fish and wildlife conserva-

24    tion and utilization.

25    (C) The taking of appropriate action to ensure

9315

1 local and regional participation in the decision-
2 making process affecting the taking of fish and
3 wildlife populations on public lands within the
4 region for subsistence uses.

5 (D) The preparation of a recommended sub-
6 sistence management plan for such region which
7 shall be submitted to the State agency referred
8 to in paragraph (5) (A). The plan shall be updated
9 annually and shall contain—

10 (i) an identification of current and antici-
11 pated subsistence uses of fish and wildlife popu-
12 lations within the region;

13 (ii) an evaluation of current and antici-
14 pated subsistence needs for fish and wildlife
15 populations within the region;

16 (iii) a recommended strategy for the man-
17 agement of fish and wildlife populations to
18 accommodate such subsistence uses and needs;
19 and

20 (iv) recommendations concerning policies,
21 standards, guidelines, and regulations necessary
22 to implement the plan.

23 The local councils within each management region shall
24 provide advice to, and shall assist, the regional council

9316

1    with respect to carrying out the functions set forth in

2    this paragraph.

3       (7) The assignment of adequate and necessary

4    qualified staff to the regional councils and the timely

5    distribution of all available relevant technical and scien-

6    tific support data to the local councils and regional

7    councils.

8       (8) A requirement that the State agency referred

9    to in paragraph (5) (A) or any other State rulemaking

10    authority shall be guided by the advice and recommen-

11    dations of the regional councils concerning the taking of

12    fish and wildlife populations on public lands within their

13    respective regions for subsistence uses and shall imple-

14    ment such recommendations unless the agency or author-

15    ity, after a public hearing, determines that any such

16    recommendation is not supported by substantial evidence

17    presented at the hearing, violates recognized scientific

18    principles of fish and wildlife conservation, or would be

19    detrimental to the satisfaction of subsistence needs.

20    ENFORCEMENT DUTIES OF THE SECRETARY

21    SEC. 705. (a) REVIEW BY THE SECRETARY.—The

22    Secretary shall monitor the State subsistence management

23    program and the implementation of such program. If the

24    Secretary, after notice and hearing, determines that the

25    program or its implementation is not in compliance with

9317

A-81

1 this title, the Secretary shall so notify the State and shall

2 indicate changes in the program or its implementation

3 which he considers necessary to bring the State into

4 compliance.

5     (b) REVIEW BY LOCAL AND REGIONAL COUNCILS.—

6 If a local council or regional council required to be estab-

7 lished under section 704 (b) (6) determines that the State

8 is not in compliance, in whole or in part, with the State

9 subsistence management program, such council shall notify

10 the Secretary in writing outlining the factual basis for

11 such determination and detailing efforts which have been

12 made to obtain timely relief through the grievance pro-

13 cedure referred to in section 704 (b) (3). If the Secretary

14 finds that based upon the representations of the council

15 there is cause to believe that the State is not in compliance,

16 in whole or in part, with the State program and that such

17 council has failed to obtain timely relief through the State

18 grievance procedure, he shall investigate and report pub-

19 licly on the results of his investigation. If such results

20 support the contention of the council, the Secretary shall

21 so notify the State and shall indicate changes in its pro-

22 gram or its implementation which he considers necessary

23 to bring the State into compliance.

24     (c) HEARINGS AND CLOSURES.—If the State fails—

25         (1) to implement a subsistence management pro-

9318

A-82

1    gram within eighteen months after the date of the
2    enactment of this Act or by such later date as the
3    Secretary deems reasonable; or

4        (2) to make, after a reasonable date, the changes
5        in the subsistence management program or its imple-
6        mentation as indicated by the Secretary under sub-
7        section (a) or (b);

8    and the Secretary determines that such failure threatens
9    the natural stability and continued productivity of the
10   fish and wildlife populations on public lands in the area
11   concerned, or the ability of subsistence-dependent Alaska
12   residents in such area to satisfy their subsistence needs,
13   the Secretary may close the public lands in such area to all
14   consumptive uses except subsistence uses by local residents.
15   The Secretary shall afford the State an opportunity to appeal
16   such closure. Within thirty days after receipt of notice of
17   such appeal, the Secretary shall afford the State a public
18   hearing and, within thirty days after such hearing, shall
19   make his final decision on such appeal. Unless the Secretary
20   affirmatively establishes that the State is not in compliance
21   with this title or with subsistence management program, and
22   that the resulting threat determined under the preceding sen-
23   tence exists, the Secretary shall revoke the closure. If the
24   Secretary establishes that the State is not in such compli-
25   ance, and that such resulting threat does exist, he may con-

1 tinue the closure, in whole or in part, until the State adopts

2 measures complying with the Secretary's determination, or

3 until such threat is otherwise ameliorated.

4     (d) EMERGENCY AUTHORITY.—(1) Notwithstanding

5 any other provision of this Act or other law, the Secre-

6 tary, after consultation with the State and adequate

7 notice and public hearing, may temporarily close any

8 public lands (including those within any conservation

9 system unit), or any portion thereof, to subsistence uses

10 if necessary for reasons of public safety, administration,

11 or to assure the natural stability and continued productivity

12 of one or more fish or wildlife populations on such lands

13 which are subject to such uses. If the Secretary determines

14 that an emergency situation exists and that extraordinary

15 measures must be taken for public safety or to assure the

16 natural stability and continued productivity of one or more

17 fish and wildlife populations on such lands which are subject

18 to such uses, the Secretary may immediately close the public

19 lands, or any portion thereof, to subsistence uses and shall

20 publish the reasons justifying the closure in the Federal

21 Register. Such emergency closure shall be effective when

22 made, shall not extend for a period exceeding sixty days,

23 and may not subsequently be extended unless the Secretary

24 affirmatively establishes, after adequate notice and public

25 hearing, that such closure should be extended.

9320

1    (2) If after notice to the State under subsection (a) or
2  (b), the Secretary determines that extraordinary measures
3  must be taken to protect public welfare, he may open public
4  lands, or any portion thereof, to subsistence uses by local
5  residents and publish the reasons justifying such action in
6  the Federal Register. Such emergency action shall be effec-
7  tive when made, but shall not extend for a period of time
8  greater than sixty days, or until such time as the threat to
9  the public welfare which necessitated such action has been
10  resolved, whichever time first occurs.

11                COOPERATIVE ARRANGEMENTS

12    SEC. 706. The Secretary may enter into cooperative
13  agreements or otherwise cooperate with other Federal
14  agencies, the State, Native Corporations, other appropriate
15  persons and organizations, and, acting through the Secre-
16  tary of State, other nations to effectuate the purposes and
17  policies of this title.

18          SUBSISTENCE AND LAND USE DECISIONS

19    SEC. 707. In determining whether to withdraw, re-
20  serve, lease, or otherwise permit the use, occupancy, or
21  disposition of public lands under any provision of law
22  authorizing such actions, the head of the Federal agency
23  having primary jurisdiction over such lands or his desig-
24  nee shall evaluate the effect of such use, occupancy, or
25  disposition on the subsistence needs, the availability of

932ᵢ

1 other lands for the purposes sought to be achieved, and

2 other alternatives which would reduce or eliminate the

3 use, occupancy, or disposition of public lands needed for

4 subsistence purposes. No such withdrawal, reservation,

5 lease, permit, or other use, occupancy, or disposition of

6 such lands which would significantly restrict subsistence

7 uses shall be effected until the head of such Federal

8 agency—

9     (1) gives notice to the State agency referred to

10     in section 704 (b) (5) and the appropriate local coun-

11     cils and regional councils required to be established

12     under section 704 (b) (6) if such councils have been

13     established,

14     (2) gives notice of, and holds, a hearing in the

15     vicinity of the area involved, and

16     (3) determines that (A) such a significant restric-

17     tion of subsistence uses is necessary, consistent with

18     sound management principles for the utilization of the

19     public lands, (B) the proposed activity will involve the

20     minimal amount of public lands necessary to accomplish

21     the purposes of such use, occupancy, or other disposition,

22     and (C) adequate steps will be taken to minimize

23     adverse impacts upon subsistence uses and resources

24     resulting from such actions.

9322

1    ACCESS

2    SEC. 708. The Secretary shall ensure that persons en-
3  gaged in traditional or customary subsistence activities shall
4  have appropriate access to subsistence resources on the public
5  lands.

6    SNOWMOBILES AND MOTORBOATS

7    SEC. 709. Notwithstanding any other provision of this
8  Act or other law, the Secretary shall permit on the public
9  lands appropriate use for subsistence purposes of snow-
10  mobiles, motorboats, and other means of surface transpor-
11  tation traditionally employed for such purposes, subject to
12  such regulations as are necessary to prevent abuse, waste,
13  or damage to fish and wildlife, habitat, or other natural
14  values.

15    RESEARCH

16    SEC. 710. The Secretary of the Interior, acting through
17  the United States Fish and Wildlife Service and in coopera-
18  tion with the State and other appropriate Federal agencies,
19  shall undertake research on fish and wildlife and subsistence
20  activities on the public lands, seek data from, consult with
21  and utilize the special knowledge of subsistence users; and
22  make the results of such research available to the State,
23  the local councils and regional councils required to be es-
24  tablished under section 704 (b) (6), subsistence users, and
25  other appropriate persons and organizations.

9323

PERIODIC REPORTS

SEC. 711. Within four years after the date of the enactment of this Act, and within every three-year period thereafter, the Secretary of the Interior, in consultation with the Secretary of Agriculture, shall prepare and submit a report to the President of the Senate and the Speaker of the House of Representatives on the implementation of this title. The report shall include—

(1) an evaluation of the results of the monitoring undertaken by the Secretary as required by section 705 (a) ;

(2) the status of fish and wildlife populations on public lands that are subject to subsistence uses;

(3) a description of the nature and extent of subsistence uses and other uses of fish and wildlife on the public lands;

(4) the role of subsistence uses in the economy and culture of rural Alaska;

(5) comments on the Secretary's report by the State, the local councils and regional councils required to be established under section 704 (b) (6), and other appropriate persons and organizations;

(6) a description of those actions taken, or which may need to be taken in the future, to permit the con-

9324

1     tinuation of activities relating to subsistence uses on

2     the public lands; and

3         (7) such other recommendations the Secretary

4     deems appropriate.

5 A notice of the report shall be published in the Federal

6 Register and the report shall be made available to the

7 public.

8                 REGULATIONS

9     SEC. 712. Each Secretary shall each prescribe such regu-

10 lations as are necessary and appropriate to carry out their

11 respective responsibilities under this title.

12                 OTHER LAWS

13     SEC. 713. Nothing in this title shall be deemed to

14 modify or repeal the provisions of any Federal law govern-

15 ing the conservation or protection of fish and wildlife.

16                 LIMITATIONS

17     SEC. 714. (a) NO PROPERTY RIGHT; LEVELS OF

18 USE.—Nothing in this title shall be construed as granting

19 any property right in any fish or wildlife or other resource

20 of the public lands or as permitting the level of subsistence

21 uses of fish and wildlife on such lands to be significantly ex-

22 panded beyond the level of such uses occurring during the

23 ten-year period before January 1, 1978. No privilege which

24 may be granted by the State to any individual with respect to

9325

A-89

1 subsistence uses under the State subsistence management pro-
2 gram may be assigned to any other individual.

3     (b) CLOSED AREAS; HABITAT.—Nothing in this title
4 shall be construed as permitting any subsistence use of
5 the resources of any portion of the public lands (whether
6 or not within any conservation system unit) if any such
7 use was not permitted on the date of the enactment of
8 this Act or as vesting elsewhere than in the Secretary any
9 authority to manipulate habitat on any portion of the pub-
10 lic lands.

11     REIMBURSEMENT TO THE STATE

12     SEC. 715. (a) AUTHORITY.—The Secretary of the In-
13 terior may reimburse the State wildlife agency, from funds
14 appropriated to the Department of the Interior, for reason-
15 able costs relating to the establishment and operation of the
16 local councils and regional councils required to be established
17 under section 704 (b) (6). Such reimbursement may not
18 exceed 50 per centum of such costs in any fiscal year. Such
19 costs shall be verified in a statement which the Secretary
20 determines to be adequate and accurate. Sums paid under
21 this section shall be in addition to any grants, payments, or
22 other sums to which the State is entitled from appropria-
23 tions to the Department of the Interior. The Secretary shall
24 ensure that such grants, payments, or other sums are ex-

9326

1 pended in a manner consistent with the policies set forth in
2 section 702.

3     (b) LIMITATION.—Total payments to the State under
4 this section shall not exceed the sum of $5,000,000 in any
5 one fiscal year.

6     (c) REVIEWS.—The Secretary of the Interior shall
7 periodically review the financial aspects of implementing
8 the State program and shall advise the Congress at least
9 once in every five years as to whether or not the maximum
10 amount of payments specified in subsection (b) is adequate
11 for proper implementation of the State program.

12 TITLE VIII—IMPLEMENTATION OF ALASKA
13     NATIVE CLAIMS SETTLEMENT ACT AND
14     ALASKA STATEHOOD ACT

15     CONVEYANCES TO VILLAGE CORPORATIONS

16     SEC. 801. (a) "CORE" TOWNSHIPS, ETC.—(1) Ex-
17 cept to the extent that conveyance of a surface estate would
18 be inconsistent with section 22 (l) of the Alaska Native
19 Claims Settlement Act, there is hereby conveyed to and
20 vested in each Village Corporation for a Native village
21 which is determined to be eligible for land under section 11
22 or 16 of the Alaska Native Claims Settlement Act all of the
23 right, title, and interest of the United States in and to the
24 surface estate in the township or townships withdrawn pur-
25 suant to section 11 (a) (1) (A) or 16 (a) of such Act in

9327

**A-91**